**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

RECEIVED
SDNY PRO SE OFFICE
2023 MAR -9  PM 1: 26

---

RICHARD ARJUN KAUL, MD;
DAVID BASCH, MD;
JANE DOE; JOHN DOE.

v.                                                          CIVIL ACTION: NO.:

INTERCONTINENTAL EXCHANGE; GEICO;                            COMPLAINT
TD BANK; ALLSTATE INSURANCE COMPANY;
FEDERATION STATE MEDICAL BOARDS; ARTHUR HENGERER
(in his personal and official capacity);
CHRISTOPHER J. CHRISTIE; DANIEL STOLZ;
ATLANTIC HEALTH SYSTEM; ROBERT HEARY;
PHILIP MURPHY (in his official capacity)
GURBIR GREWAL (in his personal and official capacity)
RIVKIN RADLER LAW FIRM; MAX GERSENOFF;
JANE DOE; JOHN DOE.

---

2

## Parties

### Plaintiffs

1. RICHARD ARJUN KAUL, MD – 24 Washington Valley Road, Morristown, NJ 07960: 973 876 2877: DRRICHARDKAUL@GMAIL.COM.
2. DAVID BASCH, MD – 90 S Sparta Ave, Sparta, NJ 07871: 201 396 0346: dbbortho@yahoo.com.

### Defendants

1. INTERCONTINENTAL EXCHANGE – 11 Wall Street, New York, NY 10005.
2. GEICO INSURANCE COMPANY – 5260 Western Avenue, Chevy Chase, MD 20815.
3. TD BANK - 1701 Marlton Pike East, Suite 200, Cherry Hill, NJ 08003.
4. ALLSTATE INSURANCE COMPANY – Attention Thomas Wilson, 2775 Sanders Road, Northbrook, Illinois 60062.
5. FEDERATION STATE MEDICAL BOARDS - 400 Fuller Wiser Rd, Suite 300, Euless, TX 76039.
6. ARTHUR HENGERER – 2365 S CLINTON AVENUE, ROCHESTER, NY 14618.
7. CHRISTOPHER J. CHRISTIE – 2nd Floor, 36th Street Capital, Maple Avenue/Dehart Street, Morristown, NJ 07960.
8. DANIEL STOLZ – 60 Christy Drive, Warren, NJ 07059-6833.
9. ATLANTIC HEALTH SYSTEM – 475 South Street, Morristown, NJ 07960-6459.
10. ROBERT HEARY – 1 Bay Avenue, Suite 5, Montclair, NJ 07042.
11. PHILIP MURPHY – c/o NJ AG, 25 Market Street, Trenton, NJ 08611.
12. GURBIR GREWAL – c/o Securities + Exchange Commission, 100 F St NE, Washington, DC 20549.
13. RIVKIN RADLER LAW FIRM – 477 Madison Avenue, Suite 410, NY, NY 10022
14. MAX GERSENOFF – 477 Madison Avenue, Suite 410, NY, NY 10022

# Preliminary Statement

1. K11-10 exposes the corruption of the United States of America by global publicly traded for-profit corporations, through the ruthless exploitation of the American public, medical profession/legal professions, and state/federal politicians, and through the perpetration of massive schemes of racketeering, that have caused, and continue to cause the wrongful deaths/incarceration of millions of innocent Americans.

2. K11-10 exposes the inner machinations of these schemes and seeks to: **(i)** effectuate regulatory and political reformation; **(ii)** to cause the perpetrators of such tyranny to be monetarily penalized; **(iii)** to re-distribute their wealth amongst the victims of their tyrannical corporate greed.

3. This case (K11-10) places before this Court, a body of evidence that has, since the illegal order of dismissal of K11-7 (Kaul/Basch v ICE: 21-CV-06992) on September 12, 2022, expanded to include further evidence of the Defendants **"ongoing pattern of racketeering"** within the for-profit system of state/corporate entities involved in the multi-billion dollar enterprise of so called physician regulation/discipline, a system of oppression and human rights violation, at the head of which sits the **"Federation-Cartel" ("FC")**.

4. **The Kaul Cases** Defendants, in a period from 2016 to 2022, have, through schemes of judicial/political corruption, prevented this body of claim conclusive evidence from being submitted to a jury in America. The evidence remains admitted and substantiates a concerted and knowing **"pattern"** of human/constitutional rights violations, whose origins extend back to March 2005, when Kaul invented and successfully performed the first outpatient minimally invasive spinal fusion. That **"pattern"** has brought together the worlds of medicine, law, business, and politics, and has been conducted through judicial/administrative/financial/governmental agencies, and is, at its core, and as often described by U.S.D.J. Mark Wolf, a scheme of **"grand corruption"**, the type for which Judge Wolf has proposed an international anti-corruption court.

5. K11-7 was filed on August 19, 2021, and assigned to U.S.D.J. Oetken, a seemingly fair-minded jurist with an apparently impeccable reputation. U.S.D.J. Oetken did not transfer the case to the District of New Jersey, as had occurred with the majority of cases filed by Kaul, but instead permitted it to advance to briefing. The final case submission was on February 14, 2022, after which the matter remained dormant until September 12, 2022, when U.S.D.J. Oetken entered an opinion/order of dismissal with prejudice and an injunction seeking, effectively, to prevent the Plaintiffs from ever having the opportunity to place the evidence before an American jury. The opinion/order is both intrinsically and extrinsically fraudulent, in that it fails, as must a legitimate opinion, to address the Plaintiffs arguments, and is an admitted product of fraud, in that U.S.D.J. Oetken has tacitly admitted to having received bribes and conspiring with the Defendants and or their agents. There evidently came a point-in-time when the Defendants' threats and or promises caused U.S.D.J. Oetken to sacrifice for personal gain, his noble commitment to a highly consequential and historic case. Plaintiffs have reported his misconduct to regulatory authorities (**Exhibit 1**). U.S.D.J. Oetken's fraud in K11-7 is part of a **"pattern"** that has been reported in other cases.

6. The law neither recognizes, nor provides for orders that are either procured through fraud or are themselves fraudulent, but does indeed encourage aggrieved persons to have such orders rendered null and void:

**"... Where it can be proved that a judgment of a court was obtained by fraud ... An independent action to set the judgment aside brought in the same court or a different court ... The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud ..."** (Hazel-Atlas Glass Co. v. Hartford Empire Co. [322 U.S. 238 (1944)]. (**Exhibit 1**).

7. K11-10 constitutes an **"independent action"**, whose evidential foundation includes facts of offense/injury neither present nor in existence in K11-7, and as such represent **"new racketeering injuries"** that contribute to the basis for this action. The Plaintiffs did not appeal the September 12, 2022, order, and thus there exists no appellate restriction.

8. The September 12, 2022, order is without any legal foundation, in that the citations on which it principally rests were dismantled/differentiated by the Plaintiffs, and that this differentiation was never contested by the Defendants nor addressed by U.S.D.J. Oetken, and thus became tacitly admitted (**K11-7: D.E. 171**).

9. Since the fraudulent September 12, 2022, order, Kaul has continued to sustain and be caused **"new"** injury to his economic standing/reputation/liberty/livelihood. This action, in conjunction with K11-5 and other legal matters pending in India (**Exhibit 2**), obligates Defendant American corporations seeking to do business in India, to respect the human/legal rights of Indians seeking to do business in America.

# Jurisdiction + Venue

10. **Jurisdiction:**

General:

28 U.S.C. § 1331 – Plaintiff's allegations arise pursuant to Section 1983 claims of violations of Kaul's Constitutional rights and U.S.C. § 1964(a)(b)(c)(d) and 1962.

U.S.C. § 337 – Plaintiff's allegations allege violations of an Act of Congress regulating commerce and monopolies.

28 U.S.C. § 1332(d)(2)(A) – Plaintiff is a citizen of a different state to certain Defendants and the aggregate amount in controversy exceeds seventy-five thousand dollars ($75,000).

Personal:

The Court has personal jurisdiction over all Defendants, as each Defendant has transacted business, maintained substantial contacts, and/or committed acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States including this District. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to a court of general jurisdiction in New York.

11. **Venue:**

28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located and (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

# Evidence

12. **'Fraud on the Court':**

U.S.D.J. Oetken's failure to comply with the law and submit his financial holdings/list exparte communications to the record, in conjunction with his legally/factually unsubstantiated September 12, 2022, opinion/order, constitute evidence of a knowing fraud against the Court. The lethal consequences of this fraud, if not nullified, would have been reflected in the fact that on March 13, 2023, in Kaul v Blue Cross Blue Shield (23-CV-518-DNJ) (K11-11), a case containing highly incriminating evidence of the claims asserted in **The Kaul Cases**, and other insurance industry orchestrated felonious schemes, the K11-11 Defendants will submit a defense based principally on the fraudulent opinion of U.S.D.J. Oetken, in an attempt to stymie Kaul's prosecution of K11-11. The evidence in K11-11 provides a basis on which Kaul's prosecution of K11-11 will further expose the insurance industry's long-standing public corruption schemes that have caused the incarceration of hundreds, if not thousands of innocent physicians to whom it owes money and whose incarceration equates to debt eradication/asset seizure.

13. **The New York State Medical Board**:

Admission of fact by senior physicians of the New York State Medical Board, that persons associated with the board, used the US wires and the authority of the State of New York, to transmit the knowing fraud that a subcommittee of the board denied Kaul's application for licensure based on a **"question of moral suitability"** (**Exhibit 5**). On October 3, 2022, Kaul participated in a virtual hearing with the New York State Medical Board regarding his application for licensure. The matter was adjourned when Kaul raised the issue of the fraud perpetrated on July 14, 2021, when a board 'investigator' informed Kaul via email that a supposed subcommittee of the board issued a purported opinion denying Kaul's application. Not until October 3, 2022, had this lie been communicated to all board members, many of whom appeared shocked upon its disclosure by Kaul. Kaul's subsequent efforts to have the hearing reconvened have been ignored, and he continues to incur ongoing injuries.

14. **The UC San Diego Physician Assessment and Clinical Education (PACE) Program**:

The knowing falsification, as proved per audio/documentary evidence, by K11-8 Defendant PACE of its assessment report of Kaul, the final prerequisite for the issuance of his Pennsylvania medical license (**Exhibit 6**). K11-8 Defendant PACE's commercial existence depends solely on physician referrals from Defendant Federation State Medical Boards, and is a functioning, profit purposed element of the **"Federation Cartel"**, that commercially exploits physicians entangled in regulatory matters.

15. **Tacit admissions**:

Defendants Christie/TD/Allstate/AHS/Heary/Geico have, pursuant to F.R.E. 801(d)(2)(b), admitted to the RICO and Section 1983 claims (**K11-7: D.E. 1-4**).

16. **Defendant Geico's "pattern" within the United States District Court**:

Since 2008/2009, Defendant Geico has filed almost identical and knowingly fraudulent claims against physicians to whom it owes money, in the willful commission of mail/wire fraud/obstruction of justice. Below are just four (4) examples:

1. Geico v Kaul: 13-CV-02597 – U.S.D.C.-D.N.J.

2. Geico v Specialty Medical Services: 14-CV-08015 – U.S.D.C.-D.N.J.

3. Geico v Kosiborod: 16-CV-04662 – U.S.D.C.-D.N.J.

4. Geico v Basch: 19-CV-13948 – U.S.D.C.-D.N.J.

9

## The Slaving-Nazi-COVID-Insurance Axis

17. In K11-7, the Defendants' disproportionate reaction to the four (4) short paragraphs of this section, evidence their knowingness of the probity that the asserted facts would have in the proof before a jury of the Defendants centuries-long **"pattern of racketeering",** that persists today in their co-conspiratorial involvement in the trafficking of successful Indian physicians into American jails, as pled in K11-5 (India). The Steven Donziger case is another egregious example of how American corporations have 'hijacked' through political/judicial corruption, the state's judicial apparatus, a system they have tyrannized, as did the Nazis, to jail/eliminate their political/economic opponents.

18. In K11-2 Kaul exposed the motivation and method for the adding and abetting of the perpetration of the slaving industry and Holocaust by the insurance industry, of which Defendants Allstate/Geico are members. In 2021, the insurance industry controls the pharmaceutical industry, and is the principal financial beneficiary of the billions of dollars generated from forced mass global vaccination programs, that violate fundamental human rights and the Nuremberg Code. The insurance industry holds substantial controlling shares in Pfizer (USA) and Astra Zeneca (UK) and are continuing the same **"pattern of racketeering"** that commenced in the 1600s with the Trans-Atlantic slaving trade, and which involved the commission of the RICO predicate act of murder, through the United States, a colony that the British Empire/Insurance Industry converted into a **"racketeering enterprise"** for the purpose of profit. There exists little or no difference between the misconduct of the insurance industry in 1940's Nazi Germany and America in 2022.

(The insurance industry was born in London in the 1600s on the back of the British trans-Atlantic slaving industry, through Lloyd's of London, an insurance conglomerate that today ultimately underwrites every insurance policy, and that has since its ignominious beginnings profited from human suffering, including that associated with the Nazi Holocaust. As a consequence of Kaul's persistence within **The Kaul Cases** of exposing the American insurance industry's connection to Lloyd's dark slaving profiteering, this British corporation did, for the

first time in its history, and unquestionably in a public relations 'damage-mitigation' effort, publicly admit to these crimes against humanity: https://www.lloyds.com/about-lloyds/history/the-trans-atlantic-slave-trade/lloyds-marine-insurance-and-slavery. The insurance industry, which includes the Defendants, has replaced shipping slaves with the human trafficking of Indian/African American physicians into the modern-day planation equivalent, that of the American jails.)

19. The forced/coerced mass vaccination programs/passports are the chains and whips of the COVID enslavement program, the strings of which are being pulled by the British controlled insurance industry. The COVID vaccine, as Kaul predicted, has now been found to be highly toxic/ineffective: https://www.drrichardkaul.com/so/24NPf5O65 This fact was known by the government/corporate entities that forced it on the world's population: https://theswisstimes.ch/swiss-banker-files-criminal-charges-over-false-covid-vaccine-statements/ In K11-7, the Defendants attempted to frame the Plaintiffs' assertion of these facts as evidence of the implausibility of their complaint, with terms such as **"vast conspiracy"** and **"nutcase"**. These facts are now proven, and this country, like Switzerland, should have the courage to bring criminal charges against those who perpetrated these crimes against humanity.

20. In K11-2, the Defendants and the Court devoted inordinate page space to Kaul's exposition of the insurance industry's four hundred (400) year-long genocide, and in doing so, did betray their conviction of the absolute truth of the matter.

21. In K11-7, Kaul identifies how, in 2021, the **"pattern"**, like the COVID-19 virus, has mutated into a purported mission to save humanity, the calling card of which is a supposed **"vaccine"**. The vaccine is more than useless, as it was the cause of the viral mutation, as Kaul in 2020, explained it would be.

# Statement of Fact

**Fraud on the Court**

22. K11-7 was filed on August 19, 2021, assigned to U.S.D.J. Oetken, summonses issued, and all Defendants were served by approximately the end of September 2021. The case was not transferred to the District of New Jersey, as was demanded by the Defendants, and as had occurred in many prior cases filed by Kaul in districts outside of New Jersey. The case was not, at any point prior to the finalization of briefing (February 14, 2022), dismissed based on the prior decisions of other courts in other matters, but was advanced to a full briefing, only to be dismissed on September 12, 2022, based on the prior decisions of other courts, a basis that existed on August 19, 2021. It was the Court's intention to have the case litigated, but the Defendants corruption of the judicial process caused the entry of the illegally procured/illegal opinion/order, a 'Fraud on the Court', and perverted the process of justice.

23. On September 13, 2022, the Plaintiffs, pursuant to the law and their rights requested U.S.D.J. Oetken disclose to the record his financial holdings/exparte communications, but as of this Complaint's filing date, no information has been provided, nor has U.S.D.J. Oetken certified that he has not violated any element of the Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 351-364 and the Rules for Judicial-Conduct and Judicial-Disability Proceedings, 249 F.R.D. 662 (U.S. Jud. Conf. 2008). On November 22, 2022, the Plaintiffs, pursuant to this Act, filed a complaint with the Judicial Disciplinary Council and noticed the Senate Judiciary Committee regarding U.S.D.J. Oetken's admitted violation of the Courthouse Ethics and Transparency Act.

24. On September 14/October 6, 2022, the Plaintiffs respectively submitted a declaration for U.S.D.J. Oetken's financial disclosures/exparte communications and motion for disqualification/nullification of the September 12, 2022, the latter being based on U.S.D.J. Oetken's admitted violation of the within referenced Acts (**Exhibit 3**). Neither of these petitions were contested/addressed/refuted by U.S.D.J. Oetken or the Defendants, and the non-

response constituted a tacit admission of the within facts of amongst other things, bribery, and thus the law caused a nullification of the September 12, 2022, opinion/order. The Defendants failed to petition the appellate court regarding the nullification of the order.

**The New York State Medical Board**

25. Kaul's February 2021 application to the New York State Medical Board caused this board, in collusion/conspiracy with **The Kaul Cases** Defendants, to initiate a fraud that his application was denied based on a supposed board subcommittee's purported opinion of a **"question of moral suitability"**. This was and is a lie. Kaul filed a petition in the New York State Supreme Court seeking a copy of this supposed opinion. The petition was denied on January 3, 2022, and Kaul moved in the First Department of the Appellate Court. Notwithstanding the pendency of the matter in the Supreme Court, the New York State Medical Board scheduled a virtual hearing on October 3, 2022, a hearing attended by approximately twelve (12) persons, including a hearing officer and counsel for the board. The matter was abruptly truncated when Kaul alerted the panel that the issue of the board's fraud was pending in the appellate court.

**The UC San Diego Physician Assessment and Clinical Education (PACE) Program**

26. In approximately September 2017, Kaul submitted a licensure application to the Pennsylvania Medical Board, and on February 7, 2020, an administrative court conducted a hearing. Kaul's application was granted on May 27, 2020, on the condition he complete an assessment course. In April 2022, Kaul applied to K11-8 Defendant UC San Diego Physician Assessment and Clinical Education PACE Program ("PACE"), and from May to July 6, 2022, he underwent the first part of the course, which consisted of two (2) recorded interviews, that were conducted virtually. On July 21/22 Kaul underwent the second part of the assessment, which was conducted on-site in San Diego, was video recorded and for which Kaul generated contemporaneous notes. On October 17, 2022, K11-8 Defendant PACE issued a report replete with knowing falsehoods, as evidenced by Kaul's audio recordings/contemporaneous notes. Kaul repeatedly requested he be provided a copy of his case file/video record (**Exhibit 4**),

but none was provided, and so Kaul filed a FOIA with the UC San Diego and filed suit against Defendant PACE on December 6, 2022, in the United States District Court for the Southern District of California (**Exhibit 6**).

**Other Facts**

27. Other relevant facts are incorporated into the legal claims. However, the most salient and irrefutable facts of the Defendants' guilt are found within their ill-conceived schemes to have Kaul kidnapped and to commit securities fraud for five-plus-years. These facts, in conjunction with the perjury/obstruction of justice/mail fraud/wire fraud/kickbacks/honest services fraud/extortion/bank fraud/bankruptcy fraud/racketeering/conspiracy/public corruption/judicial corruption/false imprisonment/false arrest committed by **The Kaul Cases** Defendants from 2008/2009 to 2021, are deemed admitted pursuant to F.R.E. 801(d)(2)(b), because they have not, nor could they ever be, denied.

28. The facts in **The Kaul Cases** are irrefutable proof of the Defendants grand corruption of American judicial/political/medical bodies, and the effect of that corruption on the Plaintiffs' international rights/privileges/liberties.

# Legal Claims

## Violation of Sarbanes-Oxley Act
## As to Defendants Allstate/TD/Geico

29. On February 22, 2016, Kaul filed suit against the Defendants in the United States District Court for the Southern District of New York (K1). The claim for monetary damages was $28, 000 trillion +, a figure in excess of ten percent (10%) of the market capitalization of all three Defendants, and thus the law required the case be disclosed in SEC filings, Forms 10K/13K, and in the corporations' accounts.

30. The Defendants conspired with their lawyers and accountants to file knowingly false returns/accounts, with the recognition that this crime did constitute a violation of Sarbanes-Oxley and was represented a willful commission of securities fraud on the global equities market.

31. From 2016 to the present, the Defendants continued to fail to report their liability, a liability that continues with K11-1/K11-3/K11-7.

32. On November 22, 2018, Kaul sent letters to the top ten corporate shareholders of Defendants Allstate/TD/Geico, creating a record in which the shareholders are foreclosed from asserting plausible deniability of the Defendants crimes. A number of these entities withdrew their positions. Kaul sent a subsequent letter on August 18, 2020.

33. The key provisions of the Sarbanes-Oxley Act are:

(1) **SOX Section 302: Corporate Responsibility for Financial Reports** – (a) CEO and CFO must review all financial reports; (b) Financial report does not contain any misrepresentations; (c) Information in the final report is **"fairly represented"**; (d) CEO and CFO are responsible for the internal accounting controls; (e) CEO and CFO must report any deficiencies in internal accounting controls, or any fraud involving the management of the audit committee; (f) CEO and CFO must indicate any material changes in internal accounting controls.

15

(2) **SOX Section 401: Disclosures in Periodic Reports** – All financial statements and their requirement to be accurate and presented in a manner that does not contain incorrect statements or admit to state material information. Such financial statements should also include all material off-balance sheet liabilities, obligations and transactions.

(3) **SOX Section 404: Management Assessment of Internal Controls** – All annual financial reports must include an Internal Control Report stating that management is responsible for an "adequate" internal control structure, and an assessment by management of the effectiveness of the control structure. Any shortcomings in these controls must also be reported. In addition, registered external auditors must attest to the accuracy of the company management assertion that internal accounting controls are in place, operational and effective.

(4) **SOX Section 409: Real Time Issuer Disclosures** – Companies are required to disclose on an almost real-time basis information concerning material changes in its financial condition or operations.

(5) **SOX Section 802: Criminal Penalties for Altering Documents** – This section specifies the penalties for knowingly altering documents in an ongoing legal investigation, audit, or bankruptcy proceeding.

(6) **SOX Section 806: Protection for Employees of Publicly Traded Companies Who Provide Evidence of Fraud** – This section deals with whistleblower protection.

(7) **SOX Section 902: Attempts & Conspiracies to Commit Fraud** Offenses – It is a crime for any person to corruptly alter, destroy, mutilate, or conceal any document with the intent to impair the object's integrity or availability for use in an official proceeding.

(8) **SOX Section 906: Corporate Responsibility for Financial Reports** – Section 906 address criminal penalties for certifying a misleading or fraudulent financial report. Under SOX 906, penalties can be upwards of $5 million in fines and 20 years in prison.

34. The Defendants knowingly/willfully violated every SOX provision, to a criminal standard. The violation caused a massive and ongoing injury to Kaul's prosecutorial and due process rights, in that he was illegally deprived of incriminatory evidence regarding the securities fraud, that Kaul

16

would have submitted as further evidence of the Defendants **"pattern of racketeering"** through the commission of the RICO predicate act of securities fraud.

35. The Defendants violation of SOX did violate Kaul's rights, and caused further injury to his economic standing, reputation, and ability to become 'un-imprisoned' and regain his livelihood, for this, <u>all</u> Defendants are liable.

**RICO 1**
**<u>Association-In-Fact Enterprise: United States District Court SDNY-NYSE</u>**
**<u>Defendant Persons: Allstate/TD/Geico/ICE</u>**
**<u>RICO Predicate Acts: Bribery/Fraud on the Court/Public Corruption/Money Laundering</u>**

<u>**Overview**</u>:

36. In a time period commencing in approximately September 2021, the Defendants did conspire to commit, and did commit a knowingly illegal **"pattern of racketeering"** and did convert the Chambers of U.S.D.J., James Paul Oetken and the New York Stock Exchange into an association-in-fact enterprise **("SDNY-NYSE Association-In-Fact-Enterprise")** through and under cover of which they perpetrated the RICO predicate acts bribery/fraud on the court/public corruption/money laundering, purposed to eliminate the Plaintiffs by having U.S.D.J. Oetken dismiss K11-7 with prejudice and permanently injunct Kaul/Basch from prosecuting their claims against the Defendants.

<u>**Specifics**</u>:

37. In the latter half of September 2021, the corporate Defendants did begin conspiring to perpetrate a knowingly illegal scheme **("SDNY-NYSE Scheme")** against the United States District Court for the Southern District of New York, in which they planned, and did eventually effectuate, a quid pro quo scheme with U.S.D.J. James Paul Oetken, that involved the funneling of non-tangible/tangible favors (stocks/shares/bonds in return for having K11-7 dismissed with prejudice and Kaul/Basch injuncted from further prosecuting **<u>The Kaul Cases</u>** Defendants.

17

38. In September 2021, the Defendants, having realized that U.S.D.J. Oetken did not intend on dismissing or transferring the case to the District of New Jersey, a court whose judges are on their 'payroll', initiated a series of digital/non-digital communications/meetings in which they agreed that their only option was to bribe U.S.D.J. Oetken. The Defendants and their lawyers discussed the details of how to minimize any exposure of the scheme, and conceal the communications and funneling of bribes, and decided to utilize an 'arms-length' tactic, by co-opting third-party agents as the 'middlemen', a ruse employed by the Defendants for decades in the New Jersey courts.

39. It was not until approximately February 2022, that the specifics of the scheme had been agreed upon and willing third-party agents identified. The next phase involved persuading U.S.D.J. Oetken to participate in the scheme, and consisted of intensive time-consuming third-party mediated communications, which occurred slowly due to the Defendants priority for the maintenance of secrecy and their recognition that if any information were leaked to court staff, it would sabotage the scheme, and cause U.S.D.J. Oetken to withdraw.

40. A substantial part of the time from inception to execution was assigned to the contents of U.S.D.J.'s September 12, 2022, and to the Defendants attempt to effectively and permanently suppress Kaul's ability to vindicate his rights. In these communications, the Defendants' lawyers transmitted across the US wires to non-official emails belonging to U.S.D.J. Oetken and or agents acting on his behalf, the substance of the September 12, 2022, report, which the Defendants intended to disseminate to their shareholders, who had been withdrawing their positions. The Defendants recognized that unless the opinion/order permanently suppressed Kaul's legal rights, their shareholders would continue their withdrawal and their share price would continue to decrease.

41. Subsequent to the September 12, 2022, opinion/order Defendant Allstate's share price has risen, a rise that has enriched U.S.D.J. Oetken, and a rise that is a direct consequence of his illegally procured order. Defendant Allstate continues to launder the proceeds of this crime

through the NYSE, and to cause the dissemination of these fraudulent assets into the global equities market, including that in India.

42. In the planning and perpetration of the scheme, neither the Defendants nor U.S.D.J. Oetken discussed nor expected the Plaintiffs to request U.S.D.J. Oetken's financial holdings/exparte communications, nor file a motion for his disqualification, but they did conspire to include verbiage encouraging the Plaintiffs to file an appeal, knowing that an appeal would prohibit a judicial disciplinary investigation, and more likely conceal their corruption of the Court. However, when the Plaintiffs did request U.S.D.J. Oetken's financial holdings/exparte communications, the Defendants in collusion/conspiracy with U.S.D.J. Oetken through their third-party agents, concluded that their optimal option was to ignore the Plaintiffs' request and motion, believing that the Plaintiffs would not ascertain a legal basis on which to render null/void the order, and that even if they did, they would not ascertain the requisite law to exclude U.S.D.J. Oetken from any involvement in a future filing. In the perpetration of this overall scheme, the Defendants have, through their use of the US wires, knowingly committed wire fraud and through their use of the apparatus of the United States District Court, committed honest services fraud against the American public.

## RICO 2
### Association-In-Fact Enterprise: State of New York-New York State Medical Board
### Defendant Persons: FSMB/Allstate/Geico
### RICO Predicate Acts: Bribery/Fraud on the Court/Public Corruption

**Overview:**

43. In a time period commencing in approximately April 2021, the Defendants did conspire to commit, and did commit a knowingly illegal **"pattern of racketeering"** and did convert the State of New York and the New York State Medical Board into an association-in-fact enterprise **("NYS-NYSMB Association-In-Fact-Enterprise")** through and under cover of which they perpetrated the RICO predicate acts fraud on the court/public corruption, purposed to, in conjunction with the RICO 1 **"SDNY-NYSE Scheme"** and the RICO 3 **"FC-PACE Scheme"**, eliminate Kaul, by

19

attempting to prohibit his access to the courts for compensatory redress and his access to a livelihood.

**Specifics**:

44. In February 2021, Kaul submitted a licensure application to the New York State Medical Board, and on July 14, 2021, an investigator for the state emailed him a letter, stating that his application had been denied by a supposed sub-committee of the board who allegedly found that there existed a **"question of moral suitability"**. Kaul, after having been informed by this person of his right to appeal, requested a copy of the alleged opinion, in order to ascertain the basis of the opinion, but was informed it would not be provided until the conclusion of the appeal.

45. Kaul indicated he would seek judicial relief if the document was not provided by August 25, 2021, and on September 17, 2021, Kaul filed a petition for an OTSC in the New York State Supreme Court. The petition was directed at Defendant Hengerer and Dr. Howard Zucker, the New York State Health Commissioner, and sought an order compelling production of the alleged opinion.

46. The NY AG responded for the Respondents, arguing that Kaul had no **"clear legal right"** to the document, despite knowing that no such document existed, and the NY AG thus implicitly adopted the Respondents knowingly false position that such a document existed. The Respondents/NY AG propagated their fraud into the New York State Supreme Court, and on January 3, 2022, the judge adopted their fraud and denied Kaul's petition based on **the "clear legal right"** defense. Kaul appealed to the First Department of the New York State Supreme Court, Appellate Division, at which point a senior appellate litigation counsel within the NY AG entered the case.

47. However, in April 2022, while this matter was proceeding through the New York State Supreme Court, Kaul was contacted by counsel for the New York State Medical Board, and advised that his application was to be scheduled for a hearing on October 3, 2022. Kaul re-

requested a copy of the alleged opinion of the supposed sub-committee, but none was provided, and in June 2022, Kaul had a senior board member admit that no subcommittee had ever convened regarding his application and that no opinion had ever been issued (**Exhibit 5).** Kaul served a subpoena on this individual to appear at the October 3, 2022, hearing.

48. The virtual hearing was initiated on October 3, 2022, and was adjudicated by a hearing officer with a panel of approximately twelve (12) members of the New York State Medical Board. As the matter commenced it became immediately apparent to Kaul that the proceeding's sole purpose was to provide cover for the fraud of the alleged opinion and to deny Kaul's appeal.

49. Kaul halted the proceeding by asserting that unless the alleged opinion was produced, the matter could not proceed, and that regardless, the issue of the alleged opinion was pending in the Appellate Court. The hearing officer/panel went off-line for approximately ten (10) minutes, to discuss whether to proceed. Counsel for the board argued that the matter should proceed, but the officer/panel discontinued the hearing, pending the outcome of the Appellate Division. The subpoenaed senior board member did not appear. Kaul subsequently procured a transcript of the approximately twenty (20) minute hearing.

50. The New York State Medical Board is a member of the **"Federation Cartel"** and profits from the fees, fines and other expensive and uselessly proven educational activities that American physicians are forced to undergo to obtain, retain and have licenses reinstated. The commercial existence of these units of the **"FC"** depends on this revenue stream, and the monies generated from disciplinary actions. The greater the number of state board disciplinary actions, the more affected physicians are shunted into 'Solent-Green' like **"FC"** system, with the majority of physicians being either ethnic minorities and or foreign medical graduates, most of whom have 'slaved' in the American system for decades, and most of whom have their life assets illegally seized by government agencies under direction from the insurance industry.

51. The RICO 2 **"NYS-NYSMB Scheme"** was conceived of shortly after Kaul commenced his application for licensure in the State of New York, and involved the K11-7 Defendants/agents

conspiring/colluding with the New York State Medical Board/agents in the perpetration of a scheme to attempt to prevent Kaul from obtaining a license, in order to facilitate, in conjunction with the RICO 1 **"SDNY-NYSE Scheme"** and the RICO 3 **"FC-PACE Scheme"**, the elimination of Kaul, in order to attempt to eradicate the legal/economic/political/public relations threats posed by Kaul's economic resurgence and or their continued prosecution by Kaul in the United States District Court. One of the litigation benchmarks in **The Kaul Cases** appears to be Defendant Allstate's share price, which fell during the pendency of K11-7, and only began to rise after the illegal September 12, 2022, opinion/order. The litigation related fall substantiated the merit of K11-7. Investors withdraw their positions after consultation with litigation counsel. The **"NYS-NYSMB Scheme"/ SDNY-NYSE Scheme"/ "FC-PACE Scheme"** emerged in late 2022, and were coordinated principally by the **"FC"** and the corporate K11-7 Defendants, with the purpose of attempting to prohibit Kaul's access to the courts for compensatory redress/evidential disclosure and his access to a livelihood.

52. Within the conspiratorial digital/non-digital communications relevant to the conception, planning and perpetration of the **"NYS-NYSMB Scheme"**, the Defendants did not anticipate that Kaul would pursue the issue of the alleged opinion to the Appellate Division, nor have a senior board member admit that no subcommittee was ever convened nor any opinion ever issued, and so they perpetrated their fraud through the state's administrative/judicial/prosecutorial apparatus with a sense of experienced impunity, and with an overall purpose of attempting to contribute to halting Kaul's prosecution of the K11-7 Defendants.

53. The Defendants used the US wires in the perpetration of the **"NYS-NYSMB Scheme"** and within the corpus of communication, there exists evidence of a knowingly illegal agreement with the New York State Medical Board that any response to Kaul's application should be delayed, and that if Kaul persisted in requiring a response, a false response should be fabricated without involving any member of the board, but falsely claiming otherwise.

54. It is noteworthy that during the October 3, 2022, hearing, Kaul observed an appearance of 'shock' on the faces of several panel members when he raised the issue that senior members

(Dr. Jane Massie/Dr. Raju Ramanathan) had admitted that no subcommittee/opinion had ever been convened/issued.

55. It is the **"pattern"** of the Defendants to conduct their **"pattern of racketeering"** through courts/governmental agencies in a manner that is restricted, for the purpose of secrecy, to a person/limited persons, with whom the Defendants engineer or have already engineered a bribery-based quid pro quo scheme.

56. The immensity of the potential losses of liberty/property/life associated with the crimes of **The Kaul Cases** Defendants, has caused them to coerce others into committing knowing/willful violations of the law and Kaul's human/constitutional rights, with the most recent coercion consisting of an assurance that U.S.D.J. Oetken's order/opinion would definitely eliminate any threat posed by Kaul.

57. The Defendants have conducted this **"pattern of racketeering"** for decades in collusion/conspiracy with the state medical board members of the **"FC"**, by using the medical boards purported mission to **"protect the public"** as cover for their profit purposed crimes. There exists admitted evidence that medical boards do not **"protect the public"**, as the **"FC"** system of physician discipline related fees/fines and slave physician labor for the insurance industry, is purposed simply for corporate/executive profit. A continuation of a four hundred (400) year **"pattern"**.

### RICO 3
**Association-In-Fact Enterprise: State of California-UC San Diego Physician Assessment and Clinical Education (PACE) Program**
**Defendant Persons: FSMB/Allstate/Geico**
**RICO Predicate Acts: Wire fraud/Conspiracy/Public Corruption**

**Overview:**

58. In a time period commencing in approximately April 2022, the Defendants did conspire to commit, and did commit a knowingly illegal **"pattern of racketeering"** and did convert the State

23

of California and the  UC San Diego Physician Assessment and Clinical Education (PACE) Program
into an association-in-fact enterprise **("UC-PACE Association-In-Fact-Enterprise")** through and
under cover of which they perpetrated the RICO predicate acts of fraud on the court/public
corruption, purposed to, in conjunction with the RICO 1 **"SDNY-NYSE Scheme"** and the RICO 2
**"NYS-NYSMB Scheme"**, eliminate Kaul, by attempting to prohibit his access to the courts for
compensatory redress and his access to a livelihood.

**Specifics**:

59. On May 27, 2020, the State of Pennsylvania granted Kaul's application for licensure after a
one-day administrative hearing on February 7, 2020. In order for Kaul to be provided an actual
license, he was required to take an assessment course, which he commenced with K11-8 (Kaul v
PACE/Leung-USDC-SDC) Defendant PACE in May 2022, with the conduction of three virtual
interviews on May 4, June 15, and July 6, 2022.

60. K11-8 Defendant PACE, a for-profit corporation, derives the majority, if not all of its
business from the **"FC"**, and prior to Kaul's first interview it knew the FSMB was a Defendant in
K11-7. During the first interview, Kaul detected a suspicious tone, which caused the subsequent
two (2) interviews to be recorded.

61. On July 21/22, Kaul completed the second and on-site component of the course at the K11-
8 Defendant PACE's facility in San Diego, the entirety of which was video recorded by K11-8
Defendant PACE and from which Kaul retained contemporaneous notes. At the conclusion of
the course on July 22, 2022, after Kaul had drafted the final note to be submitted to the
evaluation committee, he created a copy of this note for his records.

62. Prior to Kaul's departure he enquired as when he would receive the final report, and was
informed it would be emailed directly to him, and only him within eight (8) weeks. On
September 22, 2022, not having received the report, Kaul telephoned and was informed by the
person responsible for drafting the report that she has allegedly been out on **"sick leave"** and
no other staff member had wanted to **"work"** on the report. On October 12, 2022, Kaul

received an email from this person, in which she requested Kaul provide her an email/telephone number of a **"contact person"** at the Pennsylvania Medical Board. Kaul instructed this person that the report was <u>NOT</u> to be sent to any person associated with the medical board until he had reviewed it.

63. K11-8 Defendant PACE perpetrated the **"FC-PACE Scheme"** with Defendant FSMB to render a false and negative report regarding Kaul, and to transmit it directly to the Pennsylvania Medical Board to attempt to cause it to not issue Kaul a license, and to prevent Kaul from exposing its fraudulence and to then claim qualified immunity if and when Kaul sued.

64. The perpetration of this scheme was conducted across the US wires by emails and telephone conversations, and it was agreed that a knowingly false and highly defamatory report would be issued, in which K11-8 Defendant PACE would describe Kaul as not only being a danger to the public, but that he would likely never meet the standards to ever return to the practice of medicine. The K11-7 Defendants conducted the same negative report/opinion/order generating scheme with K11-8 Defendant PACE, as it did with U.S.D.J. Oetken. K11-8 Defendant PACE, in drafting and transmitting the knowingly fraudulent report, did not anticipate that the virtual interviews had been recorded and that Kaul had retained a copies of his contemporaneous notes.

65. On October 17, 2022, K11-8 Defendant PACE used the US wires to transmit to Kaul a copy of their knowingly fraudulent report. It is an eleven (11) page document that Kaul's audio/final note evidence proves is fraudulent. Kaul, having reviewed the report, did then request he be sent a copy of his entire case file, which includes the video recordings of the July 21/22 on-site assessments. K11-8 Defendant PACE continues to withhold the property of Kaul's file.

66. On October 19, 2022, Kaul sent a letter to K11-8 Defendant PACE, in which he included a link to the July 6, 2022, audio recording and re-requested a copy of his file. No file was produced (**<u>Exhibit 4</u>**)

67. On October 31, 2022, Kaul sent a second letter, in which he provided further evidence of the fraudulence of the October 17, 2022, report, and re-requested a copy of his case file (**Exhibit 4**). No file was produced. K11-8 Defendant PACE remained in communication with Defendant FSMB, and used the US wires to discuss what steps it should implement to address Kaul's exposition of their fraud, and Kaul's October 19/31 letters. Within these communications it was agreed that K11-8 Defendant PACE should not amend its fraudulent report, as U.S.D.J. Oetken's September 12, 2022, order/opinion purported to foreclose Kaul from filing suit in the United States District Court, and thus, in their estimation, Kaul could not seek redress for Defendant PACE's violation of his rights.

68. K11-8 Defendant PACE's lawyers obtained a copy of U.S.D.J. Oetken's September 12, 2022, report, and advised K11-8 Defendant PACE that Kaul had no legal recourse for their false report, and that they should send Kaul a letter informing him that they would not amend their report. In the commission of this scheme, K11-8 Defendant PACE knew its misconduct constituted a violation of the wire fraud act, the honest services act and of Kaul's human/constitutional rights, and that their misconduct had converted the University of California – San Diego into a **"racketeering enterprise"** that furthered the interests of the **"FC"** at the expense of the people of the State of California. **The Kaul Cases** Defendants decade-plus-long criminal conspiracy has exposed the State of California to immense domestic/international legal liability.

69. On November 10, 2022, Kaul submitted a FOIA request to the UC-San Diego seeking copies of all physician assessment reports since 2012. K11-8 Defendant PACE was notified of this request.

70. On December 6, 2022, Kaul attached a copy of the suit against K11-8 Defendants PACE/Leung (**Exhibit 6**) to a complaint he filed against Defendant Leung with the California Medical Board.

**RICO 4**
**Association-In-Fact Enterprise: State of New Jersey-NYSE-SEC**
**Defendant Persons: Allstate/TD/Geico/ICE/Christie**
**RICO Predicate Acts: Securities fraud/mail fraud/wire fraud/money laundering**

**Overview**:

71. In a time period commencing in approximately 2009, the Defendants did conspire to commit, and did commit a knowingly illegal **"pattern of racketeering"** and did convert the NYSE/SEC/State of New Jersey (executive/legislative/judicial) into an association-in-fact enterprise, through and under cover of which they perpetrated thousands of the RICO predicate acts of mail fraud/wire fraud/securities fraud/money laundering, purposed to advance their political/economic agenda. Specifically, Defendant Christie sought to raise monies for gubernatorial and presidential campaigns, while Defendants Allstate/TD/Geico/ICE sought to increase executive compensation and share price.

72. The Defendants **"State of New-NYSE-SEC" ("SNS Scheme")** scheme involved an intersection of the worlds of medicine/business/law/politics, and commenced in 2009, with the purpose of, amongst other things: **(i)** having Kaul's medical license revoked; **(ii)** eradicating all debt owed to Kaul by insurance carriers (approx. $45 million); **(iii)** destroying Kaul's reputation; **(iv)** eliminating any future financial liability to Kaul; **(v)** causing Kaul to enter a state of poverty/homelessness; **(vi)** attempting to cause Kaul to be jailed/deported/killed; **(vii)** intimidating other minimally invasive spine surgeons into not performing minimally invasive spine surgery, in order to divert a greater percentage of the public's insurance premiums into corporate/executive compensation.

73. The Defendants have colluded and conspired to orchestrate both their underlying **"SNS Scheme"** and the subsequent, and multiple schemes to conceal and provide cover for the **"SNS Scheme"**. The concealment has been perpetrated through massive schemes of corruption of state/federal politicians/judges, in an attempt to prevent Kaul from exposing the Defendants decades-long schemes of judicial/public corruption.

27

74. In 2005, Kaul invented and successfully performed the first outpatient minimally invasive spine surgery, at a NJ surgical center that had credentialed him to perform the procedure, and under the authority of his state medical license; a license issued in 1996 by the State of New Jersey for both medicine and **surgery**. The state argued in proceedings from April 2 to June 28, 2013, that Kaul was not licensed to perform surgery. In this proceeding the Defendants and the state committed massive fraud, as evidenced in '**The Solomon Critique'** (K1-D.E. 225) + '**The Solomon Critique 2**' (K1-D.E. 299-18).

75. From 2006 to approximately 2009, Kaul was subjected to rule-of reason antitrust violations by, amongst others, Defendants Heary/AHS, who wanted to eliminate the threat of Kaul's rapidly expanding minimally invasive spine surgery practice. In furtherance of this scheme, the Defendants did engage in multiple quid pro quo schemes with Defendant Christie, in which they funneled bribes into his political campaign, purposed to have him use state power to have the medical board revoke Kaul's license.

76. Kaul's license was illegally suspended/revoked on April 2, 2012/March 24, 2014, and the Defendants then, with knowing illegality, did use the US mail/wires to transmit this fraudulent notice globally to all governmental agencies, including all state medical boards/National Practitioners Data Bank/DEA/FBI.

77. From 2012 to 2020, the Defendants/co-conspirators did conspire to commit, and did commit bankruptcy fraud and insurance fraud, by defrauding Kaul's medical malpractice carriers of millions of dollars through the submission and fraudulent judicial adjudication of false claims, as pled in K11-4.

78. Commencing in 2016, the Defendants/co-conspirators did extend their **"pattern of racketeering"** into the NYSE, through an ongoing commission of the predicate acts of securities fraud, in that they submitted false SEC filings/accounts, that defrauded, and continue to defraud the global equities market.

79. Based on this knowingly false information, the Defendants did perpetrate millions of trades with unsuspecting investors, concealing from them the massive risk associated with the purchase of these fraudulent equities. In conjunction with these crimes, the Defendants/co-conspirators did not disclose to the market that its profits are the product of crimes, as detailed in **The Kaul Cases**, but yet willfully and with knowledge of its illegality, did launder the proceeds of these crimes through the NYSE.

80. From 2006 to the present, the overarching theme of the Defendants/co-conspirators crimes, has been the commission of increasingly more serious crimes, in an attempt to conceal their prior crimes, malfeasance and misconduct. What commenced in 2006 with the professional jealousy of Kaul's competitors, of which Defendant Heary was a 'ring-leader', is in 2021, a multitude of felonies that include, amongst others: **(i)** bankruptcy fraud; **(ii)** securities fraud; **(iii)** mail fraud; **(iv)** wire fraud; **(v)** perjury: **(vi)** bribery; **(vii)** obstruction of justice; **(viii)** public/judicial corruption; **(ix)** civil rights violations; **(x)** evidence tampering; **(xi)** witness tampering; **(xii)** false imprisonment; **(xiii)** false prosecution: **(xiv)** insurance fraud; **(xv)** kickbacks; **(xvi)** human rights violations; **(xvii)** retaliation; **(xviii)** false seizure of property; **(xix)** honest services fraud; **(xx)** racketeering; **(xxi)** conspiracy; **(xxii)** market manipulation/money laundering.

**ICE**:

81. From 2016 to the present, Defendant ICE knew or should have known that Defendants Allstate/TD/Geico committed securities fraud, in willfully, and with knowledge of its illegality, failing to report to the market and the SEC its liability in **The Kaul Cases**.

82. Defendant ICE was motivated to willful ignorance and did fail to cross reference court records with the filings of Defendants Allstate/TD/Geico.

83. Defendant ICE, in recognizing that its profits were tied to those of Defendants Allstate/TD/Geico, did tacitly conspire with these Defendants to perpetrate a knowingly illegal

scheme of securities fraud concealment, that artificially manipulated the market, and was purposed to prevent a decrease in its share price.

84. Defendant ICE used the US mail and wires to exchange information with Defendants Allstate/TD/Geico, in furtherance of the **"SNS Scheme"**, in recognition of the illegality of the scheme and the manipulation of the market that would be caused by such a fraud.

85. Defendant ICE did conspire with and did commit a **"pattern of racketeering"** by aiding and abetting the laundering of the criminal proceeds of Defendants Allstate/TD/Geico through the apparatus of the **"SNS Association-In-Fact Enterprise",** the principal purpose of which was to increase insurance industry executive profit and share price, at the expense, and through the exploitation of Kaul and thousands of other physicians, many of whom remain falsely imprisoned.

86. Defendant ICE, although having reported regulatory/litigation risks in its SEC filings, did willfully and knowingly fail to specifically identify the securities fraud crimes of Defendants Allstate/Geico/TD, and is thus liable for not just these crimes, but for those from which the criminal proceeds originated in administrative/state/bankruptcy/federal courts within the geographic boundaries of the State of New Jersey, in a period that commenced in at least, if not before, Defendant Christie's first term as governor.

87. Defendant ICE recognizes that because it both trades on the NYSE and engages in commerce with global exchanges, which affects the value of those exchanges, that its participation in the **"SNS Scheme"** caused it to become a conduit to these exchanges of market valuations that it knew, or ought to have known were false, and were the product of crime.

88. Defendant ICE used the US mail/wires to globally transmit knowingly fraudulent information about the market valuations of Defendants Allstate/TD/Geico, in that it omitted any specific reference within its SEC filings to the legal liability ($28,000 trillion +) to the global equities market of **The Kaul Cases**.

89. Defendant ICE, in propagating this knowingly fraudulent information to the global equities market, did recognize its role in false equity evaluations and the creation of a 'bubble market'

90. Defendant ICE's Indian headquarters is Hyderabad (Kaul's birthplace), and it is cognizant of the fact that the Indian stock market is currently reported as being in a 'bubble' by the Reserve Bank of India. Kaul has filed a notice of litigation against Defendant ICE (India) (**Exhibit 2**).

91. Defendant ICE recognizes that the false evaluations of the NYSE are responsible for the Indian 'bubble', and that the false evaluations of the NYSE are a consequence of the Defendants financial crimes.

**Christie**:

92. From 2000, the year that Defendant Christie was appointed the US Attorney for the District of New Jersey, he has abused state power and converted state/federal agencies into **"racketeering enterprises"**, through which he has conducted a **"pattern of racketeering"** purposed to further the economic/political agendas of himself and those individuals with whom he engaged in quid pro quo schemes of bribery and public corruption.

93. Commencing in or around 2008/2009, Defendant Christie entered into knowingly illegal conspiracies with Defendants Allstate/TD/Geico, in which they methodically planned schemes to eliminate Kaul, through the abuse of governmental power. The Defendants conspired with state/federal investigative/prosecutorial authorities to file criminal indictments against Kaul. These investigations ceased when Kaul filed K1 on February 22, 2016.

94. From 2009 to 2017, he converted the executive/legislative/judicial branches of the State of New Jersey into a **"racketeering enterprise"**, that he used against Kaul, in an attempt to have him jailed/deported/seriously injured/killed, in order to eliminate: **(i)** the debt owed to him by the insurance industry; **(ii)** future liability to Kaul by the insurance industry; **(iii)** the threat that Kaul's minimally invasive spine surgery practice posed to **The Kaul Cases** physician/hospital Defendants, from whom, along with Defendants Allstate/TD/Geico, Defendant Christie had received bribes.

95. Defendant Christie believed that he would become the 2016 President of the United States, that Kaul would be eliminated, and the crimes of **The Kaul Cases** Defendants would go undetected, and that Kaul would not commence litigation in 2016.

96. However, when Kaul did commence litigation, Defendant Christie, in collusion/conspiracy with **The Kaul Cases** Defendants and certain judges within the United States District Court, did perpetrate a massive scheme of obstruction of justice, that violated Kaul's human rights, and was intended to prevent Kaul from exposing the crimes, and to obviate the obligation of Defendants Allstate/TD/Geico (Berkshire Hathaway) to report the $28,000 trillion + in their SEC filings.

97. In the perpetration of the **"SNS Scheme"**, Defendant Christie did use the US mail/wires to exchange information with **The Kaul Cases** Defendants regarding the bankruptcy and securities fraud, as it pertained detrimentally to the share price of Defendants Allstate/TD/Geico.

98. In aiding and abetting the **"SNS Scheme"**, Defendant Christie did fully recognize its illegality and the international criminal consequences of his participation in the defrauding of the global equities market.

99. Defendant Christie, nonetheless, did persist in the perpetration of the scheme out of fear that if the $28,000 trillion + liability were disclosed to the global equities market, it would cause shareholder litigation, that would expose the massive crimes committed by **The Kaul Cases** Defendants within the executive/legislative/judicial branches of the State of New Jersey, the United States District Court, and the United States Bankruptcy Court (2006 to Present).

100. Defendant Christie was also motivated to aid and abet the securities/bankruptcy fraud, as he had been bribed with shares from Defendants Allstate/Geico, as part of the quid pro quo scheme in which he ordered the medical board to revoke Kaul's license.

101. Defendant Christie maintains a controlling position within the **"SNS Association-In-Fact Enterprise"** from which he continues to illegally profit, the profits of which he launders through

the enterprise his political lobbying/law business, that currently provide cover for his **"ongoing"** schemes of bribery and public corruption.

**Allstate/Geico**:

102. Kaul commenced suit against Defendant Allstate on February 22, 2016, in K1, in which Kaul seeks $28,000 trillion + in monetary damages. Allstate's market capitalization was approximately $33 billion, and thus it was obligated to report the claims in its SEC filings. It did not.

103. Defendant Allstate, in recognizing the immense civil/criminal consequences of disclosure, and the damage to its reputation within the global equities market, did conspire with Defendant ICE in its withholding of this information.

104. Defendant ICE was motivated to participate in the **"NSS Scheme"** as its share price and corporate profits were linked to those of Defendant Allstate, and it recognized that exposure to the global equities market of the $28,000 trillion + liability had the potential to bankrupt Defendant Allstate.

105. Defendants ICE/Allstate did use the US mail/wires and face-to-face meetings to exchange information about the **"NSS Scheme"**. Within the corpus of communication, Defendants ICE/Allstate concluded that the risk of Kaul exposing a securities fraud violation was minimal compared to the risk of bankruptcy if **The Kaul Cases** were exposed to the global equities market.

106. Defendant Allstate, in recognizing that Defendant ICE would not report its false filings to the SEC/DOJ, did continue to fraudulently trade millions of shares from 2016 onwards, in the knowledge of its illegality, and that it would cause false market valuations, market manipulations and investors to be defrauded.

107. Defendant Allstate reaped illegal profits from the **"NSS Scheme"**, that it funneled as bribes to certain judges within the United States District Court (K11-3) and certain state/federal

politicians (K11-1), in order to control the **"racketeering enterprise"** into which **The Kaul Cases** Defendants had converted certain courts (district/appellate) within the United States District Court.

108. Defendant Allstate, through a **"pattern of racketeering"**, and in conspiracy/collusion with **The Kaul Cases** Defendants, did in a period commencing in approximately 2008/2009, convert into **"racketeering enterprises"** the State of New Jersey, the United States District Court, the United States Bankruptcy Court and the New York Stock Exchange and state/federal investigative/prosecutorial authorities, all purposed to eliminate Kaul and then to provide cover for their crimes, when their Kaul elimination scheme failed (2008/9 to 2021).

**TD:**

109. On February 22, 2016, with the filing of K1, Kaul did expose the crimes of Defendant TD, and their role in the revocation of Kaul's license and the knowingly illegal use of state/bankruptcy courts within the geographic boundaries of the State of New Jersey to bankrupt Kaul's corporations.

110. Defendant TD commenced conspiring with Defendants Christie/Allstate/Geico in or around 2010, in a series of quid pro quo schemes, in which Defendant TD received regulatory favors from Defendant Christie in return for arbitrarily foreclosing on Kaul's personal/commercial loans.

111. Defendants Allstate/Geico had bribed Defendant Christie to eliminate Kaul, and Defendant Christie's quid pro quo with Defendant TD, was purposed to deprive Kaul of monies to litigate the licensing case against the State of New Jersey, and to bankrupt his corporations in order to facilitate the elimination of debt ($45 million) owed to Kaul by the insurance industry.

112. Defendant TD, in recognizing the immense civil/criminal liability of **The Kaul Cases**, did conspire with Defendant ICE to conceal the litigation from the global equities market, and did submit false SEC filings and accounts from 2016 to 2021, in the belief that Kaul would not

expose its prior crimes, as **The Kaul Cases** Defendants had bribed certain judges within the United States District Court and the United States Bankruptcy Court.

113. From 2016 onwards Defendant TD did use the US mail/wires and engage in face-to-face meetings with Defendants ICE/Allstate/Geico/Christie, in furtherance of the **"NSS Scheme"**. At these meetings, and within these communications, the Defendants did discuss and conclude that the risk of Kaul exposing their securities fraud violation was substantially outweighed by the risk of disclosing the $28,000 trillion + liability to the global equities market.

114. In conspiring with **The Kaul Cases** Defendants, Defendant TD did recognize the illegality of their failure to disclose and did follow the advice of counsel in failing to disclose.

115. Defendant TD's counsel did conspire/collude with counsel for **The Kaul Cases** Defendants in furtherance of the **"NSS Scheme"**, for the purpose of concealing their prior crimes, which involved massive schemes of judicial/public corruption, at the center of which was Defendant Christie, his presidential ambitions, and the commercial agendas of corporations/persons from whom Defendant Christie had received bribes.

116. Defendant TD, in willfully committing securities fraud and defrauding the global equities market of their right to honest services, did perpetrate such a scheme with the premeditated purpose of violating Kaul's litigation rights, in that it stymied his 'whistleblowing' on the crimes of **The Kaul Cases** Defendants.

117. Defendants Allstate/TD/Geico did recognize that disclosure to the global equities market would cause investors to withdraw their stock position, as occurred with K11-2 Defendant Boston Partners, after Kaul informed them in November 2018 of the pending litigation in K1/K2.

118. Defendants Allstate/TD/Geico did recognize that a disclosure of the $28,000 trillion + liability would cause massive shareholder litigation and damaging publicity regarding their schemes of judicial/public corruption, and that this litigation/publicity would augment Kaul's prosecution rights.

119. Defendants TD/Allstate/Geico knowing and willful violation of the Sarbanes-Oxley Act was purposed to provide cover for their previous crimes against Kaul (bribery/mail fraud/wire fraud/judicial corruption/public corruption/civil rights violations/perjury/kickbacks/false arrest/false imprisonment/obstruction of justice/illegal seizure of assets/money laundering/bankruptcy fraud/bank fraud), and were purposed to, and did in fact, violate Kaul's prosecutorial rights.

## RICO 5
**Association-In-Fact Enterprise: United States Bankruptcy Court-NYSE-State of New Jersey**
**Defendant Persons: Allstate/TD/Geico/Stolz**
**RICO Predicate Acts: bankruptcy fraud/mail fraud/wire fraud/public corruption/bank fraud/securities fraud/money laundering**

**Overview**:

120. In a period commencing in approximately 2008/2009, Defendants Allstate/Geico/TD did commence conspiring to commit, and did commit a **"pattern of racketeering"** through the enterprise of the executive/legislative/judicial branches of the State of New Jersey and did, in 2013, extend and amplify this "**pattern of racketeering**" into the U.S.B.C., and did, in 2016, extend and amplify this **"pattern of racketeering"** into the NYSE, to form an association-in-fact enterprise, the **"State of New Jersey-United States Bankruptcy Court-New York Stock Exchange Association-In-Fact Enterprise" ("SUN-Association-In-Fact Enterprise").**

121. The Defendant Persons, that orchestrated, controlled, aided, and abetted, and that did either occupy or effect controlling positions within the enterprises were Defendants Stolz/Allstate/TD/Geico.

122. The co-conspirators and specifically, K11-3 Defendant/U.S.B.J. John Sherwood, did aid and abet the Defendants perpetration of their **"SUN Scheme"** through a "**pattern of racketeering**" that involved the commission of the RICO predicate acts of mail fraud/wire fraud/perjury/obstruction of justice/kickbacks/judicial corruption/public corruption/money laundering/bankruptcy fraud/bank fraud/securities fraud, and was committed,

36

knowingly/willfully, and with knowledge of its illegality, through a purposeful conversion of the State of New Jersey/U.S.B.C./NYSE into **"racketeering enterprises"**, the principal purpose of which was to increase executive/corporate profit and compensation for Defendants Stolz and Christie (political campaign donations/other bribes).

123. The Defendants did use the US mail/wires and conduct face-to-face meetings in New York, for the purpose of devising, planning, and executing the knowingly illegal **"SUN Scheme"**.

124. The Defendants, in the initial planning of their criminal enterprise did not anticipate that in 2016, Kaul would commence litigation, or that the damages sought would be in excess of ten percent (10%) of their market capitalization. In fact, the Defendants believed that Kaul would be deported/jailed/killed, and on May 27, 2021, the Defendants, in a state of desperation, did perpetrate a final scheme in which Kaul was illegally arrested/imprisoned, with the intention of having him permanently injured or killed in the Mercer County jail in Trenton, New Jersey. The scheme failed, and Kaul filed suit on June 15, 2021, against K11-9 Defendants Christopher J. Christie/Philip Murphy/Doreen Hafner/Gurbir Grewal/Robert McGuire.

125. Defendants Allstate/TD/Geico, in recognizing their $28,000 trillion + liability, did conspire with Defendant ICE, in the concealment of this information from the global equities market, in which Defendants Allstate/TD/Geico (Berkshire Hathaway) trade. In 2012, Defendant Allstate extended its operations into India, while simultaneously conducting, in collusion/conspiracy with American state/federal investigative/prosecutorial authorities, policies of racially targeting Indian physicians for license revocation and imprisonment.

**Defendants Allstate/Geico**:

126. In June 2013, Defendant TD, in furtherance of the Defendants **"racketeering schemes"** (2008/2008-2021) caused Kaul's corporations to file for Chapter 11 bankruptcy. On July 21, 2014, the Chapter 11 was converted to a Chapter 7, because of the illegal revocation of Kaul's license on March 24, 2014. Defendant Stolz and his now deceased law partner, Robert Wasserman, were assigned as the trustee.

127. In a period that commenced in approximately July 2014, Defendants Allstate/Geico did enter into a conspiracy with Defendant Stolz, in which Defendant Stolz agreed to accept bribes from Defendants Allstate/Geico in return for not pursuing the $45 million owed to Kaul by Defendants Allstate/Geico and others within the insurance industry, as irrefutably pled in K4.

128. Defendants Allstate/Geico did use the US mail/wires and face-to-face meetings with Defendant Stolz to exchange information regarding the perpetration of the **"SUN Scheme"**, the purpose of which was to increase share price and compensation to their executives and Defendant Stolz.

129. During these communications, Defendants Allstate/Geico and Stolz did consider the money laundering risk posed by the investment of the proceeds of their crimes into the NYSE. The Defendants calculated that the risk was minimal, as Kaul would be eliminated, and any person who had knowledge of the crime would not disclose, out of fear of retaliation of a criminal indictment from Defendant Christie.

130. Defendants Allstate/Geico/Stolz calculated that their illegal scheme would cause an elevation of share price, the false basis of which would be concealed from the global investment community.

131. Subsequent to Kaul's filing of K1, the Defendants did conspire to not report the case in their SEC filings, in order to provide cover for, amongst other things, their crime of bankruptcy/creditors fraud. However, in doing so, they commenced committing securities fraud, a crime that they have undoubtedly committed before, but in this case, a crime that commenced in 2016, and is ongoing in 2021.

132. On May 27, 2021, the Defendants attempted to have Kaul seriously injured or killed (K11-9).

**Defendant Stolz**:

133. Defendant Stolz, a lawyer, knew that in conspiring to commit and committing the RICO predicate acts of bankruptcy fraud/securities fraud/mail fraud/wire fraud, through a **"pattern of racketeering"** in which he converted the United States Bankruptcy Court into a **"racketeering enterprise"**, for a period commencing on July 21, 2014, he has incurred international criminal liability, and has defrauded the global equities market of its right to honest services.

134. Kaul has exposed the crimes of Defendant Stolz, who from 2018 conspired with corrupted judges in the District of New Jersey to prevent Kaul from prosecuting his claims against Defendant Stolz. The tactics used by Defendant Stolz included having Defendant/U.S.B.J. John Sherwood enter an order in February 2020, that sought to bar Kaul from prosecuting Defendant Stolz for his crimes. Defendant Sherwood, as plausibly and irrefutably pled in K11-3, did accept bribes from Defendants Allstate/Geico, in return for entering judgements adverse to Kaul/creditors in the bankruptcy proceedings (July 21, 2014, to July 31, 2020).

135. When Kaul commenced litigation against Defendant Stolz in 2018, Defendant Stolz and his lawyer, Scott Rever, desperate to prevent their prosecution by Kaul, did threaten to expose the names of state/federal politicians and judges, who had either participated/facilitated his bankruptcy fraud in Kaul's case, or had received bribes from Defendants Allstate/Geico in cases involving other physicians/healthcare providers.

136. From 2016 to the present, Defendant Stolz, with knowledge of Defendants Allstate/TD/Geico's securities fraud crimes, has failed to report the crimes to regulators or the global equities market, as he recognizes that to report would expose his crime of bankruptcy fraud, and the crimes/malfeasance of all of **The Kaul Cases** Defendants, extending back to 2006.

137. Defendant Stolz has knowledge that Defendants Allstate/TD/Geico did conspire with Defendant ICE to conceal from the global equities market, their $28,000 trillion + liability, and did conspire with the SEC to have K11-9 Defendant, Gurbir Grewal, transferred on June 29,

2021 from the Office of the NJ AG to the securities fraud enforcement division, after Kaul had sued him in K11-9, and K11-2 Defendant, Boston Partners, had admitted to withdrawing its position in Allstate, after Kaul they received a letter from Kaul in November 2018.

**Defendant TD:**

138. In approximately 2010, Defendant TD commenced conspiring against Kaul with Defendants Allstate/Geico/Christie, in a scheme to eliminate Kaul through the destruction of his career/livelihood/reputation/economic standing.

139. In furtherance of this scheme, Defendant TD used the US mail/wires to transmit information regarding its devising/implementation/execution, in the knowledge that such transmission constituted the crimes of mail/wire fraud.

140. However, Defendant TD did not believe that Kaul would expose its crimes, as it received information from Defendants Christie/Allstate/Geico that Kaul would be eliminated.

141. Defendant TD entered into a series of quid pro quo schemes with Defendants Allstate/Geico/Christie, in which they conducted a **"pattern of racketeering"** through the American banking system and state/bankruptcy courts within the geographic boundaries of the State of New Jersey, through the commission of the RICO predicate acts of mail fraud/wire fraud/bankruptcy fraud/bank fraud.

142. Defendant TD, in converting into an association-in-fact **"racketeering enterprise"**, the executive/legislative/judicial branches of the State of New Jersey/United States Bankruptcy Court/NYSE, did know of the immense civil/criminal liability that such crime, if exposed, would cause to them and their shareholders.

143. In approximately late 2013/2014, Defendant TD, in collusion/conspiracy with Defendants Allstate/Geico/Christie, did file a knowingly false banking fraud claim against Kaul, with www.checksystems.com. The purpose and effect of this fraud was to prevent Kaul's access to banking services, cause a deterioration in his credit score and prevent him from funding

litigation. Defendant TD did not anticipate that Kaul would sue them in 2016, nor that he would expose their securities fraud violation (2016 to present).

144. During the bankruptcy proceedings (June 17, 2013, to July 31, 2020), Defendant TD, with knowledge of the illegality of the revocation of Kaul's license, and the **"racketeering schemes"** perpetrated by, amongst others, Defendants Allstate/Geico/Christie that caused the revocation/subsequent legal cases against Kaul, did conspire with its counsel to not report the bankruptcy fraud to authorities. The reason for not reporting was that Defendant TD did not want exposed its prior crimes and involvement in **The Kaul Cases** Defendants scheme to eliminate Kaul (livelihood/reputation/assets/freedom/human rights).

145. Defendant TD conspired with Defendants Stolz/Allstate/Geico and **The Kaul Cases** Defendant, Dilorio, to threaten Kaul that unless he signed over title to the real estate in which his surgical center was located, despite it belonging to a corporation not part of the Chapter 11 proceeding, that Kaul's ex-wife would be sued by Defendant Stolz.

146. In a period from 2016 onwards, Defendant TD conspired with its lawyers/accountants to defraud the global equities market of its right to honest services, through the submission of false SEC filings and accounting reports. Defendant TD perpetrated these crimes, in the belief, and with the intention to violate Kaul's prosecutorial rights, and in an attempt to prevent Kaul from exposing their crimes, that include those associated with the purchase of Commerce Bank in 2007, in which they bribed multiple NJ state politicians in a 'pay-to-play' scheme, in order to complete the purchase.

<u>RICO 6</u>
<u>Association-In-Fact Enterprise: State of New Jersey-United States District Court</u>
<u>Defendant Persons: Christie/AHS/Heary</u>
<u>RICO Predicate Acts: mail fraud/wire fraud/bribery/obstruction of justice/public corruption/money laundering</u>

**<u>Overview</u>:**

147. In a period commencing in approximately 2006, Defendants Christie/AHS/Heary commenced conspiring to commit, and did commit, a **"pattern of racketeering"** through the association-in-fact enterprise of the legislative/executive/judicial branches of the State of New Jersey and the United States District Court, the **"SU Association-In-Fact Enterprise"**, in furtherance of the **"SU Scheme"**, through the commission of the RICO predicate acts of mail fraud/wire fraud/bribery/public corruption/obstruction of justice/perjury/kickbacks/bank fraud/investor fraud. The motivation for the **"SU Scheme"** was: **(i)** to increase the Defendants economic/political power within the American legal/medical/business/political sectors of industry, at the expense of Kaul, free standing surgical centers and non-neurosurgical minimally invasive spine surgeons; **(ii)** to use the United States District Court to provide cover for the Defendants crimes within the legislative/executive/judicial branches of the State of New Jersey.

**<u>Christie</u>:**

148. In 2000, when Defendant Christie was appointed the US Attorney for the District of New Jersey, he commenced abusing state prosecutorial power for advancement of his personal/political/economic agendas and used this power to threaten persons with criminal prosecution in order to coerce them into funneling money into his political campaigns and offshore bank accounts/trusts.

149. Defendant Christie used this money to occupy the governor's office in 2009/2013 and abused the power of the governor's office to extort further money from persons with threats of criminal prosecution, and did engage in massive schemes of bribery, in which monies were funneled into his political campaigns/offshore bank accounts by, amongst others, Defendants AHS/Heary.

42

150. The bribes from Defendants AHS/Heary were part of a series of quid pro quo schemes, purposed to have eliminated Kaul/free standing surgical centers/billing codes for outpatient spine surgery and to have introduced legislation that prevented the issuance of state licenses for physician owned surgical centers and downgraded the RVU of billing codes for spine surgery in free standing physician owned surgical centers.

151. These illegally conducted tactics were part of an overall strategy perpetrated by for-profit healthcare corporations, such as Defendants AHS/Allstate/Geico, to illegally monopolize, through both per se/rule of reason violations, the American healthcare market.

152. At the heart of this conspiracy lies the **"HIPIC-FC"** and related to this is the **"Hospital-Insurance-Pharmaceutical-Industry-Complex-US Government Cartel"** the **"HIPIC-USC".** These two cartels operate to eliminate physicians through license revocation/incarceration/suicide/death, in order to increase the corporations' profits/share price, by reducing the amount of patient care provided, by reducing the number of physicians.

153. Defendant Christie, in his capacity as the US Attorney, and through his association with his brother, did come to understand the mechanics of the securities market, and was involved with securities fraud cases. ICE came into existence in 2000, the year Defendant Christie became US Attorney, and in 2021 it has a market capitalization of $68 billion.

154. Bribery: Defendant Christie's relationship with bribers, bribery and quid pro quo schemes extends back to his early political/legal career in Morris County, New Jersey. Without corruption his career would have stalled at the NJ municipal court level. In a time period from 2008 to 2016, Defendants AHS/Heary funneled bribes to Defendant Christie, using as cover, his political campaign account and law/public relation/political lobbying firms with whom Defendant Christie conducted illegal transactions, in which he used the public treasury to funnel state contracts to these firms in return for bribes. The monies (bribes) flowed from Defendants AHS/Heary to Defendant Christie, and the public's money (kickbacks) flowed from Defendant Christie to Defendants AHS/Heary ($3.1 million state 'salary').

155. <u>Mail Fraud/Wire Fraud</u>: In a period from 2008 to 2021 Defendant Christie/counsel did, with knowledge of its illegality, use the US mail/wires to exchange information with Defendants AHS/Heary/counsel in furtherance of the **"SU Scheme"**, for the purpose of illegal market monopolization (2008-2014) and then to provide them cover in the United States District Court against Kaul's prosecution of their crimes (2016-2021).

156. <u>Obstruction of Justice</u>: In a period from 2012 to 2021, Defendant Christie did conspire to commit, and did commit an obstruction/violation of Kaul's right to justice by, through and as a consequence of his control of the executive/judicial/legislative branches of the State of New Jersey. This period of obstruction (2012-2017) resulted in some of the injuries detailed in. Defendant Christie conspired with Defendants Stolz/Allstate/Geico/TD to obstruct Kaul's right to justice in the United States Bankruptcy Court (2013 to 2020), and this period of obstruction resulted in injury exacerbation and further injuries. Defendant Christie/counsel conspired with **The Kaul Cases** Defendants/counsel (2016-2021) to obstruct/violate Kaul's prosecutorial rights in the United States District Court, in order to prevent Kaul from further exposing their crimes in the State of New Jersey and the United States Bankruptcy Court.

157. <u>Public Corruption</u>: In a period from 2008 to 2021, Defendant Christie abused his political power and public office to engage in acts of public corruption with private actors (persons/corporations), state/federal judges, medical boards and NJ state police to: **(i)** eliminate Kaul (deportation/jail/killed); **(ii)** to order state judges/courts to obstruct Kaul's right to justice/enter multi-million dollar judgments against him; **(iii)** to obstruct Kaul's right to justice in the United States Bankruptcy Court; **(iv)** to violate Kaul's prosecutorial rights in the United States District Court; **(v)** conspire with the SEC to have K11-9 Defendant Grewal transferred to the enforcement division of the SEC on June 29, 2021, to attempt to quash a securities fraud prosecution of Defendants Allstate/TD/Geico.

**AHS:**

158. <u>Mail/Wire Fraud</u>: In a period from approximately 2008/2009 to 2014, Defendant AHS did with knowledge of its illegality, use the US mail/wires to conspire with, amongst others, Defendant Christie, regarding the perpetration of the first half of the "**SU Scheme**", that being the revocation of Kaul's license, the destruction of his economic standing/reputation and elimination, be it by jail/deportation/death. From 2016 to 2021, Defendant AHS/counsel did, with knowledge of its illegality, use the US mail/wires to conspire with **The Kaul Cases** Defendants/counsel, regarding the perpetration of the second half of the "**SU Scheme**", that being the corruption of judges within the United States District Court to obstruct justice by violating Kaul's prosecutorial rights, in order to prevent him further exposing the crimes committed in the first half of the "**SU Scheme**", and the securities fraud violations of Defendants Allstate/TD/Geico. Defendant AHS shareholding in these corporations has increased since the filing of K1, on February 22, 2016, as is the case with many other Defendants.

159. <u>Bribery</u>: In a period from 2008/2009, Defendant AHS did engage in a series of quid pro quo schemes with Defendant Christie, in which they converted the executive/legislative/judicial branches of the State of New Jersey into a "**racketeering enterprise**", through which they conducted a "**pattern of racketeering**", in which they conspired to commit, and did commit with knowing illegality, the RICO predicate acts of bribery/public corruption.

**Heary**:

160. <u>Mail/Wire Fraud</u>: In a period from approximately 2008/2009 to 2014, Defendant Heary did with knowledge of its illegality, use the US mail/wires to conspire with, amongst others, Defendant Christie, regarding the perpetration of the first half of the "**SU Scheme**", that being the revocation of Kaul's license, the destruction of his economic standing/reputation and elimination, be it by jail/deportation/death. From 2016 to 2021, Defendant AHS/counsel did, with knowledge of its illegality, use the US mail/wires to conspire with **The Kaul Cases** Defendants/counsel, regarding the perpetration of the second half of the "**SU Scheme**", that being the corruption of judges within the United States District Court to obstruct justice by violating Kaul's prosecutorial rights, in order to prevent him further exposing the crimes committed in the first half of the "**SU Scheme**", and the securities fraud violations of

Defendants Allstate/TD/Geico. Defendant Heary's shareholding in these corporations has increased since the filing of K1, on February 22, 2016, as is the case with many other Defendants.

161. <u>Bribery/Public Corruption</u>: In a period from 2008/2009, Defendant Heary did engage in a series of quid pro quo schemes with Defendant Christie, in which they converted the executive/legislative/judicial branches of the State of New Jersey into a **"racketeering enterprise"**, through which they conducted a **"pattern of racketeering"**, in which they conspired to commit, and did commit with knowing illegality, the RICO predicate acts of bribery/public corruption.

**<u>RICO 7</u>**
**<u>Association-In-Fact Enterprise: State of New Jersey-United States District Court-United States</u>**
**<u>Bankruptcy Court-NYSE</u>**
**<u>Defendant Persons: Allstate/Geico/FSMB/Christie</u>**
**<u>RICO Predicate Acts: mail fraud/wire fraud/bribery/obstruction of justice/public</u>**
**<u>corruption/money laundering</u>**

**<u>Overview</u>**:

162. In a period that commenced in approximately 2008/2009, the Defendants did conspire to commit, and did commit, with knowledge of its illegality, a **"pattern of racketeering"**, through the commission of the RICO predicate acts of mail fraud/wire fraud/bribery/obstruction of justice/public corruption, by converting the executive/legislative/judicial branches of the State of New Jersey, the United States Bankruptcy Court and the United States district Court into an association-in-fact racketeering enterprise, the **"SUUN Association-In-Fact Enterprise"**, through which the Defendants perpetrated the **"SUUN Scheme"**, the purpose of which was: **(i)** to eliminate Kaul; **(ii)** have Defendant Christie become the 2016 US President; **(iii)** prevent Kaul from further exposing their crimes, and the securities fraud/bank fraud/bankruptcy fraud of Defendants Allstate/TD/Geico.

163. Central to the perpetration of the **"SUUN Scheme"** was the **"Hospital-Insurance-Pharmaceutical-Industry-Complex"** (**"HIPIC-FC"**) and their monopolization/control of all elements of American medicine by for-profit public/private corporations, whose shared economic mission is the maximization of corporate profit and share price, through the exploitation of the American public (denial of care) and medical profession (license suspension/revocation/incarceration) achieved through their corrupt control of the executive/legislative/judicial branches of state/federal government.

**Christie:**

164. <u>Mail/wire fraud</u>: In a period commencing from approximately 2008/2009 to 2016 Defendant Christie did use the US mail wires in a knowing illegal manner, to exchange information with Defendants Allstate/Geico regarding the perpetration of the first half of the **"SUUN Scheme"** to revoke Kaul's license, destroy his economic standing/reputation and have him eliminated (jail/deportation/killed). From 2016 to 2021, Defendant Christie/counsel did use the US mail/wires in a knowingly illegal manner, to exchange information with Defendants Allstate/Geico/FSMB regarding the second half of the "**SUUN Scheme**" to <u>obstruct his efforts to procure a license anywhere in the world</u> and to violate his prosecutorial rights/obstruct justice by corrupting judges within the United States District Court, in an attempt to prevent Kaul from further exposing their crimes, and the securities fraud/bankruptcy fraud/bank fraud crimes of, amongst others, Defendant Allstate/TD/Geico/Boston Partners (K11-2)/State Street Capital (K11-2)/Stolz. Defendant Christie received substantial shares from Defendants Allstate/TD/Geico as part of the quid pro quo schemes of bribery, to eliminate Kaul.

165. <u>Bribery</u>: In a period from 2008/2009 to 2016, Defendant Christie did enter into a series of quid pro quo schemes with Defendants Allstate/Geico, in which he received bribes under cover of political campaign donations and shares, and monies transferred into multiple tax-free offshore havens, including Israel, the latter having occurred with monies received from, by and through entities associated with Sheldon Adelson and his corporations. An element of these monies pertained to his trafficking of chemical weapon components to Syrian rebel forces between 2012-2013. Adelson sought to destabilize the region, blame Assad, and thus provide

pretext for further Israeli incursion into Arab territories. In a period from 2016 to 2021, Defendant Christie/counsel did corrupt judges within the United States District Court in quid pro quo schemes purposed to violate Kaul's prosecutorial rights and prevent him from exposing the crimes of **The Kaul Cases** Defendants, including their securities fraud/bankruptcy fraud/bank fraud crimes, either through direct or vicarious liability, pursuant to RICO.

166. Obstruction of justice/public corruption: In a period from 2008/2009 to 2016, Defendant Christie conspired to commit, and did commit, in collusion/conspiracy with **The Kaul Cases** Defendants, and as part of the first half of the **"SUUN Scheme"**, an ongoing scheme to violate Kaul's right to justice within administrative/state/bankruptcy/federal courts within the geographic boundaries of the State of New Jersey, based on multiple quid pro quo schemes in which **The Kaul Cases** Defendants funneled bribes to Defendant Christie to have Kaul eliminated. In a period from 2016 to 2021, Defendant Christie/counsel did corrupt judges within the United States District Court to violate Kaul's prosecutorial rights in order to obstruct justice and prevent Kaul from exposing the Defendants decades-long schemes of corruption of American state/federal politicians/judges/legislators and the **"FC"**, and the ongoing securities fraud and bankruptcy fraud/bank fraud.

167. Money laundering: In a period from 2008/2009 to 2017, Defendant Christie did launder the proceeds of his **"SUUN Scheme"** related criminal activity, in the same places that he laundered the proceeds of his many other criminal enterprises, those being: **(i)** his family; **(ii)** the NYSE; **(iii)** off-shore trusts/banks; **(iv)** his law/political lobbying firm; **(v)** his lawyers; **(vi)** his accountants; **(vii)** his public relation personnel (Mercury); **(viii)** investments in Defendants Allstate/TD/Geico/AHS/HUMC (K11-2); **(ix)** real estate holdings.

**Allstate/Geico:**

168. Mail fraud/wire fraud: In a period from 2008/2009, Defendants Allstate/Geico did, with a knowing illegality, use the US mail/wires to exchange information with Defendant FSMB, in furtherance of both the fist half of the **"SUUN Scheme"** and in continued furtherance of the decades-long **"HIPIC-FC"** scheme (1986-Present). In these communications, Defendants

Allstate/Geico conspired with Defendant FSMB to globally disseminate information regarding Kaul's elimination, in order to prevent him exposing their crimes. From 2016 to 2021, Defendants Allstate/Geico/counsel did, with a knowing illegality, use the US mail/wires to exchange information with Defendant FSMB/counsel and all **The Kaul Cases** Defendants/counsel, in furtherance of the second half of the **"SUUN Scheme"** to violate Kaul's prosecutorial rights in the United States District Court through judicial corruption; in order to prevent him exposing the Defendants prior crimes (2008/2009-2016) in the executive/legislative/judicial branches of the State of New Jersey and the United States Bankruptcy Court, in addition to attempting to conceal their securities fraud crimes in the NYSE (2016-2021).

169. Bribery: Defendants Allstate/Geico have, since 1986, participated in an illegal bribery-based scheme of racketeering with Defendant FSMB, the **"HIPIC-FC"** scheme, purposed to monopolize the entire American healthcare system, a monopolization made possible by the corruption/control of the American judiciary and body politic, and facilitated in 2010 by Citizens United. From 2008/2009 to 2016 Defendants Allstate/Geico/FSMB perpetrated a massive series of crimes against Kaul, though the conduction of a **"pattern of racketeering"** through the **"SUUN Association-In-Fact Enterprise"** and in furtherance of the first half of **"SUUN Scheme"** and the entire **"HIPIC-FC"** scheme.

170. Obstruction of justice/public corruption: From 2008/2009 to 2016, Defendants Allstate/Geico did with knowing illegality, use the US mail/wires to exchange information with Defendant FSMB, regarding the **"SUUN Scheme"** to eliminate Kaul. From 2016 to 2021, Defendants Allstate/Geico/counsel did with knowing illegality use the US mail/wires to conspire to commit, and commit corruption of judges within the United States District Court, to violate Kaul's prosecutorial rights and obstruct justice, in order to prevent Kaul from further exposing the Defendants prior crimes (2008/2009-2016) in the executive/legislative/judicial branches of the State of New Jersey and the United States Bankruptcy Court, in addition to attempting to conceal their securities fraud crimes in the NYSE (2016-2021).

171. <u>Money laundering</u>: Defendants Allstate/Geico did launder and continue to launder the proceeds of their crimes (2008/2009-2021) through the NYSE and global investment community, including the sovereign funds of many other nations, and exchanges, including the London, Shanghai, and Bombay Stock Exchanges. Defendants Allstate/Geico continue to fail to disclose to international markets their ongoing commission of securities fraud (2016-Present), and the liability this continues to cause to private/sovereign funds currently invested/investing in these Defendants. Defendants Allstate/Geico have not disclosed the **$28,000 trillion +** liability in any filings, anywhere in the world, at any point in time after 2016.


**FSMB:**

172. <u>Mail fraud/wire fraud</u>: In a period from 2008/2009 to 2016, Defendant FSMB did, with knowing illegality, use the US mail/wires to exchange information with Defendants Allstate/Geico regarding the first half of the **"SUUN Scheme"** pertaining to the elimination of Kaul. From 2016 to the present, Defendant FSMB did similarly use the US mail/wires to conspire with **The Kaul Cases** Defendants/counsel to commit acts of corruption of judges/senators within the United States District Court/US Government, purposed to violate Kaul's prosecutorial rights and obstruct justice, in order to prevent Kaul from further exposing **The Kaul Cases** Defendants crimes (2008/2009 to 2016), in addition to attempting to conceal their securities fraud crimes (2016-Present). From 2014 to 2021, Defendant FSMB, in collusion/conspiracy with and through the **"FC"**, did conspire with **The Kaul Cases** Defendants/counsel to attempt to obstruct Kaul from procuring a medical license anywhere in the world, in order to violate his prosecutorial rights by restricting his access to capital, to prevent him from exposing the crimes (2008/2009 to 2021) of **The Kaul Cases** Defendants (mail fraud/wire fraud/perjury/extortion/kickbacks/obstruction of justice/public corruption/evidence tampering/witness tampering/securities fraud/bankruptcy fraud/bank fraud/money laundering/judicial corruption/kidnapping/manslaughter/chemical weapon trafficking).

173. <u>Bribery</u>: Since 1986, Defendant FSMB has conducted ongoing schemes of bribery with for-profit corporations **("HIPIC-FC"),** in furtherance of their scheme to monopolize all elements of

American medicine, from the business of regulation to healthcare commerce. Defendants Allstate/Geico bribed, and continue to bribe Defendant FSMB, to have Kaul eliminated from the market (2012/2014) and to attempt to prevent his re-entry, in order to deny him access to capital, to attempt to prevent Kaul from prosecuting them in the United States District Court. From 2016 to 2021, Defendant FSMB has bribed judges/senators within the United States District Court/US Government, in order to violate Kaul's prosecutorial rights and obstruct justice, in order to prevent Kaul from further exposing **The Kaul Cases** Defendants crimes (2008/2009 to 2016), in addition to attempting to conceal their securities fraud crimes (2016-Present).

174. <u>Obstruction of justice/public corruption</u>: From 2016 to 2021, Defendant FSMB, by, through and with the **"FC"**, and in collusion/conspiracy with **The Kaul Cases** Defendants, did bribe judges/senators within the United States District Court/US Government to pervert the course of justice, and violate Kaul's prosecutorial rights, in order to prevent him from further exposing the crimes of **The Kaul Cases** Defendants.

175. <u>Money laundering</u>: Since 1986, Defendant FSMB, has generated millions of dollars from its **"pattern of racketeering"** within American medicine, through the exploitation of the American public and medical profession. The criminal proceeds have been laundered through investments in corporations publicly traded on the NYSE, including Defendants Allstate/Geico and other health insurance companies including third-party carriers commercially allied with state/federal governments. The proceed are also laundered through law/political lobbying/public relation firms that funnel bribes to state/federal judges/executives/legislators, in exchange for judgments/legislation that further the political/economic agendas of Defendant FSMB and all corporations involved in commerce with the **"HIPIC-FC-Association-In-Fact Enterprise"**.

**RICO 8**
**Association-In-Fact Enterprise: State of New Jersey-United States Bankruptcy Court-United States District Court**
**Defendant Persons: Christie/Murphy/Grewal/Allstate/Geico**
**RICO Predicate Acts: kidnapping/mail fraud/wire fraud/bribery/obstruction of justice/public corruption**

**Overview**:

176. In a period from February 22, 2016 to February 24, 2021, **The Kaul Cases** Defendants did conduct a **"pattern of racketeering"** within the association-in-fact enterprise of the State of New Jersey-United States Bankruptcy Court-United States District Court, and did convert it into a **"racketeering enterprise"**, through which they perpetrated the RICO predicate acts of kidnapping/mail fraud/wire fraud/bribery/obstruction of justice/public corruption/judicial corruption, in order to prevent Kaul from further exposing their crimes prior to the crime of having Kaul kidnapped on May 27, 2021. The scheme functioned in that it caused all cases filed by Kaul, except K11-1/K11-3, to be transferred to the District of New Jersey-Newark. However, the courts in K11-1/K11-3 have refused, in collusion/conspiracy with **The Kaul Cases** Defendants to issue summonses.

**Christie**:

177. Kidnapping: On May 27, 2021, Defendant Christie was served at his law office in Morristown, with a summons and complaint in K11-2. Shortly thereafter, Defendant Christie did, with knowing illegality, conspire with Defendants Murphy/Grewal/Allstate/Geico to have Kaul kidnapped on May 28, 2021, by nine (9) armed individuals (K11-9), who purported to be NJ state police. No warrants were produced, and Kaul was forcibly detained against his will, and rapidly removed to a local police station, where he was chained to a bench. He was then forcibly transferred to another police station and told that he was to be transferred to the Mercer County Jail in Trenton, NJ. Kaul's repeated requests for a warrant were ignored. The events surrounding the kidnapping are detailed in K11-9. This RICO predicate act was committed in order to have Kaul jailed/injured/killed in order to cause him to become unable to

continue the prosecution of K11-2, to prevent him from further exposing the crimes of **The Kaul Cases** Defendants, including those of securities fraud.

178. <u>Mail/wire fraud</u>: In a period from May 27, 2021, to the present, Defendant Christie, with knowing illegality did use the US mail/wires to exchange information with Defendants Murphy/Grewal/Allstate/Geico regarding the planning/execution and unexpected consequences of the 'Kaul Kidnapping Scheme. When the scheme failed, the Defendants, realizing that Kaul would file suit, did use the US mail/wires to conspire with judges/senators in the United States District Court/US Government to violate Kaul's prosecutorial rights by obstructing justice through venue transfer from the Southern District of New York to the District of New Jersey, where the case was dismissed, in an attempt to prevent Kaul from further exposing the crimes of **The Kaul Cases** Defendants (2008/2009 to 2021).

179. <u>Bribery</u>: In a period from 2008/2009 to 2016, Defendant Christie did engage in multiple quid pro quo schemes of bribery with Defendants Allstate/Geico, in which he abused state power to further the economic/political agendas of, amongst others, himself and these corporate Defendants, the principal purposes of which were to have elected as the 2016 US President and to increase share value/executive compensation of Defendants Allstate/Geico, through the knowing/willful exploitation of the American public and medical profession. During his tenure as NJ Governor (2009-2017) Defendant Christie abused state power to have incarcerated many innocent physicians (principally ethnic minorities) to whom the insurance industry owed money for the provision of clinical services. These false prosecutions/convictions were perpetrated by his Attorney General, and in NJ state courts corrupted by Defendants Allstate/Geico.

180. <u>Obstruction of justice/public corruption</u>: Defendants Christie, in conspiring to have Kaul kidnapped, did attempt to violate Kaul's prosecutorial rights, and obstruct justice in the United States District Court, in order to prevent Kaul from exposing the massive crimes of **The Kaul Cases** Defendants, of amongst other things, judicial/political corruption.

**Murphy**:

181. Kidnapping: Defendant Murphy, prior to becoming the NJ Governor was the US Ambassador to Germany, and prior to that was a partner at Goldman-Sachs, a corporation that holds shares in Allstate/Geico, the dividends from which Defendant Murphy continues to profit. Defendant Murphy, recognizing that there were no legitimate means of contesting Kaul's right to continue prosecuting **The Kaul Cases** Defendants, did conspire with Defendants Christie/Grewal/Allstate/Geico to have Kaul eliminated on May 28, 2021, be it by either severe injury and or death, in order to prevent him from further exposing the crimes of **The Kaul Cases** Defendants, including the securities fraud violations. Defendant Murphy, in perpetrating the 'Kaul Kidnapping Scheme', did recognize its illegality and violation of Kaul's basic human rights, but persisted nonetheless, because of the immense civil/criminal liability posed to **The Kaul Cases** Defendants.

182. Mail/wire fraud: Defendant Murphy, in conspiring to perpetrate the 'Kaul Kidnapping Scheme' did, with knowledge of its illegality, use the US mail/wires to exchange information with Defendants Christie/Grewal/Allstate/Geico, about both the execution and the unintended consequences, including the filing/publicization of K11-9.

183. Bribery: Defendant Murphy continues to receive bribes from Defendants Allstate/Geico, under cover of dividends/shares from Goldman-Sachs, and has not, since becoming the NJ Governor, relinquished his or his family's holdings in the corporation, in accordance with NJ law pertaining to state official conflicts of interest.

184. Obstruction of justice/public corruption: Defendant Murphy, in conspiring to have Kaul kidnapped, did attempt to violate Kaul's prosecutorial rights and obstruct justice in the United States District Court, in order to prevent Kaul from exposing the massive crimes of **The Kaul Cases** Defendants, of amongst other things, judicial/political corruption. Defendant Murphy, in furtherance of this scheme to obstruct justice, did in a period from June 15, 2021, conspire with judges/senators in the United States District Court/US Government to have K11-9 transferred from the Southern District of New York to the District of New Jersey, and then dismissed.

**Grewal**:

185. <u>Kidnapping</u>: On May 27, 2021, Defendant Grewal did conspire with Defendants Murphy/Christie/Allstate/Geico to have Kaul kidnapped on May 28, 2021, with the purpose of having him incarcerated in the Mercer County jail in Trenton, over the Memorial Day Weekend, in order to haver him either seriously injured or killed. When the 'Kaul Kidnapping Scheme' commenced on May 28, 2021, at approximately 2:30 pm EST, Defendant Grewal remained in constant contact with the kidnappers, and did, at approximately 7 pm EST, learn that the scheme had publicly failed. Defendant Grewal, in the planning and execution of the scheme, did know that its principal purpose was to have Kaul eliminated, in order to prevent him further exposing the serious and massive crimes (2008/2009-2021) of **The Kaul Cases** Defendants.

186. <u>Mail/wire fraud</u>: Defendant Grewal, in the planning, perpetration and 'damage control' phases of the 'Kaul Kidnapping Scheme' did, with a knowing illegality, use the US mail/wires to exchange information with Defendants Christie/Murphy/Allstate/Geico, and in these exchanges the Defendants revealed their opinion that the scheme would be successful, and Kaul would be mentally and or physically unable to continue his prosecution of **The Kaul Cases** Defendants. Also in these exchanges, were frantic emails that evidenced their fear of public exposure when they learned that the scheme had failed, particularly as it related to the political careers of Defendants Murphy and Grewal.

187. <u>Bribery</u>: Defendant Grewal made the decision to participate in the 'Kaul Kidnapping Scheme' believing that it would be successful. However, when it failed and Kaul sued him on June 15, 2021 (K11-9), he panicked and was transferred to the enforcement division of the SEC, in the belief that it would shield him from Kaul's prosecution. The transfer was the bribe, part of the quid pro quo with the other Defendants, in which they attempted to purchase the silence of Defendant Grewal, while placing him in a position with a perception that it would prevent exposure of the securities fraud crimes of Defendants Allstate/TD/Geico (Berkshire Hathaway).

188. <u>Obstruction of justice/public corruption</u>: Defendant Grewal was appointed the NJ AG in 2017 by Defendant Murphy. He, as with Defendant Murphy, took orders from the insurance industry, in the filing of indictments and or license revocation actions against physicians to whom the insurance industry owed monies. Many of these false cases were brought on fabricated and meaningless claims regarding the prescription of pain-relieving medications. Defendant Grewal participated with Defendants Allstate/Geico/Murphy/Christie in schemes of public corruption and abused state power to violate the Constitutional rights of these physicians, and in the process caused an obstruction of justice, all purposed to further the economic/political agendas of Defendants Christie/Murphy/Allstate/Geico, through the exploitation of the American public and medical profession. Defendant Grewal, in the commission of these RICO predicate acts, did recognize that he, a public servant, was converting the State of New Jersey into a **"racketeering enterprise"** to serve the interests of corrupt corporations/politicians/judges.

**Allstate/Geico**:

189. <u>Kidnapping</u>: From 2006 to 2016, Defendant Allstate employed a multi-pronged strategy to attempt to eliminate Kaul, that included: **(i)** denial of certification for patient clinical care; **(ii)** denial of payment after Kaul provided clinical care; **(iii)** contesting Kaul at every fee arbitration; **(iv)** disseminate falsehoods to lawyers/doctors/surgical centers/hospitals to attempt to destroy Kaul's reputation, and make it impossible for him to work; **(v)** file fraudulent lawsuits against Kaul in corrupted NJ state/federal courts when Kaul wins the arbitration hearings; **(vi)** order the state medical board to revoke Kaul's license; **(vii)** have the state AG and US Attorney/FBI initiate far-reaching investigations purposed to alienate Kaul, have him incarcerated and seize his assets and those of his family; **(viii)** have him indicted on false tax charges; **(ix)** conspire with his ex-wife to have him jailed on unpaid child support charges; **(x)** prevent him access to banking services; **(xi)** bribing judges/senators in federal court/government to obstruct/dismiss all cases filed by Kaul; **(xii)** scheming to have Kaul **KIDNAPPED**/ deported/jailed/seriously injured/killed.

<u>Mail/wire fraud</u>: Defendants Allstate/Geico, in the planning/execution/'damage control' phases of the '<u>Kaul Kidnapping Scheme</u>', did, with knowledge of its illegality, use the US mail/wires to exchange information with Defendants Murphy/Christie/Grewal.

190. <u>Bribery</u>: In conspiring to commit the RICO predicate act of kidnapping, Defendants Allstate/Geico did funnel bribes to Defendants Christie/Murphy/Grewal, as part of a quid pro quo scheme, in which Defendants Christie/Murphy/Grewal sold, without the public's permission, state power to Defendants Allstate/Geico, in furtherance of their efforts to eliminate Kaul, and prevent him from further exposing their crimes.

191. <u>Obstruction of justice/public corruption</u>: In having Kaul kidnapped, **The Kaul Cases** Defendants did attempt to violate his prosecutorial rights in the United States District Court, in the belief that he would either be unwilling or unable to continue the prosecution of his claims, and did in the process, attempt to cause a knowingly illegal obstruction of justice within the United States District Court. Defendants Allstate/Geico, in coopting a state police agency into the commission of the crimes of kidnapping/mail fraud/wire fraud to obstruct justice in the United States District Court, did simultaneously: **(i)** convert the State of New Jersey into a **"racketeering enterprise"** through which the Defendants, being aided/abetted by the state police, did conduct a **"pattern of racketeering"** through the commission of RICO predicate acts; **(ii)** convert the United States District Court into a **"racketeering enterprise"** through which the State of New Jersey, being aided and abetted by the Defendants/NJ state police, did conduct a **"pattern of racketeering"** through the commission of the RICO predicate acts of obstruction of justice/kidnapping/mail fraud/wire fraud/bribery, all purposed to eliminate Kaul and prevent him from further exposing their corporate decimating crimes.

## RICO 9

**Association-In-Fact Enterprise: State of New Jersey-State of New York-NYSE ("SSN Association-In-Fact Enterprise)**
**Defendant Persons: Allstate/Geico/FSMB/Hengerer**
**RICO Predicate Acts: Bribery/Mail Fraud/Wire Fraud/Obstruction of Justice/Conspiracy**

**Overview:**

192. In a period that commenced in late 2020, the Defendants did conspire to, and did conduct a knowingly illegal **"pattern of racketeering"** through the **"SSN Association-In-Fact Enterprise"**, through the commission of the RICO predicate acts of mail fraud/wire fraud/obstruction of justice/conspiracy, the purpose of which was to prevent Kaul from obtaining a physician license in the State of New York, in an attempt to stymie his economic resurgence, in the belief that such a scheme would mitigate the exposure of their crimes from 2008 onwards, amongst which are bribery/public corruption/evidence tampering/witness tampering/bankruptcy fraud/bank fraud/mail fraud/wire fraud/judicial corruption/perjury/kickbacks/securities fraud.

193. In the commission of obstructing Kaul's efforts to obtain a license in the State of New York (October 2020 to July 2021), the Defendants did conspire to and did use a multitude of frauds to attempt to deceive, delay and deny Kaul's application, by using the US wires to propagate knowingly false information that there existed a question of so called **"moral character"**, and failed to produce any state policy regarding the regulation of any process of character assessment. Kaul made multiple requests for such a policy, but none was provided, and instead, the Defendants conspired with an individual by the name of **"Vincent Vollaro"** to attempt, on June 17, 2021, to engage me in a non-recorded phone call, in which he would **"explain the process"** to me. The call did not occur, but its purpose was to fabricate evidence to bolster their false position regarding moral character.

194. On July 14, 2021, consequent to Kaul having sent letters to <u>every</u> member of the NY State Government regarding the state's liability for the crimes of **The Kaul Cases** Defendants, the Defendants did conspire with **"Vollaro"** to use the US wires to transmit a knowingly fraudulent

58

document, in which **"Vollaro"** asserts that a **"subcommittee"** of the state medical board had purportedly found there existed a **"question"** regarding moral character. Kaul's requests for a copy of the transcript and signed opinion of the supposed subcommittee were ignored and then denied.

195. On August 27, 2021, Kaul filed a petition (Kaul v Zucker/Hengerer: 101019-2021) in the New York Supreme Court (Borough of New York), that sought to compel Defendant Hengerer to produce the purported **"subcommittee"** opinion. To date no physician/member of the New York State Medical Board has confirmed participating in any evaluation of Kaul's application.

**Hengerer:**

196. Defendant Hengerer is a board director on Defendant FSMB, with whom he engages in commerce related to the business of so called **"physician discipline"**, and in the perpetration of this scheme he does abuse the authority as the Chairman of the Board for Professional Medical Conduct, to eliminate physicians targeted by Defendants Allstate/Geico, to whom the Defendants owe money.

197. Defendant Hengerer, cognizant of the illegality of his participation in the **"HIPIC-FC"** scheme, has persisted in his unlawful use of the US mail/wires to propagate the scheme to both eliminate physicians and prevent Kaul, an individual suing entities from whom he receives bribes, from properly participating in the relevant market, an offense that Defendant Hengerer recognizes is violative of antitrust law and Kaul's constitutional/human rights.

198. Defendant Hengerer, despite knowing the penalties associated with his violation of law and of Kaul's rights, was motivated to commit the crimes because of the economic benefit that inured to him, and because of his recognition that Kaul's pioneering minimally invasive outpatient spine surgery, did pose a substantial threat to the business of American hospitals and the American Hospital Association. Defendant Hengerer was paid to be a surgical chairman at Strong Memorial Hospital in Rochester, NY for many decades.

199. In a period from May 13, 2021, Defendant Hengerer, despite being noticed on multiple occasions by Kaul that he was participating in a **"pattern of racketeering"** did continue with his knowingly unlawful conduct.

**FSMB/Allstate/Geico:**

200. The introduction of the HCQIA in 1986 foreshadowed and created the conditions that spawned the **"HIPIC-FC"**, a scheme that Defendants Allstate/Geico/FSMB have used to convert American healthcare into a massive **"racketeering enterprise"** purposed simply for profit at the expense of the American public/medical profession, the singular goal of which is to increase share price at the cost of human life. The American Hospital Association shares the same exploitative business vision, and on February 22, 2018, a CNBC story published a ProPublica list of hospitals that receive vast sums of money from corporations doing business in the healthcare sector, and Strong Memorial Hospital is on the list.

201. Defendants FSMB/Allstate/Geico did conspire with Defendant Hengerer to use the New York State physician licensing apparatus to conduct a **"pattern of racketeering"** and did recognize that in committing these crimes, did convert the State of New York into a **"racketeering enterprise"**, the principal purpose of which was to mitigate any further exposure to the global equities market/international regulators of their crimes of securities fraud crimes.

202. Defendants Allstate/TD/Berkshire Hathaway-Geico and their counsel do know that on September 7, 2021, a release was published to the world-wide-web entitled: **"United States Securities And Exchange Commission Alerted To Securities Fraud Crimes Of Three Titans Of North American Finance"**, and that the release was disseminated to the CEOs/CFOs of the S/P 500. On September 7, 2021 Defendant Allstate's share price was 134, and on September 11, 2021 it was less than 132.

203. In this period, Defendants Allstate/TD/Berkshire Hathaway-Geico did use the US wires to transmit knowingly false information to their shareholders/global investment community that violates section 10(b) of the Securities/Exchange Act, in that they failed to inform the market of

a pending action in the Indian High Court (K11-5) and attempted to frame this Court's denial without prejudice of Kaul's Summary Judgment motion, as evidence of their lack of guilt.

204. The Defendants ongoing crimes constitute an **"ongoing open-ended pattern of racketeering"** being conducted in collusion/conspiracy with Defendant Hengerer through the **"SSN Association-In-Fact Enterprise"**, that continues to violate Kaul's constitutional/human rights, in that he continues to be deprived (2012-Present) of his right to a livelihood, his right/duty to support his children and his right to freedom. The Defendants, in knowledge of their immense civil/criminal liabilities in multiple international jurisdictions, did on May 27, 2021, attempt to have Kaul seriously injured/killed.

205. Pursuant to RICO's doctrine of vicarious liability, all of **The Kaul Cases** Defendants have incurred, and will continue to incur liability of the aforementioned crimes, and any further ones that any of the Defendants might commit.

### Violation of Civil Rights
### Symbiosis of State/Private Actors

206. **Applicable state function tests**:

1. The Symbiotic Test
2. The Joint Participation Doctrine
3. The State Command and Encouragement Test
4. The Pervasive Entwinement Test
5. The Public Function Test

207. **Facts of test confirmation**:

The above pled facts regarding: **(i)** the exchange between private and state actors, of monies and information pertaining to **"patterns of racketeering"** conducted through the executive/legislative/judicial branches of the State of New Jersey, the United States District Court and the United States Bankruptcy Court; **(ii)** the purchasing by private actors of state

functions through schemes of judicial/political bribery; **(iii)** the funding by the State of New Jersey of legal defenses of private actors in **The Kaul Cases,** do confirm the intertwinement, for the purposes of section 1983 claims, of the state actor status of the private actors/defendants, and that the crimes committed against Kaul by the private actors/defendants, are the crimes of the State.


**Section 1983 claim**
**Violation of 1st/2nd/4th/5TH/6th/8TH/14TH Amendments**


208. The Law:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."


209. **The Facts:**

In a period from 2008/2009 to the present, the Defendants, as state-actors did abuse state/federal power to knowingly/willfully violate and deprive Kaul of his constitutional rights pursuant to the 1st/2nd/4th/5th/6th/8th/14th amendments, and that these violations did illegally deprive Kaul of: **(i)** his property; **(ii)** his right to due process; **(iii)** his right to freedom of speech; **(iv)** his right to an impartial tribunal; **(v)** his prosecutorial rights; **(vi)** his right to equal protection; **(vii)** his liberty and a decade of his life. These injuries were perpetrated by private/state/federal actors, and through the State of New Jersey, the United States Bankruptcy

Court, the United States District Court and the NYSE. The commercial nexus between Defendants Allstate/TD/Geico and Defendant ICE, and the complicity of Defendant ICE in the securities fraud violations of Defendants Allstate/TD/Geico,
does confer state-actor liability on Defendant ICE with regards to the violations of Kaul's constitutional rights.

210. **The Kaul Cases** Defendants were, and are motivated to commit, and continue to commit these violations of Kaul's human rights, in order to prevent Kaul from exposing their crimes, including those of defrauding the global equities market.

### UN Human Rights Violation
### The United Nations Universal Declaration of Human Rights

211. **The Kaul Cases** Defendants have knowingly/willfully abused the power of the American State to violate Kaul's human rights as enshrined in the Universal Declaration of Human Rights.

**BASCH CLAIM**
**RICO**
**Association-In-Fact Enterprise: State of New Jersey-Rivkin Radler-United States District Court**
**("SRU Association-In-Fact Enterprise"/"SRU Scheme")**
**Defendant Persons: Geico/Rivkin Radler/Gersenoff**
**RICO Predicate Acts: mail fraud/wire fraud/bribery/public corruption**

**Overview**:

212. In a period that commenced in or about 2008/2009, Defendants Geico/Rivkin Radler/Gersenoff did conspire to conduct, and did with a knowing illegality, conduct a **"pattern of racketeering"** through the **"SRU Association-In-Fact Enterprise"**, through the commission of the RICO predicate acts of mail fraud/wire fraud/bribery/public corruption, in the perpetration of the **"SRU Scheme"** under cover of the State of New Jersey and the United States District Court. The scheme is purposed to exploit the medical expertise of Plaintiff Basch and defraud him of his property, by illegally using the power of the United States District Court, in order to increase corporate/executive compensation and share price

213. The **"SRU Scheme"** is purposed to increase Defendant Geico's executive compensation/share price, and Defendant Rivkin Radler/Gersenoff's 'legal fees', at the expense, and through the grave exploitation of the American public and medical profession. The Defendants have been aided and abetted in their scheme by corrupted judges within the United States District Court for the District of New Jersey/corrupted politicians within both the state/federal governments/corrupted media outlets, the role of the latter entity being to digitally disseminate slanderous/libelous information about the person/s against whom they file suit.

214. Defendant Geico has perpetrated, and continues to perpetrate this scheme, at the heart of which lies the same **"pattern"** of fraud, and it is this: There exists within New Jersey a no-fault arbitration system that adjudicates claims filed by physicians and other health related professionals, against auto-insurance carriers for compensation regarding care life-saving care delivered to their clients, who have sustained injuries in car accidents. If a physician prevails in

64

these arbitrations, members of this sector of the insurance industry then file knowingly fraudulent lawsuits in state/federal court within the geographic boundaries of the State of New Jersey, seeking to re-litigate their losses in state sanctioned arbitration forums, to whose jurisdiction they submitted.

215. In the arbitration proceedings the Defendants scheme to intentionally omit the arguments they subsequently submit in state/federal courts, as they recognize that the physician has no legal costs in the arbitration (paid by losing insurance carrier), but that state/federal courts actions will require the physician to retain a lawyer at his own enormous cost. Within the subsequent state/federal court actions, the Defendants conspire to file, and do file knowingly false, **evidentially un-supported** RICO claims, in which they seek not only monetary amounts far in excess of what they paid the physician, but injunctions to stop the physician ever treating any of their injured clients. This is their **"open-ended pattern of racketeering"**, one in which they have converted the United States District Court into a massive **"racketeering enterprise"** not dissimilar to the one they have created within American state/federal governments, and the NYSE/SEC.

216. As a consequence of the Defendants **"racketeering",** Plaintiff Basch has sustained, and continues to sustain substantial and irreparable injury to his reputation and finances and has no other recourse than to bring suit in this Court. The Defendants have corrupted the judges/court within the District of New Jersey (K11-1/K11-3), and thus Plaintiff Basch, in exercising his Constitutional right to due process/impartial tribunal is afforded the right to vindicate his rights in any court within the United States District Court, other than the District of New Jersey.

**Geico**:

217. Mail Fraud/Wire Fraud: In a period from 2008/2009 to 2021, Defendant Geico did, with a knowing illegality, and in collusion/conspiracy with judges in the District of New Jersey/Defendant Rivkin Radler/Gersenoff use the US mail/wires in furtherance of the **"SRU Scheme"** and through a **"pattern of racketeering"** whose continuity is **"open-ended"**  and has knowingly and respectively converted the United States District Court and it's judges into a

"racketeering enterprise" and aiders/abettors of the Defendants decade-plus-long crime. Defendant Geico launders the process of its criminal enterprise through the NYSE and members of the S/P 500, a fact they conceal from the global equities market.

218. Bribery/Public Corruption: In a period from 2008.2009 to 2021, Defendant Geico, in collusion and conspiracy with Defendants Rivkin Radler/Gersenoff, did use the US mail and wires to conspire to commit, and did commit the RICO predicate acts of bribery/public corruption, in funneling bribes to judges within the District of New Jersey in a series of quid pro quo schemes, in which corrupted judges did enter order/judgements adverse to Plaintiff Basch and other physicians, while entering orders/judgments advantageous to Defendant Geico. In the commission of these crimes, Defendants Geico/Rivkin/Radler did know the illegality of their misconduct and did know the severe civil/criminal penalties associated with such felonious conduct. The Defendants corruption of the United States District Court has violated and continues to violate the Constitutional right of Plaintiff Basch to due process/impartial tribunal/equal protection, when life/liberty/property are at stake, as they are here. Defendant Geico has also violated the right of Plaintiff Basch to independent counsel, in that the Defendants continue to conspire to coerce his counsel into having Plaintiff Basch concede to the Defendants fraudulent claims.

**Rivkin Radler**:

219. Mail Fraud/Wire Fraud: In a period from 2008/2009 to 2021, the law firm of Rivkin Radler has conducted and continues to conduct massive schemes of mail and wire fraud, in which, on a weekly basis, it uses, with a knowing illegality, the US mail/wires to exchange fraudulent information with members of the NJ state/federal judiciary and governments, in furtherance of its multiple **"ongoing"** illegal schemes, that do provide the basis for this complaint. Defendant Rivkin Radler is a central cog in the Defendants **"pattern of racketeering"** conducted in **"enterprises"** and association-in-fact enterprises over a decades-plus-long period in which it has used the cover of its law firm/attorney-client privilege to perpetrate a massive criminal enterprise, in collusion/conspiracy with the State of New Jersey and the United States District Court. Defendant Rivkin Radler has used and continues to use this criminal enterprise to inflict

intentional harm on the economic standing and reputation of Plaintiff Basch, harm for which he now seeks recompense.

220. <u>Bribery/Public Corruption</u>: Defendant Rivkin Radler has within the last two (2) decades, if not longer, perpetrated massive schemes of judicial/public corruption, in which it has both acted as a conduit of bribes from corporations to state/federal politicians/judges, monies that it has disguised as 'legal fees' and 'political campaign donations', **and** a progenitor of bribes/favors to corrupted judges, to whose family members it provides 'no show' jobs. It has conducted these illegal schemes with impunity, as it knows its corporate masters control the investigative/prosecutorial arms of state/federal government. Defendant Rivkin Radlker has employed and continues to employ this scheme against Plaintiff Basch, to violate his Constitutional right to due process/impartial tribunal/equal protection, in its pursuit of profit through the exploitation of the medical expertise and economic welfare of Plaintiff Basch. Defendant Rivkin Radler has conducted these illegal schemes of bribery/public corruption with knowledge of their illegality.

**Gersenoff:**

221. <u>Mail Fraud/Wire Fraud</u>: Defendant Gersenoff, in a period from 2008/2009 to 2021, has used, with a knowing illegality, the US mail/wires to exchange information with **The Kaul Cases** Defendants and Defendants Rivkin Radler, regarding the planning and execution of the multiple **"racketeering schemes",** including the **"SRU Scheme"**, in which Defendant Gersenoff acknowledged that Defendant Geico's strategy was to file knowingly false RICO claims against physicians to whom Defendant Geico owed monies and against whom Defendant Geico had lost in state sanctioned arbitration hearings. Defendant Gersenoff acknowledged that these filings did constitute the crimes of mail/wire fraud but stated that because Defendant Geico had corrupted the judges/prosecutors/politicians in the District of New Jersey, their crimes would remain un-investigated and un-prosecuted, and that all lawyers in the District of New Jersey had either been corrupted or were too fearful to file racketeering claims against Defendant Geico. Defendant Gersenoff admitted during one phone call, that Defendant Geico controlled the entire judicial/prosecutorial apparatus within the District of New Jersey.

Defendant Gersenoff's 'Fraud on the Court' scheme has caused and continues to cause injury and violation to the Constitutional rights/economic standing/reputation of Plaintiff Basch, for which he now seeks recompense in this Court.

222. Bribery: Defendant Gersenoff has, within the last two (2) decades, conducted a **"pattern of racketeering"** with knowing illegality, through the enterprise of the law firm of Defendant Rivkin Radler, by aiding and abetting, and using the attorney-client privilege as cover for the crime of trafficking bribes from Defendant Geico to state/federal politicians/judges, in furtherance of massive quid pro quo schemes, that have exploited, and continue to exploit the American public and medical profession in pursuit of corporate/shareholder profit. For these ongoing/willful injuries, Plaintiff Basch seeks recompense.

# Relief

On February 22, 2016, in K1 (Kaul v Christie: 16-CV-02364) the first of **The Kaul Cases**, Kaul set forth in the Complaint, the calculations underpinning his monetary demand. From this date until September 12, 2022, not one of **The Kaul Cases** Defendants, nor any of the intervening judges, have submitted argument/opinion/fact that demonstrates and or proves any flaws in the calculation, and have thus implicitly validated its accuracy. Instead, the submissions have consisted entirely of unsubstantiated derogations, that are consistent with **The Kaul Cases** Defendants six (6) years-worth of frivolous briefing, judicial corruption, and evidential avoidance. The demands in K11-10 remain unchanged.

# Certification

We, the Plaintiffs, do certify that the above statements are true and accurate to the best of our knowledge, and that if it is proved that we knowingly and willfully misrepresented the facts, then we will be subject to punishment.

_____                    _____
RICHARD ARJUN KAUL, MD                                    DAVID BASCH, MD

DATED: March 9, 2023

69

**Exhibit 1**

(Rev. 7.30.2020)

**ATTORNEY GRIEVANCE COMMITTEE**
Supreme Court, Appellate Division
First Judicial Department
180 Maiden Lane, 17th Floor
New York, New York 10038
(212) 401-0800

**JORGE DOPICO**
**Chief Attorney**

Email Complaint and Attachments to: AD1-AGC-newcomplaints@nycourts.gov. In addition, please send **one copy** of your complaint and attachments **by regular mail** to the above address. (If you do not have a personal email account, please send two (2) complete sets of your complaint and all attachments. There may be a delay in processing your matter if it is not emailed. Please **do not** include any original documents because we are unable to return them.)

**Background Information**

Today's Date: 11/30/2022

Your Full Name: (Mr. Ms. Mrs.) RICHARD ARJUN KAUL, MD/DAVID BASCH MD

Address: 440c SOMERSET DRIVE

City: PEARL RIVER     State: NY     Zip Code: 10965

Cell Phone: 973 876 2877     Business/Home Phone: _____

Email Address: drrichardkaul@gmail.com

Are you represented by a lawyer regarding this complaint? Yes ✔ No ___ If Yes:

Lawyer's Name: N/A

Address: _____

City: _____ State: _____ Zip Code: _____

Business Phone: _____ Cell Phone: _____


**Attorney Information**

Full Name of Attorney Complained of: (Mr. Ms. Mrs.) JAMES PAUL OETKEN

Address: Room 706, 40 Foley Square

City: New York     State: NY     Zip Code: 10007

Business Phone: 212 805 0266     Cell Phone: _____

Email Address: _____

Date(s) of Representation/Incident: 11/30/2022

Have you filed a civil or criminal complaint against this attorney? Yes ☐ No ✔ If Yes:

If yes, name of case (if applicable): _____

Name of Court: _____

Index Number of Case (if known): _____

Have you filed a complaint concerning this matter with another Grievance Committee, Bar Association, District Attorney's Office, or any other agency? Yes ✔ No ☐

If yes, name of agency: JUDICIAL DISCIP. COUNCIL/SENATE JUDICIAL COM.

Action taken by agency, if any: PENDING

**Details of Complaint**

Please describe the alleged misconduct in as much detail as possible including what happened, where and when, the names of any witnesses, what was said, and in what tone of voice, etc. Use additional sheets if necessary.

The Respondent, a lawyer, who in his capacity as a judge, has admitted to having enagaged in a series of quid pro quo schemes/exparte communications, in which he received bribes for illegally dismissing a case (attached sheets).The Respondent, in his capacity as a lawyer, did represent corporations for many years, and did, when he became a judge, fail to recuse himself when these same corporations brought cases before him. In these matters, the Respondent, as the record shows, did almost always rule in favor of these corporations. This " pattern" has been in existence since at least 2017.

Complainant's Signature (Required): RICHARD ARJUN KAUL, MD/DAVID BASCH, MD

Judicial Council of the <u>SECOND</u> Circuit

## COMPLAINT OF JUDICIAL MISCONDUCT OR DISABILITY

To begin the complaint process, complete this form and prepare the brief statement of facts described in item 4 (below). The Rules for Judicial-Conduct and Judicial-Disability Proceedings, adopted by the Judicial Conference of the United States, contain information on what to include in a complaint (Rule 6), where to file a complaint (Rule 7), and other important matters. The Rules are available in federal court clerks' offices, on individual federal courts' websites, and on www.uscourts.gov.

Your complaint (this form and the statement of facts) should be typewritten and must be legible. For the number of copies to file, consult the local rules or clerk's office of the court in which your complaint is required to be filed. Enclose each copy of the complaint in an envelope marked "COMPLAINT OF MISCONDUCT" or "COMPLAINT OF DISABILITY" and submit it to the appropriate clerk of court. **Do not put the name of any judge on the envelope.**

1.  Name of Complainant:   RICHARD ARJUN KAUL/DAVID BASCH

    Contact Address:   440c SOMERSET DRIVE, PEARL RIVER

    NY, 10965

    Daytime telephone:   (973) 876 2877

2.  Name(s) of Judge(s):   JAMES PAUL OETKEN

    Court:   SDNY

3.  Does this complaint concern the behavior of the judge(s) in a particular lawsuit or lawsuits?
    ☑ Yes          ☐ No

    If "yes," give the following information about each lawsuit:

    Court:   SDNY

    Case Number:   21-CV-06992

    Docket number of any appeal to the N/A Circuit:   N/A

    Are (were) you a party or lawyer in the lawsuit?
    ☑ Party          ☐ Lawyer          ☐ Neither

Page 1 of 2

If you are (were) a party and have (had) a lawyer, give the lawyer's name, address, and telephone number:

_____

N/A_____

_____

4.    **Brief Statement of Facts.** Attach a brief statement of the specific facts on which the claim of judicial misconduct or disability is based. Include what happened, when and where it happened, and any information that would help an investigator check the facts. If the complaint alleges judicial disability, also include any additional facts that form the basis of that allegation.

5.    **Declaration and signature:**

I declare under penalty of perjury that the statements made in this complaint are true and correct to the best of my knowledge.

(Signature)_____ ℛ K l. — RICHARD ARSON KAUL ___(Date) NOVEMBER 18, 2022_____

_____ JOHN B — DAVID BASCH _____

Page 2 of 2

## STATEMENT OF FACTS

This complaint is filed under the Judicial Conduct and Disability Act of 1980, 28 U.S.C. §§ 351-364 and the Rules for Judicial-Conduct and Judicial-Disability Proceedings, 249 F.R.D. 662 (U.S. Jud. Conf. 2008), and asserts that pursuant to the standard set forth in 28 U.S.C. § 352(b)(1)(A)(iii); Rule 11(c)(1)(D) the within evidence proves and or at least raises an inference that U.S.D.J. James Paul Oetken did commit judicial misconduct, at a point in time between August 19, 2021, and September 12, 2022, in the matter of Kaul/Basch v ICE et al (21-CV-06992).

The evidence includes the tacit admissions by U.S.D.J. Oetken of bribery, conspiracy and exparte communications, who despite recognizing his legal obligations to disclose his financial holdings and exparte communications, has failed to submit this information, a fact that satisfies the 28 U.S.C. § 352(b)(1)(A)(iii); Rule 11(c)(1)(D) inference standard of judicial misconduct. This council has the jurisdiction and authority to order the disclosure of this information, and have definitively addressed the issue of misconduct. However, the Plaintiffs respectfully assert that if this council elects not to compel disclosure, the law will interpret non-election as a finding of misconduct.

The misconduct (bribery/conspiracy/exparte communications) was perpetrated within the State of New York, but this is not the first case in which U.S.D.J. Oetken has engaged in such acts. There exists a **"pattern"** within his case history of always ruling in favor of corporations, and in those cases in which all the litigants were corporations, he always ruled in favor of the largest corporation. An investigation could commence with a closer examination of this **"pattern"**, and a comparison with the financial holdings (stocks/bonds/shares) of U.S.D.J. Oetken in relation to the corporations in whose favor he ruled. This was one of the methods used by journalists at the Wall Street Journal, in researching their September 2021 stories on corruption in the federal judiciary.

This complaint is based not on the merits of U.S.D.J.'s opinion, but on an admitted fraud committed against the apparatus of justice, and does therefore not lie pursuant to 28 U.S.C. § 352(b)(1)(A)(ii); Rule 3(h)(3)(A). The Plaintiffs' decision not to appeal the order, pertains to the tardiness of the procedure inherent in attempting to raise on appeal the issue of 'Fraud on the Court', and is without effect as to the Plaintiffs' position that U.S.D.J.'s opinion is factually/legally erroneous. Similarly, to have appealed the order, as suggested by U.S.D.J. Oetken, would have constituted an admission of the legitimacy of the order and would have foreclosed this council from investigating this complaint, a fact known by U.S.D.J. Oetken. This tactic evidences U.S.D.J.'s wrongful state-of-mind, in that had he known he had not committed misconduct, he would not have attempted to coerce the filing of an appeal. It was the intention of U.S.D.J. Oetken to attempt to permanently foreclose the Plaintiffs from seeking recompense in the United States District Court, by directing the case into the appellate court, knowing that this process would be lengthy and likely would conceal his misconduct.

We declare under penalty of perjury that the statements made in this complaint are true and correct to the best of our knowledge.

_____
RICHARD ARJUN KAUL, MD

_____
DAVID B. BASCH, MD

Date: November 18, 2022

**www.drrichardkaul.com**

**September 13, 2022**

Honorable J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

RECEIVED
SDNY PRO SE OFFICE
2022 SEP 14  PM 2: 12

Re: Kaul/Basch v ICE et al
    21-CV-06992
    K11-7
    Financial disclosures/conflicts of interest/ex parte communications

Dear Judge Oetken,

We write this letter with the utmost respect for you and the federal judiciary, and in recognition of the immense pressures that the above case must have brought to bear on your judgment. However, it is our position, one that is authorized by law and by our rights, that the opinion and order entered on September 12, 2022, will remain invalid until the following information has been disclosed to the record:

1. Forms AO 10 since 2020.

2. Information required pursuant to the Courthouse and Transparency Act.

3. A list of all ex parte communications between yourself and any agents acting on your behalf, and the Defendants or any agents acting on their behalf, that pertains/relates/refers/references or are in any way associated with the aspect of any of K11-7 or any of The Kaul Cases, including but not limited to: (i) the delivery and or receipt of any favor/gift/benefit/advantage/interest to you and or any member of your family to the third-degree, by the Defendants and their agents in return for granting their motions; (ii) the promise of any future delivery and or receipt of any favor/gift/benefit/advantage/interest to you and or any member of your family to the third-degree, by the Defendants and or their agents in return for granting their motions. The pertinent time period is August 19, 2021, to the present.

As you are aware, the issue of judicial corruption has unfortunately appeared prominently within The Kaul Cases, and was featured in a series of Wall Street Journal articles in September

1

2021 (K11-7: D.E. 25 Page 1 – 46 of 50). Consequent to this publicity, and in or around May 2022, the Courthouse Ethics and Transparency Act was passed in response to public pressure against judicial corruption (**Exhibit 1**). Senator Ted Cruz was one of the co-sponsors, a person to whose attention, in January 2021, I brought the issue of judicial corruption (**Exhibit 2**). The misconduct of Senator Charles Schumer regarding his **"Political interference in judicial process"** is highlighted in the letter to Senator Cruz. I understand your appointment to the bench was sponsored by Senator Schumer.

Our request for the public disclosure of the above financial information relates to the fact that your opinion/order are so thoroughly divorced from the evidence/facts/arguments/law of this case, that one cannot but conclude that you, like U.S.D.J. Kevin McNulty (U.S.D.C.-DNJ), Senator Schumer's brother-in-law, have been corrupted. U.S.D.J. McNulty engaged in the same opinion falsifying activity in K1 (D.E. 313-1), as now appears in K11-7 (D.E. 168).

Our request for the public disclosure of all ex parte communications pertains, in part, to the dissemination of notices of preservation to various ex-members of the political/legal/judicial establishment, including Jose Linares, the ex-Chief Judge of the District of New Jersey, who, in mid-late May 2019, suddenly retired from the bench, and took partner status at the law firm of English & McCarter in Newark, New Jersey, after having received a letter from me, requesting his financial disclosure/conflicts of interest (**Exhibit 3**). On May 5, 2022, Mr. Linares was served with a NOTICE OF PRESERVATION in K11-7 (**Exhibit 4**).

We respectfully assert that the principles underpinning Rules 144/455, and those of the due process clauses of the Constitution, are authoritative in this matter, and do render your opinion/order void until your impartiality/lack of bias has been evidentially established.

We thank you for your attention to this matter.

Yours sincerely

RICHARD ARJUN KAUL, MD

DAVID BASCH, MD

cc: All Counsel of Record
    All parties with a legal or other interest

# Exhibit 1

(/)

## Cornyn, Coons Bill to Apply STOCK Act Requirements to Federal Judges Signed Into Law

*In: All News (/newsroom)   Posted 05/13/2022*

Share:  f (https://www.facebook.com/sharer/sharer.php?
u=https://www.cornyn.senate.gov/content/news/cornyn-coons-bill-apply-stock-act-
requirements-federal-judges-signed-law)  (https://twitter.com/intent/tweet?
text=Cornyn%2C+Coons+Bill+to+Apply+STOCK+Act+Requirements+to+Federal+Judges+Sign
ed+Into+Law&url=https://www.cornyn.senate.gov/content/news/cornyn-coons-bill-apply-stock-
act-requirements-federal-judges-signed-law)  (mailto:?subject=Cornyn, Coons Bill to Apply
STOCK Act Requirements to Federal Judges Signed Into
Law&body=https://www.cornyn.senate.gov/content/news/cornyn-coons-bill-apply-stock-act-
requirements-federal-judges-signed-law)

> *"Bill Followed Wall Street Journal Report on Judges Neglecting Financial Disclosure
> Requirements, Avoiding Potential Conflicts of Interest"*

**WASHINGTON** – U.S. Senators John Cornyn (R-TX) and Chris Coons (D-DE) released the following
statements after their *Courthouse Ethics and Transparency Act*, which would require online publication
of financial disclosure reports for federal judges and mandate they submit periodic transaction
reports for certain securities transactions, was signed into law:

*"Excluding federal judges from the same disclosure requirements as other federal officials under the STOCK
Act was a mistake, and I'm glad we could right this wrong,"* said Sen. Cornyn. *"Thank you to my colleagues in
Congress and the Biden Administration for acting quickly to make this the law of the land so we can prevent
conflicts of interest and reassure litigants that they will receive a fair trial."*

*"Every American who has their day in court deserves to know they'll be treated fairly by their judge, and now
that the Courthouse Ethics and Transparency Act is law, they can be more confident than ever that they're
getting equal and unbiased treatment. By signing this bipartisan measure into law, President Biden has
brought badly needed transparency to federal judges' finances by signing this bipartisan measure into law,"*
said Sen. Coons.

The legislation is cosponsored by Senate Judiciary Committee Chairman Dick Durbin (D-IL) and
Ranking Member Chuck Grassley (R-IA) and Senators John Kennedy (R-LA), Sheldon Whitehouse (D-
RI), Ted Cruz (R-TX), and Jon Ossoff (D-GA).

**Background:**

The *Courthouse Ethics and Transparency Act* will require that federal judges' financial disclosure reports be made publicly available online and require federal judges to submit periodic transaction reports of securities transactions in line with other federal officials under the *STOCK Act*. The bill will amend the *Ethics in Government Act of 1978* to:

- Require the Administrative Office of the U.S. Courts to create a searchable online database of judicial financial disclosure forms and post those forms within 90 days of being filed, and
- Subject federal judges to the *STOCK Act*'s requirement of filing periodic transaction reports within 45 days of securities transactions over $1,000.

Importantly, the bill also preserves the existing ability of judges to request redactions of personal information on financial disclosure reports due to a security concern.

Under ethics guidelines and federal law prior to the *Courthouse Ethics and Transparency Act*, federal judges were prohibited from hearing cases that involve a party in which they, their spouse, or their minor children have a financial interest. Federal judges were instead supposed to disqualify themselves in any proceeding in which their impartiality may be questioned. Despite this, a recent report from the Wall Street Journal found that between 2010 and 2018, more than 130 federal judges failed to recuse themselves in nearly 700 cases in which they or an immediate family member held stock in a company involved in the case.

While federal judges were required to submit financial disclosure reports, the law did not provide sufficient transparency or certainty for litigants to discern if the judge has a conflict of interest. The process for obtaining judicial financial disclosure forms was often cumbersome and took months or even years. By contrast, financial disclosure reports for the President, Members of Congress, and Presidential-appointed and Senate-confirmed officials are readily available online.

Litigants need real-time access to judges' financial disclosures and securities transactions in order to preserve the integrity of the proceedings and ensure a recusal when there's a potential conflict of interest in their case. The *Courthouse Ethics and Transparency Act* will enact necessary updates to disclosure rules and provide litigants and the public with greater confidence in the judicial system.

Contact Senator Cornyn ⊕ (/contact)

Keep Informed

First Name

Last Name

E-mail

Sign Up

Washington, DC

<u>www.drrichardkaul.com</u>

**November 18, 2022**

Senator Edward Cruz
300 E 8ᵗʰ, Suite 961
Austin, TX 78701

**Re: Courthouse Ethics and Transparency Act/Financial Disclosures U.S.D.J. James Paul Oetken**

Dear Senator Cruz,

We write this letter to you in your capacity as a member of the Senate Judiciary Committee and a cosponsor of Courthouse Ethics and Transparency Act, and seek your assistance in resolving a matter in which a federal judge has refused to disclose his financial holdings and exparte communications, effectively admitting to having engaged in bribery and corruption of the federal bench. The jurist in question is U.S.D.J. James Paul Oetken of the Southern District of New York.

On September 13, 2022, in the matter of <u>Kaul/Basch v ICE et al: 21-CV-06992</u>, and as per the enclosed letter, we requested from U.S.D.J. Oetken his Forms AO 10 since 2020 and a list of all exparte communications with the Defendants and or their agents. This request was submitted pursuant to the Courthouse Ethics and Transparency Act. In this letter we referenced the articles published in September 2021 by the Wall Street Journal, regrading corruption within the federal judiciary.

We believe this case presents the first test of the Act, and we hope that this test proves the Act has weight.

We thank you for your attention to this matter.

Yours sincerely

_____                    _____
RICHARD ARJUN KAUL, MD                       DAVID BASCH, MD

# INVALIDATING A JUDGMENT FOR FRAUD
## ... AND THE SIGNIFICANCE OF
## FEDERAL RULE 60(b)

### By W. Dean Wagner*

When it can be proved that a judgment of a court was obtained by fraud, the question arises whether or not it can be set aside and a new trial had. The problem to be discussed here is when can relief be obtained. Two different procedures are to be distinguished:

1. A motion in the court that rendered the judgment.
2. An independent action to set the judgment aside brought in the same court or a different court.

Our concern here is with independent action of the kind brought in the federal courts. Federal Rule 60[1] was amended radically in 1946, altering considerably the former rule regarding the setting aside of judgments. The new rule (so far as pertinent) provides:

"(b) . . . Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:
(3) fraud (whether heretofore denominated intrinsic or extrinsic), . . . The motion shall be made . . . not more than one year after the judgment, order, or proceeding was entered or taken . . . *This rule does not limit the power of a court to entertain an independent action . . . or to set aside a judgment for fraud upon the court.*" (Emphasis added)

The rule thus expressly provides that either intrinsic or extrinsic fraud will constitute ground for upsetting a judgment if a motion is made within one year. But whether not only extrinsic but also intrinsic fraud will constitute sufficient ground for upsetting a judgment after the expiration of the year period is uncertain. The plain language of the rule seems to give *carte blanche* authority to a court to grant relief at anytime for any type of fraud. But recent judicial interpretations of the rule point out questions that deserve consideration.

* 3rd year law student, Duke University; A.B. Colgate, 1950.
[1] 28 U.S.C.A. Rule 60; 28 U. S. C. § 1655.

42          DUKE BAR JOURNAL

What is "fraud upon the court" within the meaning of Rule 60's saving clause and how is this to be distinguished from intrinsic and extrinsic fraud? Did the framers of the rule intend to authorize the setting aside of judgments for intrinsic as well as for extrinsic fraud in any case? Were different standards of fraud required for the "independent action" mentioned in the rule than were required for setting aside a judgment for "fraud on the court"? Rule 60(b) is so phrased as to imply that "fraud on the court" is a ground for invalidation of a judgment different from the grounds which will sustain an "independent action"; the clauses using these phrases are separated by another dealing with a quite distinct subject. Was the framers' intent to apply three different rules: one as to direct motions, another as to independent actions not involving "fraud on the court," and a third as to attacks involving "fraud on the court." It seems doubtful that this distinction is sound; for as commentators have suggested,[2] it is difficult to see why any and every instance of fraud is not "fraud upon the court."

The framers' intention is best indicated in the Advisory Committee's discussion of the rule.[3]

"The amendment . . . [makes] . . . fraud an express ground for relief by motion; and under the saving clause, fraud may be urged as a ground for relief by independent action insofar as established doctrine permits.[4] . . . And the rule expressly does not limit the power of the court to give relief under the saving clause.  *As an illustration of the situation see Hazel-Atlas Glass Co. v. Hartford Empire Co. [322 U. S. 238 (1944)].*"  (Italics added.)

"Fraud on the court" as a word of art was new nomenclature introduced in the 1946 amendment to Federal Rule 60. Because of the definite reference to *Hazel-Atlas Glass Co. v. Hartford Empire Co.*,[5] an examination of this case is imperative for a full understanding of the meaning of the phrase.

Hartford, in support of an application for a patent, submitted to the Patent Office an article referring to the contested process as a

[2] Moore and Rogers, *Federal Relief from Civil Judgments*, 55 YALE L. J. 623 (1946), n. 268 at p. 692.
[2a] 28 U.S.C.A. following Rule 60, at p. 313.
[4] The Committee note cites Moore and Rogers, *op. cit. supra* note 2, and 3 MOORE, FEDERAL PRACTICE, (1st ed.), § 60.03, p. 3266. But the meaning of this reference defining and explaining the rule is ambiguous because these two authorities cite the conflict of opinion which is noted in this comment.
[5] 322 U.S. 238 (1944).

"revolutionary device." Although the article was written by Hartford's officials, it was signed by an impartial outsider. This article was instrumental in persuading the Patent Office to grant the application. Hartford then sued Hazel charging infringement of the patent. The Court of Appeals reversed the district court's dismissal of the complaint, largely because of the spurious article. Finally, Hazel capitulated and paid Hartford $1,000,000 and entered into a licensing agreement. The information about the fraud was brought to light about ten years later. Hazel then instituted action to have the judgment against it set aside and the judgment of the district court re-instated. When this case reached the Supreme Court, Mr. Justice Black, writing for the majority of a court divided 5-4, directed the district court to set aside its judgment in the first action entered pursuant to the Circuit Court of Appeals' mandate, and to re-instate its original judgment. The court said:

> ". . . [The] general rule [is] that [federal courts will] not alter or set aside their judgments after the expiration of the term at which the judgments were finally entered . . . [But] every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside the fraudulently begotten judgment. Here . . . we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals . . . The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud . . ."[6]

The opinion did not refer to the distinction between extrinsic or intrinsic fraud. Prior to this case there had been two conflicting Supreme Court decisions, the earlier one holding that an independent action to set aside a judgment can be founded only upon extrinsic fraud, the other holding that intrinsic fraud suffices. The court's failure to characterize the fraud practiced by Hartford justified a belief that a liberal doctrine was to be applied in the federal courts, and that fraud synonymous with the *Hartford* fraud would be a basis for relief. Since the *Hartford* case was used by the Advisory Committee to define the term "fraud on the court," what this case means is what Federal Rule 60(b) means.

[6] *Id.* at 244, 245.

44          DUKE BAR JOURNAL

## Fraud as Ground for Independent Attack
### Before Rule 60(b)

It has generally been stated that "the acts for which a court of equity will on account of fraud set aside or annul a judgment or decree between the same parties rendered by a court of competent jurisdiction have relation to frauds extrinsic or collateral to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered."[7]  There is little doubt that the majority state rule is that the only type of fraud for which a court of equity will upset a judgment is extrinsic fraud; that intrinsic fraud does not afford ground for relief.[8]  The statement of the law is clear, but its application can lead to perplexities because it often will be difficult to categorize the fraud in question.[9] The Supreme Court has added confusion by rendering inconsistent decisions relating to the type of fraud needed to upset a judgment; in one case stating flatly that extrinsic fraud only would be ground for setting aside a judgment in an independent attack[10] and in a later decision allowing intrinsic fraud to constitute ground for setting a judgment aside.[11]  It has been suggested that the rule of the earlier *Throckmorton* case (extrinsic fraud only) and the rule of the later *Marshall* case (intrinsic fraud suffices)[12] are not in

---

[7] United States v. Throckmorton, 98 U. S. 61, 68 (1878).

[8] *Cf.* RESTATEMENT, JUDGMENTS, § 126 with § 121. See FREEMAN, JUDGMENTS, § 1233; 3 MOORE, FEDERAL PRACTICE, (1st ed. 1938), § 60.03; 126 A.L.R. 386.  Extrinsic fraud is illustrated by McGuinness v. Superior Court, 196 Cal. 222, 237 Pac. 42 (1925), where the fraud alleged was the failure to notify interested parties of the pendency of a suit.  Metzger v. Turner, 158 P.2d 701 (Okla. Sup. Ct. 1945) illustrated an application of intrinsic fraud. The defendant in an action to quiet title wherein a default judgment had been entered against him sought to have the judgment vacated on the ground of fraud, alleging that the plaintiff had made false allegations that he had good title, and falsely alleged that he was in possession when in fact he was not. It was held that the fraud complained of was intrinsic fraud going to the actual or potential issues in the original suit and was therefore insufficient ground on which to vacate the judgment.  See Note, 24 TEX. L. REV. 233.

[9] It is "a journey into futility to attempt to distinguish between extrinsic and intrinsic matter."  Moore and Rogers, *op. cit. supra* note 2 at p. 658.

[10] United States v. Throckmorton, *supra* note 7.

[11] Marshall v. Holmes, 141 U. S. 589 (1891).

[12] United States v. Throckmorton, *supra* note 7, was a bill in chancery, the plaintiff seeking to have the court set aside the confirmation of a land grant. The fraud alleged was that the defendant had obtained an illegal land grant from a Mexican official who had no authority to give it.  There were other perjured documents involved.  The Supreme Court denied relief.  In Marshall v. Holmes, *supra* note 11, after the close of the term, the defendant against whom the judgments were rendered filed a petition in the same court

conflict.[13]  But a reading of the recent cases demonstrates that different circuits disagree about the effect of these two decisions and are consequently applying different standards.

The third circuit in *Publicker v. Shallcross*[14] thought that the *Throckmorton* case was no longer law.  Rejecting the contention that it was without power to invalidate a judgment obtained by intrinsic fraud, the Court of Appeals, citing the *Marshall* case, said: "We do not consider ourselves bound by [the *Throckmorton*] case for . . . we do not believe it is the law of the Supreme Court today . . ."[15]  The court appended the comment: ". . . [The] truth is more important than the trouble it takes to get it."

On the other hand, the 8th circuit in *Phillips Petroleum Co. v. Jenkins*[16] held that the *Throckmorton* case was still law.  This was an action for relief from a tort judgment against the appellant on the ground that defendant had simulated an injury and disability and conspired with a physician to deceive examining doctors.  The court, citing the *Throckmorton* case, said: "Courts of the United States . . . will not deprive a party of the benefit of a judgment . . . on account of intrinsic fraud."[17]

The Supreme Court has never clarified its position.[18]  But the type of fraud involved in the *Hartford* case would lead to a tentative conclusion that at least some types of intrinsic fraud could be

---

for the annulment of the judgment upon the ground that the judgment had been obtained through the use of false testimony and forged letters.  The Supreme Court granted relief.

[13] See Chicago, R. I. & P. Ry. Co. v. Callicotte, 267 Fed. 799 (8th Cir. 1920), *cert denied* 255 U. S. 570 (1921); 16 A.L.R. 386.

[14] 106 F.2d 949 (3rd Cir. 1939), 126 A.L.R. 386, *cert denied* 308 U. S. 624 (1940).

[15] *Id.* 106 F.2d at 950.

[16] 91 F.2d 183 (8th Cir. 1937).

[17] *Id.* at 187.

[18] This inconsistency in the federal courts was attempted to be resolved in Craver v. Faurot, 64 Fed. 241 (C.C.N.D. Ill. 1894), *reversed* 76 Fed. 257 (7th Cir. 1896), *certif. dismissed* 162 U. S. 435 (1896), where the court, "feeling that United States v. Throckmorton and Marshall v. Holmes were in direct conflict and not knowing which way to govern, sent the case to the Supreme Court on a certificate of importance.  The Supreme Court refused to hear the merits, disposing of the case on a technicality as to the validity of the use of a certificate of importance." 3 MOORE, FEDERAL PRACTICE, (1st ed.), § 60.03, n. 17, p. 3268.

A law writer in 21 COL. L. REV. 268 commented, "As for the federal rule . . . it must remain unsettled.  Since the courts are at liberty to cite either line of authority, and do so as suits their convenience, the only possible answer in spite of repeated assertions to the contrary that the federal rule is clear is that there is no federal rule at all."

46      DUKE BAR JOURNAL

grounds for upsetting a judgment. Mr. Justice Black's assertion that the "agencies of public justice [are] not so impotent that they must always be mute and helpless victims of deception and fraud . . ."[19] would apply to deception committed by intrinsic fraud as well as deception by extrinsic fraud. Perjury is considered intrinsic fraud and since the false article utilized by Hartford seems analogous to perjured evidence there is strong ground for arguing that the more liberal *Marshall* rule was adopted as the federal rule. But, because of the ambiguity of the Supreme Court's position, we find two divergent attitudes expressed among the circuits. The lower federal circuits have been permitted to select the remedial attitude they prefer, in spite of what was a muted command to the contrary in *Hazel-Atlas Glass v. Hartford.*

### Application of Rule 60(b)

As has been seen, the amendment to Federal Rule 60(b) introduced the term "fraud on the court" and no distinction was drawn between extrinsic and intrinsic fraud in the saving clause.[20] Because of the conflicting viewpoints of the cases up to 1946 it is difficult to ascertain what was intended by this new term. But unless the saving clause of the rule was intended to recognize some type of intrinsic fraud as ground for relief in an independent action, the reference to the *Hartford* decision has no meaning.

Certainly it can be validly argued that *Hartford* impliedly suggested that the *Marshall* case overruled the *Throckmorton* case and that the *Marshall* rule was the rule of the federal courts. The Supreme Court's failure to limit the application of the fraud doc-

[19] *Ibid.* Mr. Justice Black also said ". . . tampering with the administration of justice as indisputably shown here involves far more than injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistent with the good order of society."

Two cases decided by the Supreme Court citing the *Hartford* case fail to shed much light on the meaning the court attached to the decision. Universal Oil Products Co. v. Root Refining Co., 328 U. S. 575 (1945), cited the *Hartford* case and said at p. 580, "The inherent power of a federal court to investigate whether a judgment was obtained by fraud is beyond question." But in Knauer v. United States, 328 U. S. 654 (1946), Mr. Justice Frankfurter intimated that the exclusion of intrinsic fraud as a ground for relief might still be the rule.

[20] Recall that the rule expressly provides that either intrinsic or extrinsic fraud can be ground for relief by motion to the court that rendered the judgment.

trine to extrinsic fraud indicated an intent to utilize a more liberal doctrine and to accord injured litigants a wider basis for relief. However, whatever the intent of the Supreme Court, the contention that the *Marshall* rule was the rule of the federal courts (*vis-a-vis* the *Hartford* case) was soon rejected by a lower federal court.

Prior to the adoption of Rule 60(b)'s amendment in 1946, the Court of Customs and Patent Appeals had before it in *Josserand v. Taylor*[21] a petition for leave to file a bill of review in the patent office, the plaintiff claiming that the defendant committed fraud in the interference proceeding in which priority of the invention had been awarded him.   The fraud alleged was perjury, and the court said:

> "We are unable to [agree that the *Hartford* case held] that a judgment or decree rendered by a federal court at a former term,[22] obtained by intrinsic fraud as distinguished from extrinsic or collateral fraud, should nullify a proceeding such as here involved . . . We think it is evident from [that decision] that the Court was of the opinion that 'certain officials and attorneys' of the Hartford Company had entered and carried out a conspiracy to defraud the Patent Office and the Circuit Court of Appeals and that such a conspiracy was not an intrinsic but an extrinsic or collateral fraud."[23]

This decision is important, for if the court's interpretation of the *Hartford* case is correct the new Federal Rule becomes merely a re-statement of the old *Throckmorton* rule.   And, *Josserand v. Taylor* was followed, with respect to the meaning of Federal Rule 60(b), in *Dowdy v. Hawfield*.[24]   The District of Columbia circuit was asked here to set aside the probate of a will because witnesses for the will had given perjured testimony.   The court said:

> ". . . [Rule 60(b)] stipulates that 'This rule does not limit the power of a court to entertain an independent action . . . to set aside a judgment for fraud upon the court.' The Supreme Court in United States v. Throckmorton . . .

[21] 159 F.2d 249 (Ct. Cust. & Pat. App. 1946).

[22] This decision was rendered prior to the amendment to Federal Rule 60. At this time, the rule regarding motions in the court that rendered the judgment was that a court could not upset a judgment rendered at a prior term. The amendment gave a year grace period.

[23] Josserand v. Taylor, *supra* note 21 at 253.   This decision is consistent with the suggestion that the *Hartford* case intended to apply a more liberal rule to patent cases only.

[24] 189 F.2d 637 (D.C. Cir. 1951), *cert. denied* 342 U. S. 830 (1952).

48        DUKE BAR JOURNAL

held that fraud must be 'extrinsic or collateral' to the matter tried by the first court, and not to a fraud in the matter in which the decree was rendered. *Josserand v. Taylor* . . . affirmed this rule and in that case the Hartford case was held not to have changed the rule."[25]

The effect of Federal Rule 60 (b) was thus summarily dismissed. The reasoning was: Federal Rule 60 (b) adopts the *Hartford* rule; *Hartford* in *Josserand v. Taylor* was held to have been merely an application of the rule of the *Throckmorton* case; so the *Throckmorton* rule is still law. The court gave no consideration to the possibility that the framers of the code intended to distinguish between grounds for independent attack and grounds for upsetting a judgment for fraud on the court.

Notwithstanding *Dowdy v. Hawfield*, this same District of Columbia circuit[26] was asked in *Dausuel v. Dausuel*[27] to set aside a judgment of divorce because the decree had been procured by perjury. This was a proceeding on a judgment creditor's bill for alimony wherein the husband filed a cross compliant seeking to set aside the divorce. The trial court dismissed the cross complaint and found generally for the wife. The Court of Appeals held that if the facts were as alleged in the cross complaint the decree of divorce could be vacated. Judge Edgerton said:

"A court may at anytime set aside a judgment for after discovered fraud upon the court. *Hazel-Atlas Glass v. Hartford* . . . Rule 60(b) . . . expressly does not limit the power of a court to entertain an action for that purpose." (Italics added.)[28]

The court did not cite its previous ruling in *Dowdy v. Dowdy;* and by ignoring the distinction between extrinsic or intrinsic fraud implied that it is no longer significant.

New Jersey's Rule of Civil Practice 3:60-2 is identical to Federal Rule 60(b). The New Jersey Supreme Court was asked in *Shammas v. Shammas*[29] to interpret the "fraud on the court" phrase. This was an action for divorce wherein the administrator of the estate of petitioner's second wife filed a petition to set aside

[25] *Id.*, 189 F.2d at 638.
[26] Different judges were sitting.
[27] 195 F.2d 774 (D.C. Cir. 1952).
[28] *Id.*, at 775.
[29] 9 N. J. 321, 88 A.2d 204 (1952); see also Lyster v. Berberich, 65 A.2d 632 (N. J. Super. App. Div. 1949); Williams v. DeFabio, 65 A.2d 858 (N. J. Super. App. Div. 1949); and see 98 U. OF PA. L. REV. 117, n.2.

the divorce decree and adjudge petitioner guilty of contempt for wilfully giving false testimony in the divorce trial. Although the court held that the administrators were strangers to the record and had no standing to attack the judgment, it (1) expressly rejected the *Throckmorton* rule, (2) expressly rejected the argument that if intrinsic fraud was allowed to upset judgments endless litigation would result, and (3) held that either intrinsic or extrinsic fraud was within the "fraud on the court" term.

The New Jersey Supreme Court thus has done what the Supreme Court has failed to do, *i.e.*, it has attached a definite understanding to the meaning of the phrase.

### Conclusion

Rule 60(b) can be interpreted in at least three different ways. An independent action to set aside a judgment for fraud

(1) may be grounded only upon extrinsic fraud,
(2) may be grounded upon either extrinsic or intrinsic fraud,
(3) may be grounded only upon extrinsic fraud, except in those instances where intrinsic fraud constitutes "fraud on the court."

Until now, the courts have been concerned with whether or not "fraud on the court" includes at least some instance of intrinsic fraud or whether this phrase is controlled by the *Throckmorton* rule. However, the phrasing of Rule 60(b) permits the suggestion that "fraud on the court" is a ground for invalidation of a judgment different from the ground which will sustain an "independent action."[30] Such a distinction, however, would tend to multiply the already existing confusion.

The present conflict between the circuits stems from the conflicting decisions rendered by the Supreme Court prior to the adoption of Rule 60(b) and the ambiguity of the term "fraud on the court." The new rule makes it difficult to distinguish the type of fraud which must be availed of within one year, from fraud on the court, which may be urged at anytime. Why is every fraud not a fraud on the court? But as long as the Courts of Appeals have

---

[30] The rule states, "This rule does not limit the power of a court to entertain an independent action, [then a reference to proceedings in rem], or to set aside a judgment for fraud upon the court." Conceivably there are three different circumstances here, with a different rule applicable to each.

inconsistent authorities to cite, Rule 60(b) will stand for the *Throckmorton* rule or the *Marshall* rule depending on the circuit.

Courts refusing to recognize intrinsic fraud as a basis for relief fear the recurring litigation that might result. "Endless litigation in which nothing was ever finally determined would be worse than occasional miscarriages of justice."[31] Yet, on the other hand there is a natural desire to have the courts perform justice and to deny a man the profits of his own wrongdoing. "The notion that repeated retrials of cases may be expected to follow . . . the setting aside of judgments rendered on false testimony will not withstand critical analysis. Rather it is more logical to anticipate that the guilty litigant committing perjury . . . will not risk pursuing the cause further."[32] It is submitted, however, that it is wrong to have different consequences depend on the type of fraud committed —that if "fraud vitiates a judgment" no difference should stem from the label attached to the fraud. The test, rather, should be, was the fraud of the type that the party had a real opportunity to litigate in the first action?[33] If in the opinion of a court a judgment was obtained through the utilization of false records and documents of which a party was justifiably unaware, then the judgment should be set aside, regardless of the fact that the fraud was intrinsic. On the other hand, if a party could have known of the fraud, and had a thorough opportunity to investigate the matter and through his own fault an adverse judgment was rendered, no relief should be available.

Certainly the Supreme Court demonstrated an intent to broaden the scope of the fraud rule in the *Hartford* case and that the framers of Federal Rule 60(b)'s term "fraud on the court" did not restate the *Throckmorton* rule alone. Had the latter been their purpose it seems reasonable to assume they would have said so. Contrary to the opinion in *Josserand v. Taylor, supra,* it is submitted that the Supreme Court adopted and applied the *Marshall* rule in the *Hartford* case and demonstrated an intent to liberalize the federal rule and that Federal Rule 60(b) was an expression of this intent formalized in a rule of procedure.

[31] Fawcett v. Atherton, 298 Mich. 362, 299 N.W. 108; noted in 40 MICH. L. REV. 598.

[32] Shammas v. Shammas, 9 N. J. 321, 88 A.2d 204 (1952).

[33] See, 98 U. OF PA. L. REV. 117; other law notes discussing intrinsic and extrinsic fraud rules are 22 HARV. L. REV. 600; 49 HARV. L. REV. 327; 21 COL. L. REV. 263; 21 ILL. L. REV. 533; 28 GEO. L. J. 848; 36 ILL. L. REV. 894; 24 TEX. L. REV. 223; 12 CORNELL L. Q. 385.

INVALIDATING A JUDGMENT FOR FRAUD                    51

The interpretation of New Jersey's Supreme Court stems from a more realistic understanding of the intention of the framers of Federal Rule 60(b) and of the more sensible application of the doctrine of fraud upsetting judgments.[34]  The *Throckmorton* rule leads to anomalous results: of *X* obtaining relief because his adversary kept one of *X*'s witnesses away from the courtroom and induced the witness not to testify, while *Y*'s judgment against him would stand even though his adversary bribed one of *Y*'s witnesses to utter false testimony on the witness stand.  The label extrinsic or intrinsic adds nothing—and justice should not be predicated on words.

Until now no tests have been recommended for defining "fraud on the court."  Perhaps the rationalization announced in *Hadden v. Rumsey Products*[35] by the district court for the Western district of New York is as wise as possible:

"Out of deference to the deep rooted policy in favor of the repose of judgments . . . courts of equity have been cautious in exercising their power [in upsetting judgments] . . . But when the occasion has demanded, where enforcement of the judgment is 'manifestly unconscionable' . . . they have wielded the power without hesitation."[36]

Until the Supreme Court re-defines its position the "manifestly unconscionable" test will be the only test, and it will remain, as it has been, that despite Federal Rule 60(b) there is no federal rule at all.

[34] Shammas v. Shammas, *supra* note 32, 88 A.2d at 208, "[U]pon principle, we hold that relief for fraud upon the court may be allowed under our rule whether the fraud charged is denominated intrinsic or extrinsic."
[35] 96 F.Supp. 988 (W.D.N.Y. 1951).
[36] *Id.* at 993.

**Exhibit 2**



**IN THE COURT OF THE PRINCIPAL CITY CIVIL AND
SESSIONS JUDGE, BENGALURU**

ORIGINAL SUIT NO._____/2022

**DR. RICHARD ARJUN KAUL**
S/o Late, Richard Arun Kaul,
Aged 57 years,
Mundomthanath House
Poothrikka P.O.
Puthencruz via
Ernakulam
Kerala 682308
India.

**Also at:**
440C, Somerset Drive
Pearl River, New York
NY 10965
USA

Represented by his Power of Attorney
Mr. Ankit Gupta,
S/o. Ramesh Gupta.
Residing at D 193, Main Road,
West Vinod Nagar, Mandawali,
Fazalpur, East Delhi -110 092.                    .....PLAINTIFF

Versus

1. **ALLSTATE SOLUTIONS PRIVATE LIMITED**
   The Indian subsidiary of Allstate Corporation Inc., USA
   Having its registered office at, RMZ Ecoworld,
   7th Floor, Building No. 1
   Devarabeesanahalli Village,
   VarthurHobli,
   Bengaluru - 560103
   Karnataka, India.
   Represented by its Directors.

   **Also at:**
   Allstate Corporation
   3100 Sanders Road
   Northbrook. Illinois
   IL 60062
   USA                                            .....DEFENDANT No. 1



2. **THE STATE OF NEW JERSEY**
   122 W State Street, Trenton
   New Jersey.
   NJ 08608
   USA
   Office of Governor of New Jersey    **....DEFENDANT No.2**

3. **MR. CHRISTOPHER J. CHRISTIE**
   (Father's name not known to the Plaintiff)
   Aged major,
   47 Corey Lane, Mendham
   New Jersey, NJ 07945
   USA    **....DEFENDANT No. 3**

4. **THE NATIONAL MEDICAL COMMISSION OF INDIA (NMC)**
   Formerly known as the Medical Council of India (MCI)
   Phase-I, Dada Dev Mandir Road
   Block P, Sector 8
   Dwarka,
   New Delhi-110077
   India.
       **....DEFENDANT No. 4**

(The above-described Defendant Nos. 1 to 3 are proper Defendants, while the Defendant No. 4, being the regulatory body of medical profession in India, is a formal Defendant only and no material relief is sought against Defendant No. 4)

**MEMORANDUM OF PLAINT UNDER ORDER VII, RULE I, R/W SECTION 26 OF THE CODE OF CIVIL PROCEDURE, 1908.**

The plaintiff submits as follows:

1. The address of the plaintiff for issuance of court notice, summons, etc., is as mentioned in the cause title and that of his counsels, Manjunath N., Brijesh M. Singh, Amit Anand, Nitin Bhatnagar, Advocates Adroit, No. 158, 1st Floor, Sheshadripuram, 1st Main Road, Bengaluru – 560 020.



(3)

2. The address of the defendant for the above said purpose is as mentioned in the cause title.

3. **PLAINTIFF'S INTRODUCTION:**

The Plaintiff named herein, i.e., Dr. Richard Arjun Kaul is a citizen of India, having Indian Passport Number Z2284953 (dated 20.11.2012 issued at New York) and a resident of the United States of America (USA). The Plaintiff was born in India in the city of Hyderabad in the year 1964 and emigrated to the UK with his family in the year 1966, where the family settled in the county of Kent. The Plaintiff graduated in Medicine at the Royal Free Hospital School of Medicine in the year 1988 in UK, and then completed his Post Graduation in the UK and subsequently in USA, having emigrated to the USA 1989. Copies of the Indian Passport and the Medical Degrees attained by the Plaintiff in the UK and USA are attached with this Plaint as **ANNEXURE - A**.

4. The Plaintiff has filed the present Suit and sued the Defendants herein, through his duly constituted Power of Attorney Mr. Ankit Gupta, Son of Mr. Rakesh Gupta, Resident of D 193, Main Road, West Vinod Nagar, Mandawali, Fazalpur, East Delhi-110092, duly executed and notarized in the USA, on 15.03.2022, and attached with this Plaint along with the Vakalatnama. The Plaintiff however undertakes to present himself for answering any material questions or presentations of facts, before this Court in person, as and when directed to



do so. Copy of the Power of Attorney is attached herewith as **ANNEXURE – B.**

5. The Plaintiff is an Indian born and British raised Doctor who successfully emerged as a Surgeon. After of surgical internships in New York, USA, in the early 90s, the Plaintiff began a three-year fellowship in anesthesia, and was certified by the American Board of Anesthosiology in the year 1996. The Plaintiff started an independent practice in the early 2000s and soon became a very successful Medical Practitioner and a minimally invasive spine surgeon and made a mark for himself in the United States. The Plaintiff was soon acknowledged and lauded as pioneer in minimally invasive spine surgery. The Plaintiff successfully performed the first outpatient spinal fusion in New Jersey in February 2005 and became internationally recognized as a specialist and a pioneer in this emerging specialty. The Plaintiff continued to achieve greater professional heights but the rise and feat of the Plaintiff did not go down well with a powerful league and lobby of competitive practitioners, who colluded with the Defendant Nos. 1 to 3 and pulled down the Plaintiff by filing multiple and knowingly false cases against the him, that caused a loss of his vocation, career progression and amongst other things, pecuniary, social and reputational losses, for which the Plaintiff has now been contesting, with other issues, in various legal cases in the Courts in USA.



$\widehat{5}$

**DEFENDANTS' INTRODUCTION:**

6.  The Defendant No. 1 is the Indian Subsidiary of Allstate Corporation, which is one of the largest publicly held Insurance providers in the United States of America. It has also spread its operations in Canada and owns and operates 18 companies around the USA, Canada and India. The Defendant No. 1, Allstate Solutions Private Limited (**ASPL**) is also known as Allstate India and is a subsidiary of Allstate Corporation. It was incorporated in the year 2012 and serves as a strategic business services branch for the Corporation and operates under the overall administration and control of the Allstate Corporation, USA. Copy of the Master Data downloaded from the website of MCA21 is attached herewith as **ANNEXURE- C.**

7.  Defendant No. 2 is the State of New Jersey, USA. The State is sued through the Office of the Governor of the State of New Jersey. The Defendant No. 2 is a necessary and proper party to the present case. It is the Plaintiff's case that the Defendant Nos. 1,2 and 3 have colluded to defame the Plaintiff under the guise of false charges of medical negligence which were inflicted upon the Plaintiff, under the influence and control of a powerful lobby of local medical practitioners, as the Plaintiff's success in the field of minimally invasive spine surgery did not go down well with these individuals who influenced the State, i.e., the Defendant No. 2 and other colluding Defendants, with the motive of inflicting false charges on the Plaintiff to





intentionally destroy his career. The Plaintiff submits that the State of New Jersey has a major role in causing severe irreparable loss and damages to the Plaintiff, in conspiracy and collusion with the other Defendants.

8.   Defendant No. 3, Mr. Christopher James Christie, born on 6th September 1962, is an American Politician, lobbyist and a former federal prosecutor who served as the 55th Governor of New Jersey from the year 2010 to 2018. It is the case of the Plaintiff that during his stint in the office of the Governor of New Jersey, he was one of the colluding Defendants, who acted against the pecuniary, professional, and social interests of the Plaintiff and had been instrumental in inflicting monetary, social and reputational losses upon the Plaintiff and hence the Defendant No. 3 has been rightly impleaded as a necessary and proper party to the present Suit.

9.   Defendant No. 4 is the National Medical Commission, which came into being on 25 September 2020 and has replaced the Medical Council of India. The NMC has been impleaded as a formal Defendant and no pecuniary or material relief has been sought against it. The Defendant No. 4 is regulator for medical education and medical professionals in the country (India) and regulates the registration and enrolment of doctors and medical professionals in the country and grants them the license to practice medicine in India. It is the case of the Plaintiff that the colluding Defendants have, through the Indian





office of the Defendant No. 1, published and communicated negative and adverse material against the Plaintiff to prejudice the Defendant No.4 against the Plaintiff with their false narratives, owing to which, the Plaintiff is not in a position to get registered with the Defendant No. 4 who is likely to adopt a biased approach against the Plaintiff and deprive him of his medical registration in India, thereby causing a position where the Plaintiff shall not be able to practice and settle in his own country as well. The Defendant No. 4 has thus been impleaded as a formal Defendant for the purposes of information and compliance of necessary direction which this Hon'ble may be pleased to pass in the present case.

10. The Plaintiff has for now impleaded only the above described four Defendants. The Plaintiff craves the leave of this Hon'ble Court to add or delete any Defendant, if so, needed at any stage of this case.

11. The impleadment of Defendant No. 4 is essential in order to ensure the rights of the Plaintiff, as guaranteed to every Citizen of India under Article 19(1)(g) of the Constitution of India, which provides the Right to practice any profession or to carry out any occupation, trade or business to all Citizens subject to Article 19(6) which enumerates the nature of restriction that can be imposed by the State upon the above right of the Citizens. It is the case of the Plaintiff that he is being wrongly restricted from exercising his right to practice the medical



⑧

profession. The Plaintiff submits that restriction, if any, has to be tangible and sustainable in law and the same cannot be heaped upon the Citizen simply on the basis of surmises and conjectures, as has been happening in case of the Plaintiff. The Plaintiff submits that the colluding Defendants have been able to build an adverse and negative narrative around the Plaintiff and this has deprived the Plaintiff from getting himself registered with the Defendant No. 4 and the only relief sought against the Defendant No. 4 is in the form of a direction to the said Defendant to allow the Plaintiff to apply for registration and consider his application with unbiased approach and allow the registration in all fairness.  Besides this, no other relief is sought against the Defendant No. 4 and accordingly, the Defendant No. 4 in impleaded as a formal Defendant only.

**FACTS OF THE CASE:**

12. It is the case of the Plaintiff that the Defendants, led by the Defendant No. 1 had lately adopted a, practice of racial discrimination and conspiracy against Indian physicians, Doctors, Medical Professionals and Healthcare providers. The Defendants collude and conspire at international level and inter-alia use the internet and other media platforms to propagate adverse and negative narratives against successful Medical Professionals of Indian origin and cause excessive damage to their professional and social reputation and inflict financial losses to prevent them from finding work or



(9)

employment anywhere in the world including their native country. The Plaintiff has also expressed a reasonable threat to his life from the colluding Defendants.

13. The Plaintiff submits that around the year 1998, the Defendant No. 1 commenced the engineering of a racially discriminating policy which selectively targeted successful Indian medical professionals and framed many such Indian medical professionals in false civil and criminal cases and prosecuted many of them for alleged healthcare frauds. The Plaintiff also submits that the colluding Defendants have taken a wrongful advantage of the ignorance of the Plaintiff's knowledge about the American legal system and the same has been used to falsely implicate the Plaintiff and other similarly situated persons in false cases.

14. The Plaintiff submits that the policy of racial discrimination and exploitation of the Plaintiff and the similarly situated persons has been committed through a network of independent and private communication system channel and private servers, which the Defendant No. 1 runs and operates across the globe and shares the access to the same with other colluding Defendants.

15. The Plaintiff submits that in addition to the Defendants impleaded herein, some other offices including the New Jersey Department of Banking and Insurance, the office of the Insurance Fraud Prosecutor, The New Jersey Board of



(10)

Medical Examiners and some other legislators and American Politicians support this campaign against the successful medical practitioners of Indian origin.

16. The Plaintiff submits that under the direct influence and control of its American holding entity Allstate Corporation, the Defendant No. 1 has actively orchestrated the defamatory campaign and has been instrumental in spreading false propaganda against the Plaintiff, through its Indian Servers since the year 2012 and has acted like an active conduit for global propagation of Defendant No. 1's defamatory and discriminatory activities. It is the case of the Plaintiff that the Defendant No. 1 used private ISP based servers in order to conceal from the general public, the details of its nefarious designs and those of its discriminatory and exploitative policies which it uses to target successful Indian medical professionals who are first identified on the basis of their success ratio in the USA and after identification, a well hatched conspiracy is executed against them and they are framed in false cases of medical negligence and are eventually robbed of their rights to practice the medical profession or to obtain gainful employment effectively anywhere in the world. The offices of the Defendant No.1, located in India are used for executing and implementing such nefarious designs of the Defendants and the other colluding Defendants always remain supportive of each other. The Plaintiff submits that the said conspiracy is



Ankit

(11)

mainly hatched and executed against successful medical providers and healthcare professionals of Indian origin as their successful penetration into the system originally captivated by American physicians, diminishes the prospects of the business of the American physicians and takes a toll of the money-making practices which the American physicians intend to run monopolistically with major Insurance providers being hand in glove. In all this wrongful practice, the lobby of the American physicians and the colluding Insurance Companies, gets full support of the State and high officials of the State including the State Governors.

17. The Plaintiff submits that in the present times, there are approximately one hundred and forty-four (144) Indian Physicians languishing in American Jails and a far greater number have been permanently deprived of their livelihood and all these prosecutions have been executed at the behest of the colluding Defendants. The Plaintiff submits that the jailed Indian medical professionals were mostly framed in false cases alleging healthcare fraud and all this has been done at the behest of the strong lobby of American physicians who do not want the doctors and healthcare professionals from the Indian community to enter their system and flourish and become successful. The Plaintiff has identified several such cases of racial exploitation and discrimination and is himself the victim of such exploitation. In fact, the Defendants policy of



(12)

racial discrimination targeting Indian healthcare service providers and medical professionals has resulted in multiple suicides and premature deaths of Indian Physicians and medical professionals.

18. It is the case of the Plaintiff that he has been illegally deprived of his livelihood and professional life from April 2012 till date and the colluding Defendants continue to obstruct his efforts to have his New Jersey license reinstated and obtain licenses anywhere in the world, including every state in America, to prevent his economic resurgence, a fact the Defendants recognize will facilitate their prosecution by Plaintiff in the United States. The Plaintiff has since then been relentlessly fighting the battle against the colluding Defendants and in the process, he has lost his economic standing, social reputation and livelihood and even lost the companionship of his family. In the year 2015, living in a state of acute poverty, the Plaintiff suffered two epileptic seizures which almost caused his death, but he was fortunate enough to survive. The Plaintiff sustained a massive complex laceration to his tongue which required emergent surgical correction to stem the profuse bleeding.

19. The Plaintiff submits that his medical practice license was illegally revoked by the Defendant No. 2, at the behest of Defendant No. 3, under the influence and control of the Defendant No. 1's American holding Corporation, on 2nd April 2012 and the said revocation was confirmed on 24thMarch



2014. This resulted in Plaintiff not being able to apply for registration with the Defendant No. 4. The Plaintiff has sufficient reasons to believe that the Defendant No. 1 propagated false agenda against the Plaintiff and provided negative and adverse inputs to the Defendant No. 4 due to which, the Plaintiff shall not be able to succeed in getting himself registered as a medical practitioner in India. The adverse inputs confidentially shared against the Plaintiff, by the colluding Defendants shall deprive him of his fundamental right of practicing a profession or vocation of his choice in India and to expand the same anywhere in India. Such deprivation, caused at the behest of the colluding Defendant, is clearly violative of the Plaintiff's fundamental right as envisaged in Article 19(1)(g) of the Constitution of India.

20. The Plaintiff also submits that the defamatory acts of the colluding Defendants have caused deprivation of Indian Physicians' right to be trained under the hands of the Plaintiff as he is an internationally recognized pioneer and expert in minimally invasive spine surgery. The Plaintiff submits that as a part of their nefarious design, the colluding Defendants, particularly the Defendant No. 1 give massive negative publicity to the false cases in which the Plaintiff and other similarly situated persons are framed. The colluding Defendants in fact implicate the wives, children, and family members of such victimized persons, so as to scare them and



(14)

their families to the fullest and exploit them to such an extent that they eventually give in to the pressure of the American system working against them collusively. This is done with the motive of developing public opposition against such victims, to deprive them of their prospects of securing a livelihood anywhere in the world including their native country.

21. It is submitted that the Defendant No. 1 was used as a conduit to scandalize the Plaintiff and other similarly situated persons and medical professionals of Indian origin. The Plaintiff submits that the Defendant No. 1 and its US based Corporation would avail the services of the Plaintiff and other similarly situated medical professionals of Indian origin and their services were utilized on multiple occasions for providing lifesaving and pain-relieving care to patients who were clients of the Defendant No. 1. The Plaintiff submits that such services were provided for many years during which the Defendant No. 1 would hold their payments and the Plaintiff submits that he had treated hundreds of patients for free as he kept awaiting the release of his payments but to no avail. The colluding Defendants would frustrate all moves to realize the payment of the Plaintiff and it is submitted that the colluding Defendants would threaten the Plaintiff with dire consequences if the Plaintiff raised his voices seeking clearance of his dues.

22. It is also submitted by the Plaintiff that the Defendant No. 1 and its US Corporation would falsely implicate the Plaintiff and





**NKB LEGAL**
A D V O C A T E S

N. K. Bhatnagar
*Advocate*

1" Floor, 50 Janpath
Tolstoy Lane
Connaught Place
New Delhi-110001
E-mail : nkb@nkblegal.com
URL : www.nkblegal.com
Tel.: 011-43103773

16 December 2022

**Through E-mail/ Post/Fedex**
**Without Prejudice**

To

1. The Intercontinental Exchange (ICE)
   The Skyview
   9th Floor Unit No. 09th & 11th Floor
   Gachibowli, Ranga Reddy
   Raidurg Village,
   Hyderabad 500081
   Telangana, India

2. Intercontinental Exchange Inc.          also at:
   5660 New Northside Drive NW             11 Wall Street
   3rd Floor                               New York
   Atlanta, GA 30328                       NY 10005
   USA                                     USA
   +1-770-857-4700                         +1-212-3000

Sir/Madam

<u>**Sub: Legal Notice prior to commencement of Litigation**
**Proceedings on behalf of Dr. Richard A. Kaul.**</u>

1. We act for and on behalf of our client Dr. Richard A. Kaul and under instructions of our client, serve upon you the present Legal Notice, which is being served primarily to you the Noticee No. 1 above and to you the Noticee No. 2 as the parent/holding company of the Noticee No. 1. The present Legal Notice is being served by way of abundant caution to apprize you of the intent of my client to initiate appropriate Legal Proceedings before the Court of competent jurisdiction in India or elsewhere, for and on account of reasons set out below in this Legal Notice.

N.K. BHATNAGAR
ADVOCATE
Managing Partner
NKB LEGAL-Advocates & Legal Consultants
1st Floor, 50 Janpath, Tolstoy Lane,
Connaught Place, New Delhi-110001
Tel: 011-43103773



2. You the Noticee No. 2 are the parent Company of the Indian subsidiary, i.e. the Noticee No. 1 herein and hence equally liable for the acts, deeds and omissions of the Noticee No. 1 as well.

3. Please be notified that you the Noticees No. 1 and 2 have inter alia committed legal violations by way of hatching a conspiracy against our client through collusion with the Indian subsidiary of Allstate Insurance Company, namely Allstate Solutions Private Limited who continues to violate the legal rights of our client and against whom our client has already initiated suitable legal proceedings before the Court of competent jurisdiction in India. It is a reasonable suspicion and apprehension of our client that you the Noticee No. 1, on behest of the Noticee No. 2 and under collusion with Allstate Insurance and its subsidiaries, acted in a manner prejudicial to our client bringing him reputational and vocational losses in addition to pecuniary losses and defamation.

4. Please be informed that our client has sufficient material and reasonable grounds to form a valid opinion that the legal rights to which he is entitled, under the Constitution of India, being an Indian National are being wrongfully suppressed and adversely affect his right to property and the right to livelihood and life in India. It is the belief of our client that you the Noticee No. 1 have been running a false propaganda through digital and non-digital modes of communication with the Indian Territory directly causing perjury to our client.

5. Please be informed that you the Noticee No. 1, acting on behest of the Noticee No. 2 have colluded with Allstate Insurance which is impleaded as a Defendant in Lawsuit No. K11-5 before the Court of competent jurisdiction in USA and its Indian Subsidiary which is the Defendant in another Lawsuit filed before the Hon'ble City Civil Court Bangalore, and in collusion you the Noticee No. 1 have effectuated a schematic approach to thwart the economic resurgence of our client, and have inter alia used modern technology including the internet to propagate defamatory articles regarding our client's character and competence as a physician, and casting aspersions on the medical acumen of our client clearly with an intent to damage his reputation and possibilities of professional progression in India. Please take

V.K. BHATNAGAR
ADVOCATE
Managing Partner
NKB LEGAL - Advocates & Legal Consultants
1st Floor, 50 Janpath, Tolstoy Lane,
Connaught Place, New Delhi-110001



notice that these practices amount to misconduct and violate our client's legal rights under the Indian Constitution.

6. You the Noticees No. 1 and 2, are therefore, in your own interest advised to refrain yourself from indulging into such defamatory malpractices in collusion with any other entity including but not limited to Allstate Insurance or otherwise. In the event of your failure to cease and desist from continuing with the malpractices pointed out herein in the present Legal Notice, we have definite instructions from our client to initiate appropriate legal actions against you the Noticees No. 1 and 2, entirely at your own risk, cost and peril. Our client reserves its rights to claim suitable legal damages and compensation and also claim the charges incurred towards this Legal Notice amounting to USD 750 (Seven Hundred and Fifty US Dollars).

In above terms we serve upon you the present Legal Notice advising you to immediately Cease and Desist from publishing, promoting and promulgating and adverse, damaging and negative material against our client Dr. Richard A. Kaul and if at any juncture it is further observed that you the Noticees No. 1 and 2, have either under collusion or influence of any other third party or otherwise, caused any reputational harm or damage to our Client, we shall be constrained to initiate suitable Legal Actions against you the Noticees No. 1 and 2.

Please ne notified accordingly.

Yours Sincerely,

Bhatnagar, N.K.
Advocate

N. K. BHATNAGAR
ADVOCATE
Managing Partner
NKB LEGAL- Advocates & Legal Consultants
1st Floor, 50 Janpath, Tolstoy Lane,
Connaught Place, New Delhi-110001
Tel: 011-43103773

IN THE CITY CIVIL COURT, HYDERABAD METROPOLITAN
REGION, HYDERABAD, TELANGANA
(ORIGINAL JURISDICTION)

CIVIL SUIT NO._____/2023

Ravinder Rao Akula & Anr.                           **PLAINTIFFS**

Versus

The State of Louisiana & Ors.                       **DEFENDANTS**

## INDEX

| Sl. No. | Description | Page Nos. |
|---------|-------------|-----------|
| 1. | Synopsis (List of Dates and Events) | 1-3 |
| 2. | Memo of Parties | 4-5 |
| 3. | Memorandum of Civil Suit | 6- |
| 4. | Verifying affidavits of Plaintiffs | |
| 5. | ANNEXURE – P1, Copy of the UID Card of the Plaintiff. | |
| 6. | ANNEXURE – P2, Copy of the Articles of Association of Akula Foundation along with Letter of Appointment in favor of the Plaintiff appointed as its General Secretary. | |
| 7. | ANNEXURE – P3, Photographs showing the Community Service / Community Welfare Schemes run by the Akula Foundation. | |
| 8. | ANNEXURE – P4, Copy of the Notice of the 10th day ceremony of the Late Smt. Lalitha Bai Akula along with a copy of her UID. | |
| 9. | ANNEXURE – P5, E-mail trail between Dr. Shiva Akula and his Attorney Rachael J. | |

| | | |
|---|---|---|
| | Conner regarding Dr. Akula's motion to travel to India for performing last rites of his mother. | |
| 10. | ANNEXURE – P6, Webpages printed from the website of Plaintiff No. 2 www.akulafoundation.in along with Affidavit u/s 65B of the Indian Evidence Act. | |
| 11. | Power of Attorney | |
| 12. | Vakalathnama | |

Plaintiff No. 1 (Mr. Ravinder Rao Akula)

Plaintiff No. 2 (Akula Foundation – India, through its General Secretary and AR Mr. Ravinder Rao Akula)

Place: Hyderabad
Date: ___.03.2023

THROUGH:
ADVOCATES FOR PLAINTIFF

IN THE CITY CIVIL COURT, HYDERABAD METROPOLITAN
REGION, HYDERABAD, TELANGANA
(ORIGINAL JURISDICTION)

CIVIL SUIT NO._____/2023

Ravinder Rao Akula & Anr.                    PLAINTIFFS

Versus

The State of Louisiana & Ors.               DEFENDANTS

## LIST OF DATES AND EVENTS WITH SYNOPSIS

| DATE | DESCRIPTION OF EVENTS |
|---|---|
| 05.08.2021 | Dr. Shiva Akula, the nephew of Plaintiff No. 1 and the Chief Patron of the Plaintiff No. 2 was charged with indictment of 23 accounts inter alia for purported instances of financial irregularities in Medical Billing through his Company Canon Hospice operating in Louisiana, USA. The charges include those of health care fraud and Dr. Shiva Akula, an Indian turned American medical graduate from Osmania University in Hyderabad and emigrated to the US in 1983 faces legal action on multiple counts in the US since August 2021. |
| Early 2000s | Dr. Shiva Akula Founded the Akula Foundation in the US in the year 1994 and an Indian Chapter of the same under the name of Akula India Foundation is floated and launched in the early 2000s and the Foundation takes up community welfare and Social welfare activities in and around Hyderabad particularly, medical camps and health camps for the poor. The Foundation receives most of its funds through grant-in-aid from the Akula Foundation USA. |

| | |
|---|---|
| 05.11.2021 and immediately thereafter | Late Smt. Lalitha Bai Akula, who was the mother of Dr. Shiva Akula and the Sister-in-law of the Plaintiff No. 1 dies in Hyderabad and her remains await the arrival of her son Dr. Shiva Akula from the US to come over and perform the last rites and funeral of the departed soul. However, the colluding Defendants built a false narrative and vehemently oppose his legitimate travel to Hyderabad and even question the genuineness of the incident of death and deprived the Plaintiff No. 1 and his nephew of his legitimate rights to bid a graceful and respectful farewell to his deceased mother. The Defendant No. 2 meanwhile illegally freezes and holds on to a significant amount of more than USD 30,000 meant for the grant to the Plaintiff No. 2 thereby bringing the activities and operations of the Plaintiff No. 2 to a near halt and makes its existence difficult. |
| November 2021 to till date | Plaintiffs are struggling to come to terms with the damages inflicted upon them and the Plaintiff No. 1 particularly, being the eldest member of the Akula Family now continues to be struggling with the severe agony to see how his nephew failed to adieu a graceful farewell to his mother all because of wrong charges bringing an irreparable and permanent loss to the family and leaving an indelible scar. |
| | Cause of action: The Cause of action in the present Suit is a perpetual and ongoing continuous cause of action and continues to arise with each day perpetually. Not only the Defendants have caused irreparable |

| | |
|---|---|
| | damage to the Plaintiff's reputation and legal rights but have caused a clear violation of human rights as well. |
| Present day | In the present day, the Plaintiff No. 1 suffers mentally and personally while the Plaintiff No. 2 continues to suffer financially and operationally. The Defendants have caused the said misery to the Plaintiffs and therefore the Plaintiffs have decided to file the present Suit and fight for their bona fide rights and liberties. |

Plaintiff No. 1 (Mr. Ravinder Rao Akula)

Plaintiff No. 2 (Akula Foundation – India, through its General Secretary and AR Mr. Ravinder Rao Akula)

Place: Hyderabad
Date: ___.03.2023

THROUGH:
ADVOCATES FOR PLAINTIFF

IN THE CITY CIVIL COURT, HYDERABAD METROPOLITAN
REGION, HYDERABAD, TELANGANA

CIVIL SUIT NO._____/2023

Ravinder Rao Akula & Anr.                    PLAINTIFFS

Versus

The State of Louisiana & Ors.                DEFENDANTS

MEMO OF PARTIES

1. Ravinder Rao Akula
   13-2-368, Jali hanuman
   Rahimpura
   Asif Nagar
   Hyderabad
   Telangana
   India 520006

2. The Akula Foundation – India Chapter
   C/o The Akula Foundation USA
   through its General Secretary
   13-2-368 Jali hanuman
   Rahimpura
   Asif Nagar
   Hyderabad
   Telangana
   India 520006

VERSUS

1. The State of Louisiana
   through the Secretary of State
   8585 Archives Avenue, Baton Rouge
   LA 70809,
   USA
                                    …..Defendant No. 1

2. Capital One Bank
   through its Officer-in-Charge
   30 7ᵗʰ Avenue South

St Cloud
MN 56301
USA

       …..Defendant No. 2

3. Kathryn McHugh
 Attorney – US Department of Justice
 650 Poydras St Ste 1600
 New Orleans, LA, 70130-7212
 USA

       ….Defendant No.3

Plaintiff No. 1 (Mr. Ravinder Rao
Akula)

Plaintiff No. 2 (Akula Foundation –
India, through its General Secretary
and AR Mr. Ravinder Rao Akula)

Place: Hyderabad
Date: __.03.2023     THROUGH:
        ADVOCATES FOR PLAINTIFF

IN THE CITY CIVIL COURT, HYDERABAD METROPOLITAN
REGION, HYDERABAD, TELANGANA
(ORIGINAL JURISDICTION)

CIVIL SUIT NO._____/2023

Ravinder Rao Akula & Anr.                    PLAINTIFFS

Versus

The State of Louisiana & Ors.            DEFENDANTS

<u>MEMORANDUM OF CIVIL SUIT UNDER ORDER VII RULE I OF
THE CODE OF CIVIL PROCEDURE 1908 INTER-ALIA SEEKING
SYMBOLIC COMPENSATION FROM DEFENDANT NUMBERS 1
TO 3, TO A TUNE OF RUPEES 2 (INR TWO ONLY), I.E. RUPEE
1 EACH FOR THE SENTIMENTAL LOSS, PERSONAL LOSS AND
PERSONAL INJURY & GRIEVANCES ON ACCOUNT OF
SEVERE MENTAL AGONY AND LOSS CAUSED TO THE
PLAINTIFFS AND DAMAGES TO A TUNE OF RUPEES
50,00,000.00 (RS.FIFTY LAKHS ONLY) ON ACCOUNT OF LOSS
OF OPPORTUNITY, FINANCIAL LOSSES ACCRUED AND
REPUTATIONAL LOSSES SUFFERRED BY THE PLAINTIFF NO.
2.</u>

<u>MAY IT PLEASE YOUR LORDSHIPS:</u>

1.    **PLAINTIFF'S INTRODUCTION**

The Plaintiff No. 1 named herein, i.e. Ravinder Rao Akula is
a citizen and ordinary resident of India, residing at 13-2-368
Jali hanuman, Rahimpura, Asif Nagar, Hyderabad,
Telangana, India 520006 and has been very active socially in
his personal capacity and as a member of the Lions Club of
Hyderabad, which is a prominent and well known social

been leading several social service campaigns in and around the city of Hyderabad and has always been on the forefront of executing various Social Service and Community welfare schemes. The Plaintiff was born in India in the city of Hyderabad in the year 1954 and has lived permanently in the city of Hyderabad ever since. A Copy of the UID Card of the Plaintiff No. 1 is attached herewith as Annexure P1.

The Plaintiff No. 2 is the Indian chapter / Indian Arm of the US based 'The Akula Foundation' which is a Social Service and Community Service Organization founded in the year 1994 by Dr. Shiva Akula, a native of USA, originally born and brought up in Hyderabad and having emigrated to the USA after obtaining specialized Medical Education from the Osmania University of Hyderabad. The Akula Foundation/ Akula Family Foundation is founded as a Charitable and Non-Profit Organization and has in accordance with Article VII of its Articles of Association appointed Mr. Ravinder Rao Akula as its General Secretary cum Authorized Representative (AR) to overlook the Indian Chapter of the Foundation and the operational activities/social welfare activities undertaken by the said Foundation through its India Chapter which runs completely under the aegis of the Akula Foundation USA. Copy of the Articles of Incorporation of the Akula Foundation

Mr. Ravinder Rao Akula as its General Secretary in attached and marked Annexure P2 Collectively.

2. The Plaintiff No. 1 and 2 have jointly filed the present Suit and sued the Defendants herein. The Plaintiff No. 1also acts for and on behalf of the Plaintiff No. 2 as its AR who is duly authorized vide Letter of Appointment, duly executed and issued in his favor by the sole Founder and Director of the Akula Foundation and the same is attached with this Plaint along with the Vakalatnama. The Plaintiff undertakes to present himself for answering any material questions or presentations of facts, before this Court in person as the Plaintiff No. 1 and in the capacity of the AR of the Plaintiff No. 2, as and when directed or called upon by this Hon'ble Court to do so.

3. The Plaintiffs are aggrieved by the high handedness of the Defendants especially towards the irreparable loss and immense perjury and mental agony caused to the Plaintiff No.1 personally and to the Plaintiff No. 2 as well, when the Founder Principal of the Plaintiff No. 2, i.e. Dr. Shiva Akula was deliberately, rather compulsively prevented from traveling to Hyderabad India, to lit the funeral pyre of his deceased mother Smt. Lalitha Bai Akula who died on

respectful farewell by her eldest son Dr. Shiva Akula. The Plaintiff No. 1 is the brother-in-law of the deceased Smt. Lalitha Bai Akula and it was very painful for the Plaintiff No. 1 to bear the shock of unavailability of his real nephew Dr. Shiva Akula (son of the deceased) when his presence was most crucially required in the grief stricken family.   Not only that, this deprivation caused an irreparable and permanent loss and perpetual injury for the entire family where no such incident had taken place in the past where an eldest son was unable to perform last rite of his deceased parents, something which is considered to be a sacred ritual and a duty of every person to perform the *Antim Sanskar* (last rites) of his/her deceased parents, for the overall solace and peace of the departed soul and for the well-being of the aggrieved family. The Plaintiff No. 1 submits that this right was forcefully taken away from the family and has not only caused acute distress, mental pain and agony not only to Dr. Shiva Akula but also to the entire family and in-particular, to the Plaintiff No. 1 who is now the eldest and most active member of the Akula Family in Hyderabad. The Plaintiff No. 2 is also aggrieved of the Defendants' collective actions restraining the flow of funds and aid to the Plaintiff No. 2, which has resultantly caused huge loss to the operational and social welfare activities of the Plaintiff No. 2 organization as such

Exhibit 3

**www.drrichardkaul.com**

**September 13, 2022**

Honorable J. Paul Oetken
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

RECEIVED
SDNY PRO SE OFFICE
2022 SEP 14  PM 2: 12

**Re: Kaul/Basch v ICE et al**
    **21-CV-06992**
    **K11-7**
    **Financial disclosures/conflicts of interest/ex parte communications**

Dear Judge Oetken,

We write this letter with the utmost respect for you and the federal judiciary, and in recognition of the immense pressures that the above case must have brought to bear on your judgment. However, it is our position, one that is authorized by law and by our rights, that the opinion and order entered on September 12, 2022, will remain invalid until the following information has been disclosed to the record:

1. Forms AO 10 since 2020.

2. Information required pursuant to the Courthouse and Transparency Act.

3. A list of all ex parte communications between yourself and any agents acting on your behalf, and the Defendants or any agents acting on their behalf, that pertains/relates/refers/references or are in any way associated with the aspect of any of K11-7 or any of **The Kaul Cases**, including but not limited to: **(i)** the delivery and or receipt of any favor/gift/benefit/advantage/interest to you and or any member of your family to the third-degree, by the Defendants and or their agents in return for granting their motions; **(ii)** the promise of any future delivery and or receipt of any favor/gift/benefit/advantage/interest to you and or any member of your family to the third-degree, by the Defendants and or their agents in return for granting their motions. The pertinent time period is August 19, 2021, to the present.

As you are aware, the issue of judicial corruption has unfortunately appeared prominently within **The Kaul Cases**, and was featured in a series of Wall Street Journal articles in September

2021 (K11-7: D.E. 25 Page 1 – 46 of 50). Consequent to this publicity, and in or around May 2022, the Courthouse Ethics and Transparency Act was passed in response to public pressure against judicial corruption (**Exhibit 1**). Senator Ted Cruz was one of the co-sponsors, a person to whose attention, in January 2021, I brought the issue of judicial corruption (**Exhibit 2**). The misconduct of Senator Charles Schumer regarding his **"Political interference in judicial process"** is highlighted in the letter to Senator Cruz. I understand your appointment to the bench was sponsored by Senator Schumer.

Our request for the public disclosure of the above financial information relates to the fact that your opinion/order are so thoroughly divorced from the evidence/facts/arguments/law of this case, that one cannot but conclude that you, like U.S.D.J. Kevin McNulty (U.S.D.C.-DNJ), Senator Schumer's brother-in-law, have been corrupted. U.S.D.J. McNulty engaged in the same opinion falsifying activity in K1 (D.E. 313-1), as now appears in K11-7 (D.E. 168).

Our request for the public disclosure of all ex parte communications pertains, in part, to the dissemination of notices of preservation to various ex-members of the political/legal/judicial establishment, including Jose Linares, the ex-Chief Judge of the District of New Jersey, who, in mid-late May 2019, suddenly retired from the bench, and took partner status at the law firm of English & McCarter in Newark, New Jersey, after having received a letter from me, requesting his financial disclosure/conflicts of interest (**Exhibit 3**). On May 5, 2022, Mr. Linares was served with a NOTICE OF PRESERVATION in K11-7 (**Exhibit 4**).

We respectfully assert that the principles underpinning Rules 144/455, and those of the due process clauses of the Constitution, are authoritative in this matter, and do render your opinion/order void until your impartiality/lack of bias has been evidentially established.

We thank you for your attention to this matter.

Yours sincerely

RICHARD ARJUN KAUL, MD                          DAVID BASCH, MD

cc: All Counsel of Record
    All parties with a legal or other interest

Kaul/Basch v ICE

21-CV-06992

K11-7

## The Oetken Disqualification

By: Richard Arjun Kaul, MD
David B. Basch, MD

October 6, 2022

RECEIVED
SDNY PRO SE OFFICE
2022 OCT -6  PM 1: 02

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RICHARD ARJUN KAUL, MD

Plaintiff

v.

INTERCONTINENTAL EXCHANGE, ET AL

Defendants

Case No. 21-CV-06992

**AFFIDAVIT AND MOTION IN SUPPORT OF APPLICATION FOR JUDICIAL DISQUALIFICATION OF UNITED STATES DISTRICT COURT JUDGE J. PAUL OETKEN PURSUANT TO 28 U.S.C. § 144 AND 28 U.S.C. § 455**

We, the Propria Persona Plaintiffs, Richard Arjun Kaul, MD, and David B. Basch, MD, do hereby swear under oath and penalty of perjury that the facts, reasons, and statements submitted in support of this application are true and accurate to the best of my knowledge.

Dated: October 6, 2022

_____
RICHARD ARJUN KAUL, MD

_____
DAVID B. BASCH, MD

### Conclusion + Relief Sought

Kaul respectfully asserts that based on the above facts/reasons/arguments, Judge James Paul Oetken be disqualified from K11-7, and that all orders entered onto the dockets be immediately vacated, including the September 12, 2022, order at D.E. 168.

Kaul respectfully asserts that Judge James Paul Oetken be required to disclose to the record all his financial holdings for the period from September 2017 to September 2022, in accordance with the rules and regulations of the Guide to Judiciary Policy, Volume 2D, Chapter 1 to Chapter 6, as revised on March 23, 2018, and in accordance with the terms of the September 13, 2022, demand at D.E. 170.

Kaul respectfully asserts that Judge Oetken be required to disclose to Kaul and the record the full extent and substance of any and all ex parte communications as set forth at D.E. 170. All communications must include any form of information exchange to include but not limited to: **(i)** texts; **(ii)** face to face conversations: **(iii)** e-mails; **(iv)** typed letters: **(v)** handwritten letters; **(vi)** telephone conversations conducted via cellular phone or land line.

We, the Propria Persona Plaintiffs, do hereby certify and swear under penalty of perjury that the foregoing information and facts are true and accurate to the best of our knowledge, and that if it is proved that we knowingly and willfully misrepresented the facts, then we will be subject to punishment. We also certify, pursuant to Section 144, that this application for disqualification/vacatur is submitted in good faith.

Dated: October 6, 2022

RICHARD ARJUN KAUL, MD                          DAVID B. BASCH, MD

# Order

It is hereby ordered that on October 7, 2022, that unless Judge James Paul Oetken immediately brings himself into compliance with legal authority regarding judicial disclosures, the law will deem him to be in knowing violation, and he will be immediately disqualified from any further administrative, ministerial, legal, or other involvement in either K11-7, or in any other case that involves Plaintiff Kaul and or Basch.

It is hereby ordered that on October 7, 2022, that unless Judge James Paul Oetken immediately brings himself into compliance with legal authority regarding judicial disclosures, the law will deem him to be in knowing violation, and he will become subject, and will willingly submit to investigative/disciplinary action by state/federal regulators.

It is hereby ordered that on October 7, 2022, that unless Judge James Paul Oetken immediately brings himself into compliance with legal authority regarding judicial disclosures, the law will deem him to be in knowing violation, and it will be hereby ordered that on October 8, 2022, all orders entered by Judge James Paul Oetken are immediately nullified, including the September 12, 2022, order at D.E. 168.

It is hereby ordered that on October 7, 2022, unless the defendants, by October 21, 2022, rebut/refute/deny/contest the evidence submitted in support of Kaul's motion for summary judgment against Defendant Allstate New Jersey Insurance Company (D.E. 5), it will be deemed to have proven Kaul's case against Defendant Allstate.

Dated: October 6, 2022.                                    s/p United States District Court

**Exhibit 4**

www.drrichardkaul.com

**October 19, 2022**

David Bazzo, MD, FA Æ̸P
Director
UCSD PACE Program

**Re: Critique of O ctober17, 2022, opinion/motion to amend**

Dear Dr. Bazzo,

I ("Kaul") respectfully assert that the October 17, 2022, report of the PACE program, is a fraud and was procured through a fraudulently conducted conspiracy with the Federation of State Medical Boards, an entity being sued by Kaul, and an entity from which PACE receives business referrals. Its fraudulence renders it null and void for any purpose, it constitutes further evidence of the **"Pennsylvania Scheme"** as pled in K11-7, and I will be seeking a refund of monies paid. Please also be informed that as a **"new racketeering injury"** it will in due course be submitted into K11-8.

Please accept this letter in response to the purported opinion issued by PACE on October 17, 2022, that bears little or no resemblance to the evidence contained within the medical literature, and or the evidence submitted by Kaul in regard to his character, psychiatric fitness, and the crimes committed against him by **The Kaul Cases** Defendants from 2006/7 to 2021, the last event being a kidnapping on May 27, 2021. The non-inclusion of this incriminating body of evidence, highly probative of his federal claims, undermines the absurd suggestion that Kaul is a narcissist, simply because he is fighting for his rights, and has detailed, in a number of his publications, the vicious life-ending tactics used against him and his family over a decade-long plus period. Dr. Macdonald has, unfortunately 'hung his narcissist hat' on the now debunked story of British journalist, Alex Hannaford (2014).

It is interesting that in the totality of Kaul's like, no person has described him as a narcissist, other than a journalist looking to do a 'hit job' and Dr. Macdonald, a psychiatrist working for an organization with commercial ties to corporations being sued by Kaul. In fact, not one healthcare professional in Kaul's thirty-four (34) life has ever implied, let alone found such a finding. I suppose a reasonable/fair minded person would conclude that when Kaul/his family were attacked, Kaul would relentlessly fight with honor and with his life, for the lives of his children, as described by NYS lawyer, David Detoffol (copy enclosed).

1

The criticism of the purported report is as follows:

**Competency Assessments Results**:

The report of Dr. Albert Leung is replete with knowing falsehoods, that render the entire PACE report either fraudulent or grossly negligent, but ultimately of no legal weight in any administrative or legal proceeding, except in the capacity of self-incriminating evidence. Kaul will demonstrate the illegality of the opinion by reference to the following pieces of evidence:

1. July 6, 2022, audio recording from PACE scheduled Zoom Call:

https://soundcloud.com/richard-kaul/220706-kl-pa-pace-leung/s-LEJxhGxL4ce?si=7fb0e829b6634c208b64190cd9d2bd6b&utm_source=clipboard&utm_medium=text&utm_campaign=social_sharing

The conversation unequivocally proves false Dr. Leung's disparaging/slanderous recitation of Kaul's clinical knowledge and skills. Several other senior interventional pain practitioners in the North-East have listened to the audio file and reviewed Dr. Leung's opinion, and have all concluded that his opinion is not based on the evidence and is false. For example, one practitioner stated that a cervical stellate ganglion block is indeed performed at the C6 vertebrae, as correctly stated by Kaul:

https://www.ncbi.nlm.nih.gov/books/NBK507798/

Dr. Leung was wrong in stating: **"His knowledge of the neuronal markup, location, and innervation of stellate ganglion was inadequate as he incorrectly indicated the location of the ganglion is at the C6 tubercle instead of C7. He was unable to come up with a reasonable cause of contrast spread behind the tracheal shadow in fluoroscopic imaging, which may suggest inadvertent esophageal perforation and his subsequent management plan brought up another level safety concern for his practice in pain medicine."** This point is illustrated at time segment: 59:49 to 1:04:07

Dr. Leung's criticism of my process of differential diagnosis formulation is without evidential foundation in the medical literature, and in fact most publications on the issue augment to differentials distilled after a thorough history/physical:

https://en.wikipedia.org/wiki/Differential_diagnosis

**"Strategies used in preparing a differential diagnosis list vary with the experience of the healthcare provider. While novice providers may work systemically to assess all possible explanations for a patient's concerns, those with more experience often draw on clinical experience and pattern recognition to protect the patient from delays, risks, and cost of inefficient strategies or tests. Effective providers utilize an evidence-based approach, complementing their clinical experience with knowledge from clinical research"**

However, as is evident from the audio file, Dr. Leung prevented Kaul from obtaining further information about the patient's conditions, and stated: **"Despite repeated prompting from me, he was unable to come up with other differential diagnoses which may result in similar initial clinical presentation."**

The three procedures discussed by Kaul, are procedures of which Kaul has successfully performed tens of thousands since 1996, and there are videos online of Kaul competently performing these procedures:

1. Radiofrequency facet ablation:

https://www.youtube.com/watch?v=Zr7S81OFS-A

The video further substantiates Kaul's interview statement at time segment 26:27 that a specialized radiofrequency technician operates the unit while Kaul is performing the procedure. The video and the audio file undermine Dr. Leung's false statement regarding patient safety and machine modification. Kaul has successfully performed thousands of spinal radiofrequency lesioning since 1996, with the use of a specialized technician, as is the widely accepted standard of care.

2. Transforaminal epidural injection:

https://www.youtube.com/watch?v=9NjJV7XhBB0

At time segment: 52:19 Kaul, discussed performing a transforaminal epidural injection, and never discussed conducting a lumbar facet injection, as stated with knowing falsity by Dr. Leung: **"While his procedural approach in lumbar medial branch radiofrequency ablation appeared to be acceptable, his neuroanatomical knowledge related to the procedure was inadequate as he incorrectly indicated the levels of medial branches innervating the right 3-4 facet joint."** This is a blatant falsity.

Kaul would like to provide you an opportunity to rectify the falsehoods propagated in this opinion, but do also provide you, via this letter, fair notice of litigation if my rights are not vindicated.

Yours sincerely

RICHARD ARJUN KAUL, MD

3

cc: All Counsel of record in **The Kaul Cases** re K11-8 notice.

# DeToffol & Gittleman

### ATTORNEYS AT LAW

125 Maiden Lane - Suite 5C          www.ddtlaw.com          telephone (212) 962 - 2220
New York, New York  10038                                   facsimile   (212) 962 - 2221

*Delivered Via Email to:  Megan.Lawrence@nysed.gov*

May 7, 2021

Steven Boese, Executive Director c/o
Office of the Professions N.Y. State Education Dept.
Riverview Center
150 Broadway, Suite 355
Albany, N.Y.  12204

re:   **Richard Kaul**
      **Application for Medical Physician Licensure**

Dear Members,

I have been asked by Dr. Kaul to submit an affidavit to the Office of the
Professions N.Y. State Education Department in support of his application for
medical licensure in the State of New York, and specifically regarding his moral
character.

About me, I have practiced law in New York since 1995, after having graduated
from St. John's Law School, and specialize in intellectual property law, medical
negligence and personal injury law. I am admitted into (list the courts).

I first met Dr. Kaul in 2005 and have come to know him both personally and
professionally. We were neighbors in Manhattan from 2005 to 2012, after which
he relocated to New Jersey. Since then, we have remained in regular contact.

**<u>Integrity:</u>**

Dr. Kaul is a man of great morality, intelligence, integrity, wisdom and humility.
My experiences have proven him to be a determined person, who has pursued his

Page 2 of 6
To:    OP NYS ED
Date:  May 7, 2021

life goals with a quiet perseverance and has repeatedly overcome seemingly insurmountable obstacles. Dr. Kaul's professional and personal achievements are many, but the most outstanding and enduring ones are his seemingly innumerable acts of kindness in caring and helping those less fortunate than himself. I believe that his inspirational element of his character would come from his own personal childhood experiences of loss, and his genuine appreciation and respect for well founded institutional principals, instilled in him by those that saw his potential and invested in his early development in England, namely Catholic eleemosynary orphanages and Jesuit schools that honed his personal fortitude and critical thinking and self reflection. Presumably evident in record, as well as one can garner from any topic of conversation with him, is that he had, and continues to excel in academics and athletics. These achievements, in the face of incredible odds, talk to the strength of his moral character. Having lived alone starting at the early age of sixteen, he demonstrated then an incredible discipline that does not fade to this day, to not engage in delinquent or anti-social behavior. Instead, he focused on achieving educational and professional excellence. This is who Dr. Kaul is. I know him very well, and he is not an individual that some would have you believe.

**Highly Competent**:

Dr. Kaul is a highly competent and ethical physician. I know this because since 2005, I have referred him several of my injured clients, and all, without fail, have expressed great satisfaction with the care and consultation he provided them. From the perspective of my interactions, I observed him to conduct his practice of medicine with diligence, professionalism and care and this was the opinion of numerous lawyers and physicians, whom I knew and who had worked with Dr. Kaul. His contributions to the field of spine medical treatment earn the high regard from his disclosures for invention contributions in 2005, for a procedure that permits spinal fusions to be performed in a same-day outpatient facility. It is my understanding that this percutaneous technique is now a standard if care. I have witnessed Dr. Kaul's expertise in multiple videos of him performing these procedures with apparent success.

Page 3 of 6
To:    OP NYS ED
Date:   May 7, 2021


**Honorable Gentleman**:

My view is that the patient public lost service from a talented physician when Dr. Kaul's New Jersey medical license was suspended in June 2012, and then revoked in March 2014.  It was also a loss to many impoverished people in Africa, whom Dr. Kaul had been helping since 2008, when he established the Spine Africa Project with his own money, time and resources, and plans to expand the charity. The revocation caused him to fall into a state of poverty, and he was therefore, not able to sustain the work of the charity.

Facing the adversity of having his professional life swept from him, I witnessed Dr. Kaul's admirable character sustain.  He did not give up despite losing everything, including his pursuit of happiness, his reputation and freedom. The harsh circumstances caused him to become estranged from his young son and daughter. He was arrested and jailed for non-payment of child support, and was made homeless on several occasions, one of which, in 2018, I was able to provide him shelter for four months.

In this period too, I admired his tenacity, focus and determination to find justice for himself and his children. In one of our conversations, he told me that the reason he remained in the U.S. after his license was revoked, was to fight for the truth as to why his license was really revoked. He wanted to leave his children with a legacy of which they would be proud. He remained steadfast to his word doing this, as just another example of his measured stable character.  While living in a state of abject poverty, in which oftentimes he had no money for food, he taught himself the law, and then on February 22, 2016, he initiated legal action in the United States District Court against those who by his estimates and allegations conspired against him with the sequelae to have impact his erstwhile licensed status, and sadly too his own personal life.

Dr. Kaul is a righteous and principled individual, who since being divested from his medial license has sacrificed a lot in his quest for justice. He did not walk away, and he told me that in 2015, he was approached by certain individuals in New Jersey who attempted to extort him for money in return for having his license reinstated. He rejected that act, despite his desperate circumstances. This is the

Page 4 of 6
To:   OP NYS ED
Date:   May 7, 2021

conduct of an honorable man, one which the State of New York should be proud to
have provide medical care within its borders. What happened to Dr. Kaul is may
well be proven a travesty of justice, and from 2016 to the present he has remained
within the law and used it in his favor to fight for that eventual justice. This talks to
his character, determination and a moral fortitude that one rarely finds today.

### Generosity:

I have seen and know many examples of Dr. Kaul's good moral character,
generosity of time, money and spirit as his next-door neighbor for seven years,
where he himself opened his door rent free to friends going through their own
domestic disputes. During one of our conversations, he told me that his
compassion for those encountering misfortune, came from his own experience
from those who helped him during his earlier hardships. In one story, he described
how, when he was a teenager he had no money to purchase bus or train tickets, and
each time someone showed him generosity, he promised himself, that although he
could not repay that particular person for that particular act, he would carry
forward that spirit of generosity and help others when he had the money and
resources. Dr. Kaul remained true to his promise and that is typical of his moral
character. Time and time again his word has been his bond and so I am confident
to regard him, to be his word.

### Evidence of Legally Good Moral Character:

Having interacted with Dr. Kaul at professional and personal levels of affair, I
came to know the accounts of his professional history in the UK and US.
Regarding any residuum of his case in the UK, it is my understanding that Dr.
Kaul, after a six-month suspension in 2003, had his license to practice medicine
and surgery reactivated. Since 2001, the UK case has been examined, re-examined
and legally dissected by American judges, lawyers, politicians and physicians and
the New Jersey Medical Board, and has been found to have no legal weight in
American jurisprudence. In fact, a hearing examiner in Pennsylvania, issued a
decision on May 28, 2020 that likened the case to a medical malpractice action in

Page 5 of 6
To:     OP NYS ED
Date:   May 7, 2021

the US.  Noteworthy to this point, the Pennsylvania hearing examiner did not find lack to good moral character.

I believe that the New Jersey Board of Medical Examiners too concluded in 2003 that the UK 'conviction' provided no basis for discipline.  And in approximately 2007, Dr. Kaul was granted permanent residence status in the U.S. where I was told that Dr. Kaul's lawyer submitted legal briefs that argued the UK case was not a 'crime' of moral turpitude, and became the same position agreed and adopted by the U.S. Government. It is my understanding that the legal standards used by the Immigration and Naturalization Service would mirror those applied by the states in their evaluation of professional law and medical licenses.

From 2001, Dr. Kaul paid his taxes and from 2003 to 2012, he generously supported his children and ex-wife.  As I witnessed too, he is a responsible man, who maintained a cordial relationship with his ex-wife after a bitter divorce, in order to provide his children with a harmonious environment.  From 2005 to 2012, his children would stay with him every other weekend, and I was able to see him as an amazing father.  His children loved spending time with him, and on several occasions, when he invited friends with children to have lunch with him and his children, I would 'stop-by', and all I remember was a house full of joy.

**Other Legal Standards of Good Moral Character:**

As a lawyer, I am familiar with the legal standards regarding moral character evaluation to become licensed in law, as well as similar and many more standards for review applied in the courts so as to arrive upon a well-founded judgment.

Although draconian doles of administration have burdened Dr. Kaul since 2012, he remained determined to reach a place of justice for himself, to once again provide for his children and masses of patients in need, including those erstwhile his own whom apparently continue to support him and await for his return.

During the last decade though, the events that officially began on April 2, 2012 caused his time with his children to become notably constricted. In 2015, he became subject to arrest warrant for unpaid child support, was arrested and jailed

Page 6 of 6
To:    OP NYS ED
Date:  May 7, 2021

in September 2016, and was prevented from seeing or even talking to his children from 2015 to 2018, when he was eventually able to have his ex-wife lift the warrant.

All the while and despite having suffered burdensome effect and unjust turn in life circumstances from bureaucratic edict, I have never once witnessed him carp or wish destructive harm to anyone. Instead he shouldered the yoke on a proper pathway to restore his lifelong vocation here now before you. He is a deeply philosophical person, who along the way remained consistent in character to his earlier life's great personal and professional achievements - who when confronted with challenges that would have destroyed most people, on each occasion has fairly overcome the obstacle, as is the mark and type of professional individual that society needs more.

I state with certainty that the moral character of Dr. Kaul meets and exceeds all relevant standards of moral fitness, and as such, an asset to the medical profession in the State of New York and its people, and on which I indeed support his application for State of New York medical licensure.


David DeToffol, Esq.


S.S.:  N.Y. County:
On this date and before me, the above individual known to me, signed this statement acknowledging its contents and truthfulness as stated therein.

NOTARY


JOSHUA GITTLEMAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02GI6392290
Qualified in New York County
My Commission Expires 06-28-2025

Dated:  5/7/21

www.drrichardkaul.com

**November 4, 2022**

David Bazzo, MD, FAAFP
Director
UCSD PACE Program

**Re: Further critique of October 17, 2022, opinion**

Dear Dr. Bazzo,

I write this letter in furtherance of my October 19, 2022, letter, and in order to respectively reiterate and assert prior and new points, as indicated below:

1. **Confidentiality of transmission of amended report**: The amended report, and or its contents, are NOT to be transmitted/sent/verbally communicated/referenced to any party/person/agency by any person employed/contracted/otherwise associated with PACE.

2. **Transmission of case file**: A copy of the property of my case file, certified as to its completeness, authenticity, and fidelity of audio/video files, is to be confidentially emailed to me with the amended report.

3. **Identification of further acts of fraud**: Although the falsity of the October 17, 2022, report was demonstrated in the October 19, 2022, letter with a focus on the fraudulent report of Dr. Leung, the report of Drs. Cederquist/Merrill/Gutierrez is as equally fraudulent and or negligent. Examples of this include:

- <u>Page 7 of 11</u> – Drs. Cederquist/Merrill/Gutierrez state: **"In addition, on some occasions, he ignored information the patient volunteered, such as the side effects of Norco, and decreased libido complaint."** In my handwritten summarization of the consultation, the initial draft of which I kept, and the subsequent expanded draft of which I submitted, a draft that included all the first draft information, I identify on page 2, under ROS, that the patient has **"constipation, reduced libido and no other complaints"** (copy attached).

- <u>Page 8 of 11</u> – Drs. Cederquist/Merrill/Gutierrez state: **"The only thing the patient left with was an order for an MRI, no additional pain management plan."** On page 3 of the initial draft, Kaul identifies: **"Urine – urinalysis – drug screen Soma**

1

Robert Gonzales - 3/17/70

48 ♂ - cook at restaurant

Back pain - started in 2016 after a heavy day of yard work. No prior history of back pain. Does not remember exact details of initial incident. Pain was initially restricted to lower back and limited by the belt line. Went to family practice doctor, who recommended nonsurgical/muscle relaxant + referred to physical therapy. Exercises involving flexion more than extension exercise. Pain increased over the following three and began having difficulty with walking. Pain + numbness radiated lower back all the way to the left foot. Family practice diagnosed [?] Onyx. An MRI was ordered ( HNP L4-5)(2016) left side nerve impingement. Referred in 2018 (General) orthopedic spine surgeon. Underwent surgery in 2018 and failed in complete reduction for 6 months for both back and leg pain. Pain returned in July/August 2018 and re-consulted with surgeon, who felt further surgery would not help (I/w PT/chiro. No post-operative MRI. No nerve conduction test. No CT done. Medications were changed to narco by family physician in late December 2018/Jan 2020

to the pool. The patient states letting Tylenol after the surgery, and a friend gave him some. He states that ice relieves the pain, but sitting can exacerbate it. He continues to work as a chef 8 hrs/day, 5-6 days/week. He states the pain impacts his ability to work, but that he needs to keep working as he has to support his family. His wife works.

Past Medical history: None.

Past Surgical history: L4-5 laminectomy / fusion

Medications: Norco (2 tabs 5x/max: a/day - no dose given)
                      Tylenol OTC (8-10/day)
                      Some (from friend). No dose given

FmShx: Mother was alcoholic from young age to approx. 65 - has been abstinent for 5 yrs.
Father / siblings no history alcohol / drug abuse

ROS - Constipation.
        Reduced libido
        No other complaints.

Physical -examination- 230 lbs  6'0''   150/90 BD

Pulse  76

RR  20

CNS- Alert + oriented x3

Motor - hip flexors - (R) 5/5   hip extension 5/5

(L) 3/5   hip extension 4/5

Knee flexor (R) - 5/5

(L) - 3/5

Ankle Dorsiflexion (R) 5/5

Dorsiflexion (L) 3/5

Sensory - deficits in sensation to light touch / pinprick

at L3 + L4 + L5

Reflexes - Patella - 2/4

Ankle reflex - (L) side 1/4

MS- SLR (L) + at 150

Extension normal + relieves pain

flexion limited to 35°

DDx - Lumbar - Varilyn - Orig saeen

Jomeh Mangrone

(1) Urine Steer -

(2) CBC / SMA 6/12 - full blood screen.

(3) X-ray - from lateral view

(4) CT c contrast

Dx - Degenerative Disc

Sciatica Syndrome

1

ALLEN C. HASSAN
Attorney at Law,  SBN: 104024

2

Sacramento, California 95821
(916) 971-3900;

3

Email:  AHLO1936@YAHOO.COM

4

Attorney for Plaintiff:

5

6

7

8                IN THE UNITED STATES DISTRICT COURT

9        IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

12 ALLEN C. HASSAN, M.D.             )

13                                     )    NO:

                                    )

14              Plaintiffs.       )    COMPLAINT FOR DAMAGES

                                    )

15                                     )    DEMAND FOR JURY TRIAL

                                    )

16      vs.                            )

   CALIFORNIA MEDICAL BOARD,         )

17 KIMBERLY KIRCHMEYER, Director of California)

   Board); UC SANDIEGO PACE PROGRAM,    )

18 HOWARD KRAUSS, M.D.;  FELIX C. YIP, M.D.; )

   DEV GNANADEV, M.D.; ESERIK "TJ" WATKINS )

19 RONALD LEWIS, M.D;  DENISE PINES, (Pres.) )

   LAURIE ROSE LUBIANO, J.D.;             )

20 SUSAN F. FRIEDMAN, M.D.;              )

   RANDY HAWKINS, M.D.;                )

21 ASIF MAHMOOD, M.D.; DAVID WARMOTH;  )

   RICHARD E. THORP, M.D.             )

22 And DOES 1-50, inclusive              )

                                    )

23                                     )

             Defendants.      )

24                                     )

25

                            1

Defendants have no intention for voluntarily correcting despite obvious need and requests for such correction.

## FIFTH CLAIM FOR RELIEF

### (Fraud as to Defendant UC SAN DIEGO PACE PROGRAM)

127.    Plaintiff incorporates and re-alleges every allegation every preceeding allegation as fully set forth in the present cause of action.

128.    Defendant, UC SAN DIEGO PACE PROGRAM misrepresented to the Court that Plaintiff had failed to successfully complete the PACE program, when in fact the Defendant UC SANDIEGO PACE Program, when in fact the Defendants knew that such information was false.

129.    Defendant's present to the Court numbers that it knew were incorrect for the court to rely upon in making it's decision as to whether the Plaintiff had successfully completed their program which would determine whether or not the Plaintiff had successfully complete all of the terms and conditions of probation that had been imposed up on him. Defendant's misrepresentations were material and they in fact intended that the Court relied upon those incorrect numbers in making their decisions.

130.    The Court did in fact rely upon the false representation presented by the Defendants.

131.    Plaintiff has been substantially harmed by the misrepresentations of the Defendants because by relying upon the false representation of the Defendants the Court ordered that the Plaintiff's license to practice medicine be revoked.

132.    Wherefore Plaintiff prays for the relief as set forth below.

## VI. PRAYER FOR RELIEF

Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the

21

**Exhibit 5**

**2.**     I admit that no sub-committee of the New York State Medical Board ever issued an opinion regarding the application of Kaul, for a physician license in the State of New York.

**3.**     I admit that no sub-committee of the New York State Medical Board ever communicated with a person by the name of **"Vincent Vollaro",** an individual who represented himself as being a Supervising Investigator with the Office of Professional Discipline.

**4.**     I respectfully admit and do know that neither I nor any members of the New York State Medical Board have any knowledge pertaining to the purported issuance of a supposed opinion by a supposed sub-committee of the New York State Medical Board, regarding any application by Kaul for a physician license.

**5.**     I respectfully admit and do know that both I and all members of the New York State Medical Board provided no basis for the statement made via email by Vincent Vollaro on August 23, 2021, that a purported sub-committee of the New York State Medical Board supposedly opined, regarding my application, that there existed an **"issue of moral character".** A copy of the email is attached to this document.

**6.**     I admit that I have reviewed the August 27, 2021, report of Vincent Vollaro, a copy of which is attached to this document, and admit that his statement: **"On July 9, 2021, Robert Walther, MD, Ronald Uva, MD, and Ramanathan Raju, MD, of the NY Medical Board, all agreed that there is a substantial issue of moral character relative to the application for licensure of Richard Kaul." is knowingly false.**

**7.**     I have knowledge that the August 27, 2021, report of Vincent Vollaro was only issued after, and as a direct consequence of the lawsuits filed by Kaul, on August 19, 2021, in the United States District Court for the Southern District of New York (Kaul v ICE: 21-CV-06992) and August 25, 2021, in the New York State Supreme Court (Kaul v Howard A. Zucker/Arthur Hengerer: Index No. 101019-2021). I know that Vollaro was ordered to do this to attempt to mitigate the fraud liability of the New York State Medical Board/Members, on the charge, as admitted to by Dr. Jane Massie, of having lied that a sub-committee of the board found there existed a supposed question of **"moral character".**

**8.**     I have knowledge that the fraud committed by the New York State Medical Board/Members, was the direct and proximate cause of that committed in Kaul v Howard A. Zucker/Arthur Hengerer: Index No. 101019-2021, by NY AAG, Maryam Jazini Dorcheh, on November 8, 2021, when she misled the New York State Supreme Court into believing that a subcommittee of the New York State Medical Board had issued a written opinion regarding the **"moral character"** of Kaul: **"Petitioner thus fails to state a cause of action to compel their production of a document relating to his license application.".** A copy of the VERIFIED ANSWER is attached to this document, and the falsehood is found on page 9.

**9.**     I have knowledge that the fraud committed by the New York State Medical Board/Members, was the direct and proximate cause of that committed in Kaul v Howard A.

<u>Zucker/Arthur Hengerer: Index No. 101019-2021</u>, by New York State Judge, Shlomo Hagler, on February 17, 2022, when he was misled into believing that a subcommittee of the New York State Medical Board had issued a written opinion regarding the **"moral character"** of Kaul: **"Finally, even if Petitioner had sued the proper party, there is no evidence that Petitioner has a "clear legal right" to an opinion allegedly made by the SED or OPD ..."**. A copy of Judge Hagler's order is attached to this document.

**10.**  I have knowledge that the fraud perpetrated by the New York State Medical Board/Members and then propagated through the Office of the NY AG and the New York State Supreme Court, is now before the First Department of the New York State Appellate Court, in that on March 19, 2022, Kaul appealed the lower court order. A copy of the appeal is attached to this document.

**11.**  I know that the perpetration/propagation of the aforesaid fraud constitutes the felony of 'Fraud on the Court', a RICO predicate act, which I know Kaul will submit into K11-7, in support of the racketeering claims.

**12.**  I know that the use of the US wires to transmit the product of the fraud initiated/perpetrated by the New York State Medical Board/Members/Office of the NY AG/NYS Court System, constitutes the felony of wire fraud, which I know, Kaul will submit into K11-7, in support of the racketeering claims.

**13.**  I have knowledge that it is not the intent of the New York State Medical Board to ever issue Kaul a functional license, but it is their intent to grant his application with conditions that knowingly/purposely render impossible his re-commencement of clinical practice in New York.

**14.**  I have knowledge that the purpose of the proposed hearing and issuance of a non-functional license, constitutes another element of the **"New York Scheme"**, as identified in K11-7, in which the Defendants believe that issuance of a knowingly non-functional license will bolster their venue defense and mitigate their damages.

**15.**  I have knowledge that the proposed hearing is the product of a conspiracy between certain K11-7 Defendants and the New York State Medical Board/Counsel/Members, purposed to attempt to manufacture a record that the K11-7 Defendants believe will bolster their K11-7 defense of venue, to which Kaul has submitted opposition, which in certain sections, references the New York State Medical Board/Members/Dr. Jane Massie. A copy of these sections is attached to this document.

**16.**  I have knowledge that the K11-7 Defendants, in their recognition of the highly incriminating evidence/facts/arguments/law submitted by Kaul since August 19, 2021, did conspire with the New York State Medical Board/Members to plan to conduct a **"sham hearing"**, the purpose of which is, with fraudulent intent, to manufacture a record that they believe will bolster their defenses in K11-7.

17.     I have knowledge that the New York Medical Board/Members, in furtherance of the "New York Scheme" did conspire with the K11-7 Defendants to, with a knowing illegality, ignore the May 27, 2020 opinion of a Pennsylvania Hearing Officer, that granted Kaul's application for licensure; and did with a knowing illegality not issue the exact same order, as legal reciprocity mandates, an act that constitutes a further violation of Kaul's human/constitutional rights, as pled in K11-7.

Please be advised accordingly.

Dated: June 7, 2022

RICHARD ARJUN KAUL, MD

Respond to:

drrichardkaul@gmail.com
440c Somerset Drive, Pearl River, NY 10965

4

**Exhibit 6**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

———————————————————

RICHARD ARJUN KAUL, MD

Propria Persona Plaintiff                           CASE NO:

v.                                                  COMPLAINT FOR DAMAGES

UC SAN DIEGO PACE PROGRAM                            DEMAND FOR JURY TRIAL
ALBERT Y. LEUNG, MD

———————————————————

RICHARD ARJUN KAUL, MD
PROPRIA PERSONA PLAINTIFF
440c SOMERSET DRIVE
PEARL RIVER, NY 10965
973 876 2877
drrichardkaul@gmail.com

## PRELIMINARY STATEMENT

1. This case pertains to the perpetration by Defendants Albert Leung ("**Leung**") and UC San Diego PACE Program **("PACE"),** the latter a for-profit corporation operating under the auspices of the UCSD School of Medicine, of a knowingly fraudulent scheme, that egregiously violated, and continues to violate the human/constitutional rights of Plaintiff, Richard Arjun Kaul **("Kaul").**

2. The Defendants perpetrated this offense by the issuance on October 17, 2022, of a knowingly fraudulent physician assessment report, related to Kaul's application and May 27, 2020, grant of a medical license in the State of Pennsylvania.

3. The Defendants motivation was profit and the maintenance of favorable commercial relations with one of its largest referral sources, the Federation of State Medical Boards **("FSMB")** a for profit corporation, of which all state medical boards are members, and a corporation that controls the multi-billion-dollar business of physician licensing, disciplining and continuing education.

4. Kaul commenced suit in the United States District Court against the FSMB in 2019 on anti-trust/racketeering/civil rights charges, and thus levied a threat against the commercial interests of the Defendants, who responded by issuing a knowingly false legal instrument.

5. Similarly, Defendant PACE is motivated to fail applicants, as it provides a basis on which to entangle physicians in an endless series of extremely expensive, and fraudulently based continuing education courses, from which Defendant PACE continues to profit.

6. This case includes highly incriminating audio evidence, that only emerged in this case because the initial part of the assessment was conducted virtually, due to COVID restrictions. Prior to the pandemic, the entire assessment was performed on-site, and the only retained record was that in the possession of Defendant PACE, a record that they would routinely refuse

2

to provide to physicians. In fact, in this case, Kaul's multiple requests to be provided a copy of the record of the second, on-site part of the assessment course, have either been ignored or addressed with further knowingly fraudulent statements of obfuscation. The other reason as to why previously aggrieved physicians did not seek recompense, was their lack of funds to initiate litigation and or their ability to commence suit without counsel.

7. The method employed by the Defendants in the perpetration of their scheme, involved the commission of knowingly fraudulent acts, through and under the cover of an agency of the State of California, that of UCSD School of Medicine. Defendant PACE's misconduct in this case represents a continuation of its prior **"pattern"**, in which it has disproportionately targeted physicians from ethnic minorities and foreign medical graduates. Kaul is a citizen of India and graduated from the University of London.

8. This case seeks compensatory/punitive/consequential damages, and endeavors to expose for the purposes of rectification, a serious and concerted, profit-purposed violation of human/constitutional rights of physicians and abuse of power, that further decimates the lives of physicians, their families, and their patient populations.

**PARTIES**

9. **Plaintiff**:

Richard Arjun Kaul – 440c Somerset Drive, Pearl River, NY 10965/973 876 2877
drrichardkaul@gmail.com
CV enclosed (**EXHIBIT 1**).

10. **Defendants**:

UC San Diego Physician Assessment and Clinical Education (PACE) Program – 220 West Arbor
Drive #8204, San Diego, CA 92103-8204/619 543 6770/ucpace@ucsd.edu

Dr. Albert Y. Leung – 9300 Campus Point Drive, La Jolla, CA 92037/858 657 7000

## VENUE/JURISDICTION

11. <u>**Jurisdiction:**</u>

<u>General:</u>
28 U.S.C. § 1331 – Plaintiff's allegations arise pursuant to Section 1983 claims of violations of Kaul's Constitutional rights.

U.S.C. § 337 – Plaintiff's allegations allege violations of an Act of Congress regulating commerce and monopolies.

28 U.S.C. § 1332(d)(2)(A) – Plaintiff is a citizen of a different state to certain Defendants and the aggregate amount in controversy exceeds seventy-five thousand dollars ($75,000).

12. <u>Personal:</u>
The Court has personal jurisdiction over all Defendants, as each Defendant has transacted business, maintained substantial contacts, and/or committed acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. This Court also has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to a court of general jurisdiction in California.

13. <u>**Venue:**</u>

28 U.S.C. § 1391(b)(1) – A civil action may be brought in (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located and (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## STATEMENT OF FACT

14. The facts underpinning this case, have their origins and are related to a **"pattern"** of fact generation that commenced in or around 2005/2006, as part of a conspiracy initiated by a group of New Jersey neurosurgeons/interventional pain physicians, who sought, in an anti-competitive manner, to have Kaul eliminated from the minimally invasive spine surgery market, after he had invented and successfully performed the first outpatient minimally invasive spinal fusion in February/March 2005.

15. Kaul's procedure revolutionized the field of minimally invasive spine surgery, by proving that spinal fusions could be safely performed on a same-day basis in an outpatient surgical center, by a physician with training in interventional pain/minimally invasive spine surgery.

16. The New Jersey neurosurgeons/interventional pain physicians schemed unsuccessfully for several years to stymie the growth of Kaul's practice, by slandering him to patients/physicians, threatening to withdraw their business from medical device companies that also supplied Kaul and obstructing Kaul's applications for hospital privileges in New Jersey.

17. Recognizing the failure of these tactics, these individuals and others then bribed the then New Jersey Governor, Christopher J. Christie, in a series of quid pro quo schemes, in which they funneled monies into his political campaigns, in return for him using his executive power to order the New Jersey Medical Board to manufacture a case to revoke Kaul's New Jersey license.

18. The premise of the case was that Kaul was allegedly not qualified to perform minimally invasive spine surgery, a knowingly false premise, contradicted by the facts that Kaul had been credentialled to perform minimally invasive spine surgery by Medicare, the American Association of Ambulatory Healthcare (AAAHC) and the State of New Jersey, pursuant to his license to practice medicine and surgery, a license issued in 1996.

19. In this vein of violation and fraud, the State of New Jersey also knew that Kaul had, from 2004 to 2012, successfully performed eight hundred (800) minimally invasive spinal fusions and had been credentialed by six (6) state licensed surgical centers to perform such procedures.

20. Although these facts and others were submitted during the legal proceedings, the outcome was a forgone conclusion, and was a direct consequence of a **"pattern of racketeering"** that was conducted, and converted the State of New Jersey into a **"racketeering enterprise"**, the purpose of which was to advance the economic/political agendas of these individuals.

21. Kaul's license was revoked on March 24, 2014, after a series of legal proceedings in which it subsequently emerged that there had been, amongst other things, evidence falsification/witness tampering/perjury/corruption of administrative judicial officers.

22. Having lost everything, except his life, Kaul entered a state of poverty, and taught himself the law, and on February 22, 2016, commenced litigation in the United States District Court, in what would be the first in a series of lawsuits (**The Kaul Cases**) against the individuals/entities that caused injury to himself and his children.

23. However, Kaul's efforts to present his evidence (**EXHIBIT 2**) to a jury in America have remained unsuccessful, and so on April 23, 2022, Kaul, through counsel, filed suit in India against the State of New Jersey/Allstate Insurance Company/Christopher J. Christie, an excerpt of which is enclosed (**EXHIBIT 3**). The Indian court is advancing the case, with the next court date scheduled for December 15, 2022. Another Indian American physician, subjected to the same tactics as Kaul is in the process of filing suit in India, having been unable to access even the process of justice in America, let alone justice.

24. While Kaul was attempting to secure justice in the American courts, he applied for licensure in the State of Pennsylvania, and after a one-day hearing on February 7, 2020, his application was granted on May 27, 2020, contingent on the completion of a physician assessment course. However, due to his condition of poverty he did not have the monies to fund such a course, but

was eventually able to persuade friends to pay the course fee of approximately $20,000, and provide monies for Kaul's flight/accommodation to and in San Diego.

25. The Defendants wrongdoing is the proximate cause of Kaul's continued state of poverty, as had the Defendants not issued a fraudulent report, Kaul would now be in possession of a PA license, and would be practicing medicine and earning a livelihood. The Defendants misconduct constitutes an **"ongoing pattern of racketeering"**, a **"pattern"** that commenced in 2005/2006.

26. With this context in mind, the relevant facts of chronology and those of the fraud committed by the Defendants are substantiated within the submitted evidence:

27. <u>April 12-15, 2022 – Email exchange between PACE and Kaul re: enrollment</u>: Within this exchange, Kaul received and sent multiple documents, which included a TERMS AND CONDITIONS FOR PARTICIPATION IN UCSD PHYSICIAN ASSESSMENT AND CLINICAL EDUCATION (PACE) PROGRAM and a Root Cause Analysis: April 14, 2022, submitted by Kaul (**<u>EXHIBIT 4</u>**). On Page 1 of 2 of the former, there is a section for participants that self-referred, as did Kaul, and in this section, it states: **"... I understand and agree that PACE will disclose results of my activity in the Program only to parties authorized by me or as required by law or duly authorized regulatory agency."** When Kaul attended the second on-site component of the course on July 22, 2022, he confirmed with the administrative staff that the report would only be sent to him and was told that it would, because he had paid. However, on October 12, 2022, Kaul received an email from PACE, which evidences their scheme to attempt to send it to the PA Medical Board, in clear contravention of their own TERMS AND CONDITIONS: **"Can you please provide me with a contact at the PA Board? I need this as soon as possible. Email and phone number would be great."** Kaul responded with: **"Please do not send the report to any person associated with the Pennsylvania Medical Board, until I have reviewed its contents.".** It was the intention of Defendant PACE to place their knowingly fraudulent document before the PA Medical Board, in order to have the board not issue Kaul a license, and to manufacture a qualified immunity defense, knowing that Kaul would sue. On page 4/5 of the Root Cause Analysis, there exists evidence of Defendant PACE's criminal state-of-mind, in that in response

to the question of: **"What will you do in the future to prevent this from happening again"**, Kaul responded with: **"I do not believe that considering my prosecution of K11-7, the Defendants, nor any other parties, will ever re-commit the crimes identified within the case, nor re-violate my human and constitutional rights … It was my decision to stay and fight, that will ensure such appalling events never happen again to me and my family, and hopefully such conduct will never be levied on any other physician." (EXHIBIT 4)**. Defendant PACE and K11-7 Defendant, Federation State Medical Boards, whom Defendant PACE had informed of Kaul's course participation, recognized Kaul's leverage with K11-7, a recognition that caused the K11-7 Defendants to exert pressure on U.S.D.J. Oetken to dismiss, on September 12, 2022, K11-7 with prejudice, and enter an injunction preventing Kaul from bringing suit in the United States District Court. Defendant PACE and their lawyers reviewed U.S.D.J. Oetken's order, but not realizing Kaul was in possession of audio evidence of their fraud, did believe that Kaul would have no legal recourse when they released their knowingly fraudulent document, and thus in conjunction with the K11-7 September 12, 2022, order, Kaul would be eliminated. Kaul, however, submitted documents into K11-7, that rendered the September 12, 2022, opinion/order null and void pursuant to the doctrine of 'Fraud on the Court'/Rule 60.

28. May 4, 2022 – Virtual interview with Dr. Kai Macdonald:  A thirty minute (30) virtual interview was conducted, during which Kaul answered questions regarding digital content about his life. Kaul detected a certain adversarial/judgmental tone during the short interview, which caused the subsequent two (2) virtual interviews to be recorded.

29. June 15, 2022 – Virtual interview with Dr. Kai Macdonald: A four (4) hour recorded virtual interview was conducted, during which Dr. Macdonald submitted arguments/statements that mimicked the defenses submitted by the K11-7 Defendants, and particularly in regard to the May 27, 2021, kidnapping of Kaul. On this specific point, Dr. Macdonald attempted to minimize the illegality of the event, by characterizing it, as the K11-7 Defendants did, as a legitimate arrest, when in fact the evidence proved it was not. Similarly, he characterized the K11-7 claims as unbelievable, to which Kaul responded that all legal cases **"come down to the evidence"** and that **The Kaul Cases** Defendants had spent vast sums of money since 2016 **"running away"**

from the evidence, and that was because they are **"guilty".** Kaul stated that their conduct was not that of an innocent party. Dr. Macdonald did not respond. Dr. Macdonald was attempting to make the case for the K11-7 Defendants, because Defendant PACE was in conspiracy with them.

30. July 6, 2022 – Virtual interview with Defendant Leung: A ninety (90) minute recorded virtual interview was conducted, a link to which is provided in Kaul's October 19, 2022, letter to PACE director, Dr. David Bazzo. That link is:

https://soundcloud.com/discover/sets/picks-for-you::richard-kaul

The audio evidence conclusively proves the knowing fraudulence of the Defendants October 17, 2022, report.

31. July 21-22, 2022 – On-site evaluations: Kaul's clinical/cognitive skills were assessed at Defendant PACE's physical facility in San Diego. This was video recorded, and despite Kaul's repeated requests to be provided a copy of the paid property of his file, including these videos, this evidence has not been provided by Defendant PACE, because it knows that it constitutes further proof of their knowing fraudulence of the October 17, 2022, report.

32. September 15 to October 12, 2022 – Email exchange between PACE and Kaul re: issuance of report: On July 22, 2022, while Kaul was on-site at Defendant PACE, he enquired as to when he would receive the report, and was informed that it would be within eight (8) weeks. However, by September 15, 2022, he had not received the report, and thus sent an email: **"Do you know when PACE will issue its report?".** Kaul received no response, and so telephoned the office of Defendant PACE on or around September 22, 2022. He spoke with the case manager and individual responsible for drafting the report, who advised him that she had been out on **"sick leave"** for several weeks, and that no other staff member wanted to work on drafting the report. This individual informed Kaul the report would be issued within a couple of weeks. On October 11, 2022, Kaul still not having received the report, sent another email: **"Could you please advise as to when PACE will issue its report"** to which, on October 12, 2022, the case

manager responded: **"Can you please provide me with a contact at the PA Board? I need this as soon as possible. Email and phone number would be great."** Kaul responded: **"Please do not send the report to any person associated with the Pennsylvania Medical Board, until I have reviewed its contents."** The case manager did not respond. As stated above, it was the intention of Defendant PACE to violate their own contractual terms and send their knowingly fraudulent report to the PA Medical Board, in order to prevent Kaul from having the license issued and to fabricate a qualified immunity defense, knowing that Kaul would file suit. Defendant PACE's deceptive/contractually violative misconduct evidences a criminal state-of-mind, in that it was using the US wires to transmit a knowingly fraudulent legal instrument in furtherance of a knowingly illegal scheme, i.e., the aiding/abetting of the K11-7 Defendants, Kaul elimination purposed **"pattern of racketeering".**

33. October 17, 2022 – Email from Kaul to Defendant PACE re: request for case file: On October 17, 2022, Defendant PACE used the US wires to transmit/email its knowingly fraudulent report to Kaul, who readily established its falsity by cross referencing it to the audio file. Consequently, Kaul requested from Defendant PACE: **"Could you please forward me the complete file on which this report is based … including the video files."** Kaul received no response.

34. October 19 to 27 2022 – Email exchange between Kaul and Defendant PACE re: falsity of report/request for case file: Kaul requested Defendant PACE forward a letter (**EXHIBIT 5**) from Kaul to its director and report signatory, Dr. David Bazzo, and within the email re-requested a **"complete copy of my file with the PACE Program."** Within the email Kaul states: **"I find it immensely ironic and rather sad, that while I am criticized for prosecuting cases to vindicate my human rights and the multiple criminal violations against my property/person, agencies commercially associated with The Kaul Cases Defendants, as is PACE, continue to conspire to commit further violations."** Within the letter to Dr. David Bazzo, Kaul states, amongst other things: **"The report of Dr. Albert Leung is replete with knowing falsehoods, that render the entire PACE report either fraudulent or grossly negligent, but ultimately of no legal weight … except in the capacity of self-incriminating evidence … Kaul would like to provide you an opportunity to rectify the falsehoods propagated in this opinion, but do also provide you, via**

this letter, fair notice of litigation if my rights are not vindicated." Defendant PACE uncharacteristically responded within less than four (4) hours, and the case manager, again uncharacteristically, copied the administrative director: **"Thank you for your email. As it our policy anytime someone challenges our report, we will be bringing your case back for review with our case conference committee. This will likely take place next Friday, October 28. I hope to have more updates for you soon."** The unusual rapidity of response, the multiple grammatical errors and the copying of the administrative director reflect Defendant PACE's state-of-mind re: legal liability and recognition of wrongdoing. Of note, Kaul's case manager knew that she, a signatory to the report, would not be in the office on Friday October 28, 2022, and that there would be no meeting, as on October 27, 2022, Kaul sent her an email, and was informed by an automatically generated email that she would be back in the office on Monday 31 October 2022. Kaul's request for a copy of his file was once again ignored. On October 24, 2022, Kaul, not having received a copy of his file, emailed the case manager/administrative director: **"Please accept this email as a reminder to email me a copy of my entire case file with PACE, to include the three collateral interviews conducted by Dr. Macdonald of Drs. David Basch/Victor Katz/Merrill Stromer. These interviews contain, amongst other things, evidence relevant to the proof of the claims in The Kaul Cases, and most notably no mention was made of them in the initial October 17, 2022, report. These letters constitute further evidence of the guilt of The Kaul Cases Defendants."** Kaul received no response. On October 27, 2022, Kaul requested for the fourth (4th) time (October 17/19/24/27) a copy of his file. Kaul received no response, and Defendant PACE continues to withhold from Kaul the property of his file.

35. October 31, 2022 – Email exchange between Kaul and case manager/administrative director re: amended report and case file: Kaul, having received neither the case nor the amended report, emailed the case manager/administrative director: **"Could you please send me a copy of my file with the PACE Program, and advise me as to when I will receive the amended report as per the October 28, 2022 committee meeting."** The case manager's obfuscating response was: **"We have received your requests and will get back to you later this week. Thanks for your patience."** Defendant PACE's failure to send the file is consistent with its

scheme to withhold from Kaul evidence it knows would further prove the fraudulence of its October 17, 2022, report. Similarly, Defendant PACE's continued failure to send an amended report is evidence of its recognition that the submission of an amended report would be a tacit admission of its prior commission of fraud. Had there been no audio recording of the July 6, 2022, virtual interview with Defendant Leung, Defendants PACE/Leung would likely have 'gotten away with their crime' and caused Kaul's medical career/livelihood to cease. The ease with which the Defendants committed these offenses is consistent with-it being part of a long-standing **"pattern"**, of abusing the rights of physicians embroiled in regulatory scenarios. The majority of these physicians are either ethnic minorities or foreign medical graduates. This **"pattern"** of racial discrimination/targeting operates widely within the American physician regulatory/licensing apparatus.

36. <u>November 4, 2022 – Email from Kaul to case manager re: letter to Dr. Bazzo</u>: Kaul, not having received either an amended report or his case file, emailed the case manager a letter (**<u>EXHIBIT 6</u>**) addressed to Dr. Bazzo, in which Kaul states, amongst other things: **"These facts, in conjunction with those stated in the October 19, 2022 letter, constitute serious violations of my human/constitutional rights, continue to exacerbate injury to my economic standing/reputation and represent a "pattern" of profit purposed misconduct that has undoubtedly injured other physicians ... Please be advised that if the amended report fails to reflect the evidence ... I will commence suit against all those involved in the "racketeering" conspiracy and the drafting of the fraudulent October 17, 2022, report."** As of the filing date of this complaint, Defendant PACE has failed to send Kaul the amended report and or the case file.

37. <u>November 9, 2022 – Email from Kaul to the administrative director re: amended report and case file and reimbursement of fee</u>: Kaul, not having received the amended report and or the case file, emailed the administrative director: **"Could you please provide the date as to when I will receive the amended report. However, if PACE has decided not to issue such a report, then I would ask that PACE refund the course fee."** Kaul received neither a response nor a refund.

deprivation to which Kaul has been relentlessly subjected in American administrative
bodies/courts since at least 2012.

50. Evidence of these extreme deprivations, violative of international law/human rights, have
been placed before an Indian court, as Kaul, a citizen of India, has been thus far foreclosed, for
political/economic reasons, from even seeking, let alone procuring justice in America.

51. Defendant PACE, upon recognizing that Kaul had exposed the fraudulence of their report,
then conducted multiple internal meetings and communications as to how to address the issue.
These occurred via face-face meetings, telephone conversations and email.

52. Within the corpus of this evidence, exist communications in which Defendant PACE
concluded that it could not amend its fraudulent report without it being a tacit admission of
guilt. It also concluded that its only option would be to ignore Kaul's requests for a copy of his
file, a file Defendant PACE knows contains incriminating evidence, and to address litigation if
and when filed by Kaul.

53. Defendant PACE, in adopting such a position, although cognizant of the fact of its **"pattern"**
of having violated the human/constitutional rights of many other physicians, and the liability
that would ensue from the exposition of this **"pattern"**, if Kaul filed suit, concluded its only
option was to neither render an amended report nor provide Kaul a copy of his file.

### Tortious Interference/Commercial Disparagement
### Against Defendants UCSD PACE/Leung

54. Defendant PACE, an entity whose financial survival depends on the goodwill of K11-7
Defendant FSMB, and a corporation with which it is commercially aligned, is thus a market
competitor of Kaul, whose market elimination would serve its financial interests.

55. This fact became known to Defendant PACE in or around May 2022, and caused it to devise its scheme to render a fraudulent report, in order to attempt to advance its commercial interests by eliminating Kaul. Upon information and belief, the report was illegally transmitted to the FSMB, with the intention of causing it to be widely disseminated amongst counsel for **The Kaul Cases** Defendants and all state medical boards, as part of the scheme to eliminate Kaul.

56. Defendant Leung, an independent contractor, was motivated to conspire/scheme with Defendant PACE, in the commission of fraud, as he receives substantial monetary benefit from Defendant PACE, and did not anticipate that Kaul would procure evidence of his fraudulent wrongdoing.

57. The engineering of the scheme involved multiple internal/external communications, both digital/non-digital, between agents representing Defendant PACE and those associated with K11-7 Defendant FSMB.

58. These communications focused on what specific details would need to be included in the report to not only cause the Pennsylvania Medical Board to not issue Kaul a license number, but to permanently prevent him from ever recommencing the practice of medicine, by fraudulently mischaracterizing his knowledge/clinical skills as representing a **"danger to the public"**. Defendant PACE's intent was malicious and designed to interfere with Kaul's livelihood/business rights.

59. Defendants PACE/Leung, along with other co-conspirators at Defendant PACE, knew that their statements regarding Kaul's knowledge/clinical skills were false, and that Kaul, as is clear from the audio evidence, is highly knowledgeable and skillful. The Defendants, after having been provided the audio evidence, did not assert that after having reviewed the evidence, their opinion remained unchanged. Neither did they assert that their report was truthful, was not fraudulent and did reflect both the virtual and on-site interviews/examinations.

60. In fact, Defendants ceased all communications with Kaul. The audio recording, and Defendant PACE's report have been examined by other interventional pain physicians, all of whom concluded the report is a fraud.

61. The Defendants' report was transmitted to Kaul over the US wires, and constitutes an instrument purposed to suppress Kaul's right to a livelihood and cause tortious interference/commercial disparagement.

62. The Defendants wrongdoing has caused, and continues to cause immense injury to Kaul's economic standing/reputation/life, in that had the Defendants report truthfully reflected the evidence, then Kaul would, by this point in time, have procured a licensing number and returned to the practice of medicine.

63. Instead, the Defendants wrongdoing, which represents an extension of the knowing human/constitutional rights violations that commenced in at least 2012, and the report, so extreme in its falsity/language/mischaracterizations, has caused further malicious and unlawful harm to Kaul's professional career/livelihood/life.

64. Defendant PACE's attempt to send their report directly to the Pennsylvania Medical Board sought to violate Kaul's hard-won grant of his application for licensure.

65. These facts of intent, knowledge, motive, fraudulent/wrongful interference, and actual harm substantiate the elements of claims for malicious tortious interference and commercial disparagement.


**Defamation and Defamation per se
Against Defendants UCSD PACE/Leung**

66. The Defendants defamation of Kaul's character and competence with the issuance and digital dissemination of a legal instrument with knowingly fraudulent and malicious statements,

18

constitutes misconduct tantamount to a violation of Kaul's human/constitutional right to not be subjected to unlawful attacks on his reputation and honor.

67. The Defendants report, as the audio/clinical note evidence proves, is simply not an alternative opinion of the evidence, but a falsification not only of the audio/clinical note evidence, but also a knowing misrepresentation of an established body of medical knowledge.

68. The Defendants October 17, 2022, report is submitted as a factual representation of the virtual interviews and in person evaluations, but the audio/clinical note evidence of its falsity is irrefutable, has not been refuted by the Defendants, and thus the Defendants are without either a truth or opinion defense.

69. The Defendants failure to avail themselves of the opportunity to amend their report to honestly reflect the evidence, constitutes evidence of their criminal state-of-mind, lack of good faith and or reasonable belief, and is a tacit admission of their wrongdoing.

70. These conditions deprive the Defendants of raising any qualified immunity defense or of asserting a public interest argument, as they do with knowing falsity in their report. The fraudulence of the Defendants claim that Kaul is a danger to the public because he lacks the relevant knowledge, is underscored by the audio evidence, and tacitly admitted by their refusal to communicate with Kaul and or provide him, despite repeated requests, a copy of his case file, a file that contains, amongst other things, video evidence of Kaul's on-site evaluations.

71. The Defendants, as medical professionals, are knowledgeable as to the subject matter on which their report is based, and represent themselves as such, and thus cannot claim a belief in the honesty of their statements, as with for example, the level at which a stellate ganglion block is performed. It is indeed performed at the C6 level, in clear contradiction of Defendant Leung's knowingly false statement. The Defendants knew and know that their report is replete with falsehoods, which accounts for their refusal to amend the report and or provide Kaul a copy of the file.

72. The Defendants recognition of their defamatory statements caused them to attempt to have Kaul consent to permit them to email the report directly to a **"contact person"** at the Pennsylvania Medical Board, with the belief that if Kaul sued for defamation, they could raise a 'consent' defense.

73. This tactic evidences the Defendants prior history of litigation with wronged parties, as Kaul's contract as a self-referred party restricts the dissemination of the report to himself. However, despite this clause, the Defendants transmitted the report to the FSMB in furtherance of their conspiracy with **The Kaul Cases** Defendants to attempt to eliminate Kaul.

74. The Defendants defamatory report constitutes a serious violation of Kaul's rights, in that it is continuing to prevent Kaul from securing a license/livelihood, which in conjunction with the Defendants refusal to reimburse Kaul the course fees and his decade-long state of poverty, are preventing him from securing an assessment with another program, thus causing a daily exacerbation of actual harm to Kaul.

75. This misconduct constitutes further evidence of the Defendants conspiracy with **The Kaul Cases** Defendants to attempt to eliminate Kaul, and the threat of future litigation associated with his ongoing existence.

## RELIEF

Kaul seeks compensatory/consequential/punitive damages for the ongoing injuries caused to his economic standing/professional career/reputation/liberty/life in the amount of one hundred and twenty-two million dollars ($122,000,000).