www.drrichardkaul.com

**April 22, 2023**

Honorable Jennifer L. Rochon
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

2023 APR 24 PM 2:33

**Re: Kaul/Basch v ICE: 23-CV-2016**
**K11-10**
**Plaintiffs Response to Defendant Allstate's letter (D.E. 3)**

Dear Judge Rochon,

We (hereinafter **"Plaintiff Kaul"** and **"Plaintiff Basch")** write this letter in response to Defendant Allstate's procedurally improper, motion purposed April 19, 2023 letter, to respectfully request that for the below reasons, the Court deny their request and direct them to admit or deny the facts:

**1. 'Fraud on the Court'**

The doctrine of 'Fraud on the Court', and the pled facts, authorize and substantiate the filing of K11-10 (D.E. 1 Page 4 + 82 of 169).

**2. New Evidence/Facts**

**(i)** SEDIMA, S. P. R. L. v. IMREX CO., INC., ET AL. No. 84-648. 473 U.S. 479 (1985); **(ii)** AGENCY HOLDING CORP. ET AL. v. MALLEY-DUFF & ASSOCIATES, INC. No. 86-497. 483 U.S. 143 (1987); **(iii)** LAWLOR ET AL., TRADING AS INDEPENDENT POSTER EXCHANGE, v. NATIONAL SCREEN SERVICE CORP. ET AL. 349 U.S. 322 (1955) all stand for the proposition that pursuant to RICO, a new claim accrues with every "**new**" offense, every **"new racketeering injury"** and generally when there exists, as here, an **"ongoing pattern of racketeering"**, as evidenced by **The Kaul Cases** Defendants' (including the K11-7 Defendants) illegal obstruction and ongoing violation respectively of Plaintiff Kaul's right to prosecute his claims, his right to have reinstated his illegally seized New Jersey medical license, his right to effectuate procedure to have issued his Pennsylvania medical license and his human/constitutional right to liberty and life (D.E. 1 Page 7-13 of 169).

**3. <u>Related Cases</u>**

Contained within the themes and subject matter of **<u>The Kaul Cases</u>** is the issue of insurance industry/hospital orchestrated conspiracies with certain governmental agencies. The perpetrated schemes involve the elimination from the healthcare market of principally elderly/ethnic minority physicians, through license suspension/revocation and or incarceration, in order to increase insurance/hospital corporate profit at the expense of fraudulently procured physician labor, for which the corporations illegally withhold payment.

This subject matter has underpinned and underpins multiple civil and criminal cases within the United States District Court, excerpts of which are attached to this response (**<u>Exhibit 1</u>**) as they not only corroborate the K11-10 claims, but evidence a scheme far deeper, wider, and more criminal than any alleged in **<u>The Kaul Cases</u>**. A scheme, the exposure of which in December 2022 in the matter of <u>USA v Pompy, Case No. 18-cr-20454</u> (District of Michigan) prevented a four hundred (400) year incarceration of an innocent Haitian physician. Enclosed in (**<u>Exhibit 1</u>**) is an excerpt from <u>Kaul v BCBS: 23-CV-00518</u> (K11-11) that contains the incriminating testimony of an undercover insurance industry investigator. Dr. Pompy was fortunate, but hundreds, if not thousands of other physicians were not, many of whom remain incarcerated or under the process of indictment all to increase the profit of corporations such as Defendant Allstate, an entity whose business strategy involves illegal tortious interference in physicians practices (**<u>Exhibit 2</u>**).

**4. <u>Invalidity of Defendant's Plea</u>**

Defendant Allstate argues that because K11-7 was dismissed and because K11-7 is identical to K11-10, <u>that therefore</u> K11-10 should be dismissed. This argument is false for the reasons asserted above in points 1 and 2, but implicit in Mr. D'Aloia's letter and evident in his disdain for proper procedure is that regardless of the law and facts, the Court should dismiss the case for reasons that have no relation to the law and facts. However, even if one were to understand Mr. D'Aloia's procedural deviation as a vigorous defense of his client, his letter unequivocally consolidates his client's proximate involvement in the commission of the 'Fraud on the Court', in that it is unaccompanied by any affidavits from any relevant persons denying the scheme. Defendant Allstate should simply exercise its right to admit or deny the K11-10 facts, a right it has had since 2016, but a right it has chosen to ignore, the ignorance of which has knowingly caused and continues to cause a violation of Plaintiff Kaul's human/constitutional rights.

Throughout **<u>The Kaul Cases</u>** into and including K11-7, Defendant Allstate's defense strategy has been to cause the commission of improprieties within the judicial body, a strategy it has successfully employed in New Jersey state courts since at least 1995. As with all such schemes, they eventually become exposed and caused to cease. The issue of improper judicial influence is now before the Senate Judiciary Committee (**<u>Exhibit 3</u>**), an investigation we believe will disincentivize the perpetration of these corporate schemes and prohibit/reverse their diminution of the high ethical standards of the federal judiciary.

Plaintiffs Kaul and Basch respectfully request the Court deny the relief requested by Defendant Allstate, and direct them to admit or deny the K11-10 claims/facts.

We thank you for your attention to this matter.

RICHARD ARJUN KAUL, MD

DAVID B. BASCH, MD

# Exhibit 1

KELLY M. DERMODY (SBN 171716)
DANIEL M. HUTCHINSON (SBN 239458)
JALLÉ H. DAFA (SBN 290637)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
kdermody@lchb.com
dhutchinson@lchb.com
jdafa@lchb.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| OMONDI NYONG'O<br><br>**Plaintiff,**<br><br>v.<br><br>SUTTER HEALTH, PALO ALTO MEDICAL FOUNDATION, and PALO ALTO FOUNDATION MEDICAL GROUP,<br><br>**Defendants.** | **Case No. 4:21-cv-06238-YGR**<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Dr. Omondi Nyong'o, by and through his attorneys at Lieff Cabraser Heimann & Bernstein LLP, brings this action against Sutter Health, Palo Alto Medical Foundation ("PAMF"), and Palo Alto Foundation Medical Group ("PAFMG") (collectively, "Sutter") for violations of California law arising from a racially toxic workplace. Plaintiff alleges as follows.

## I. INTRODUCTION

1. Sutter is one of California's largest integrated health delivery systems, serving 3.5 million members and employing over 55,000 individuals.

2. Plaintiff, Dr. Omondi Nyong'o, is a nationally and internationally recognized Black surgeon who has been employed by Sutter for almost 13 years. He completed his undergraduate studies at Brown University, his medical schooling at the University of California, San Francisco (UCSF) School of Medicine, and his ophthalmology residency at the University of

some patients (or their families) making sizable donations to Sutter in gratitude for Dr. Nyong'o's service.

19. Notwithstanding Sutter's willingness to exploit Dr. Nyong'o's considerable medical skills, patient service, and contributions to the Sutter community in order to advance its own corporate reputation in the areas of philanthropy and diversity and inclusion, Sutter has subjected Dr. Nyong'o to racial trauma arising from racist and discriminatory employment decisions against Dr. Nyong'o and due to a workplace culture which generally disrespects, undermines, and disciplines African American staff and doctors, including Dr. Nyong'o, due to racial bias.

20. The racist environment that permeates Sutter also limits opportunities for other Black doctors, impairs their ability to achieve their potential professionally and financially, and subjects them to racial trauma at work. Dr. Nyong'o's Black colleagues have worked extraordinarily hard over the course of their medical careers only to find that their accomplishments are devalued and that there is a glass ceiling for Black doctors at Sutter. The Black doctors at Sutter support one another, but remain demoralized by the lack of respect, heightened scrutiny, and toxicity directed at them by Sutter leadership. In order to survive at Sutter, Black doctors report that they are advised to keep their head down and remain unseen.

21. Currently, there are no Black leaders whatsoever in Sutter's senior ranks. Moreover, only three of the 354 doctors in any leadership position across Sutter are Black (less than 1%). These three Black doctors hold the lowest title, Tier 1 (head of their individual clinic). Two are in Alameda, and one in Santa Cruz (only recently appointed in December 2020).

22. Like other Black doctors at Sutter, Dr. Nyong'o has experienced numerous racially traumatizing events at work. For example, early on in his career, Dr. Nyong'o's Tier 1 leader praised Dr. Nyong'o for "not being like" another more senior Black doctor who has "a chip on his shoulder." Dr. Nyong'o was further warned not to become like the more senior Black doctor and also develop a "chip on [his] shoulder" because she could tell "you two are friends because you are the same people/race." In the fall of 2017, a current PAFMG board member, noting the dearth of Black leaders and lack of corporate support stated to Dr. Nyong'o that "people like you

## Evidence + Related Cases

**5.** UNITED STATES OF AMERICA v. LESLY POMPY: 18-cr-20454 – UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF MICHIGAN: Dr. Pompy was criminally charged on June 26, 2016, with a thirty-seven (37) count indictment in which he was accused of allegedly having dispensed opiates and other commonly prescribed pain reducing medications on certain dates to approximately fifteen (15) patients in 2016. Dr. Pompy, who had been in practice for over thirty (30) years was the largest provider of pain management services in his county, and had successfully treated tens of thousands of patients. The criminal trial commenced on November 28, 2022, and concluded on January 4, 2023, with an acquittal by the jury on all thirty-seven (37) counts. The trial resulted in the production by a BCBS investigator of testimony highly to the insurance company's **"ongoing pattern of racketeering"**, in which with it, with its state-co-conspirators, has perpetrated through and under state-cover hundreds of RICO predicate acts, that include wire fraud/entrapment/evidence tampering/falsification medical records/issuance of fraudulent of state driving licenses by state police/subornation re production of fraudulent medical documents by physician employees of Defendant BCBS/formalization and education at special undercover training units for BCBS investigators of tactics of entrapment and their subsequent propagation against physicians.

On December 2/3, 2022, testimony was provided by Mr. James Stewart Howell, a person who after having retired from the police force, was hired and trained by BCBS to conduct undercover operations, targeting principally ethnic minority/foreign trained physicians whom BCBS wanted eliminated (license revocation/incarceration/suicide/death) in order to eradicate their debt to the physician, and eliminate the competitive threat posed by their continued practice in the relevant healthcare market.

Excerpts of Mr. Howell's testimony are included below, and the entire two (2) day transcript is enclosed (**Exhibit 3** December 1, 2022 – Direct Examination) (**Exhibit 4** December 2, 2022 – Direct + Cross Examination):

**Conspiracy to commit fraud**
BY MR. CHAPMAN – Page 99 Line 11-25 (Howell defense cross examination) **(Exhibit 4):**
Q. All right. So, let's start with January 5th. Your goal is to go into Dr. Pompy's office and see if you can get seen? A. Yes, sir.
Q. You were told by the front desk that you need to have a referral for pain management?
A. That's correct.
Q. You go to Blue Cross Blue Shield and say, "He won't see me without a referral," right?
A. Right.
Q. They set you up with Dr. Robertson?
A. Yeah.
Q. Now, you understand how the referral system of medicine works, right? Doctors refer patients to other doctors when they're not able to help that specific issue?
A. It -- I -- yeah, I understand the basic sense of that, but ...

**Evidential Falsification/Tampering with medical records/Wire fraud**

BY MR. CHAPMAN - Page 101 Lines 1-25 + Page 102 Lines 1-25 + Page 3 Lines 1-17 (Howell defense cross examination) (**Exhibit 4**):

MR. CHAPMAN –Government Exhibit on page 7, Government Exhibit 1, page 7?

MS. OUELETTE: Is that page 7?

MR. CHAPMAN: Yes, please.

BY MR. CHAPMAN:

Q So I think you were correct that the – the other documents said back and nerve problems, but here we have a prescription, right?

A. Yes.

Q. And this is from Dr. Robertson?

A. It is, yes.

Q. And it says for pain management, right?

A. Yep, it just says the words "pain management."

Q. And that's Dr. Robertson's signature?

A. Yes.

Q. Now, that was dated December 10th, 2015, correct?

A. It was.

Q. You had Dr. Robertson backdate this referral to make it look like it was made before you showed up on January 5th?

A. I -- I don't recall the -- the timeline of that being signed or dated.

Q. Mr. Howell, there must have been some discussion about this. This is a medical record, right?

A. It is.

Q. You're aware that falsification of a medical record is a felony in the State of Michigan?

A. It is, yeah.

Q. Did you have any special authorization to commit a felony in the State of Michigan, to create that false medical record?

A. No, my intent was -- no intent to commit a felony. My intent was to further the investigation and get a pain management referral. There was no --

Q. The question was did you have any special permission to commit a felony in the State of Michigan and alter a medical record?

A. I – I didn't alter that document.

Q. You had Dr. Robertson do that, right?

A. He wrote that pain management referral. I didn't write it.

Q. Was your conversation with Dr. Robertson to receive pain management on December 5th or was it after January -- on December 10th or was it after January 5th?

A. It was after January 5th.

Q. That date's false?

A. That date's false. I talked to him after January 5th, 2016.

Q. The need for pain management is also false?

A. Right.

Q. Okay.

A. It's -- yeah.
Q. Did you talk to any health care professionals about whether getting a referral for pain management would give a doctor an indication that you have a legitimate medical injury?
A. No. Just I talked to Dr. Robertson about this referral. It's -- didn't go anywhere else.
Q. Did you talk to Blue Cross Blue Shield about this referral?
A. I think my manager knew I did this, yeah.
Q. Your manager said it was, okay?
A. Yeah.
Q. Did you have Dr. Robertson date that referral on December 10th or did he just do that himself?
A. I don't remember any discussion about what the date was. Q. So it just magically happened to be backdated to before you ever stepped foot in Dr. Pompy's office?
A. I didn't say that.
Q. Okay.

**Evidential Falsification/Tampering with medical records/Wire fraud/Entrapment/Conspiracy to commit fraud**
<u>BY MR. CHAPMAN - Page 143 Line 7-20 + Page 144 Line 1-25 (Howell defense cross examination) **(Exhibit 4)**:</u>

Q. In fact, during the entire time you saw Dr. Pompy, there are many of those tests that you didn't complete?
A. Many of them that I did not do, that's correct.
Q. You informed his office staff that insurance wouldn't cover it?
A. The discussion about what was not covered was in regard to an MRI, which is expensive.
Q. Was it true that Blue Cross Blue Shield wouldn't cover the test that was ordered by Dr. Pompy?
A. I don't know if it would have been or not. I didn't discuss it with anyone really.
Q. Just like you did with the X-ray, you had the ability to go to Dr. Robertson and falsify another MRI study, right?
A. I -- sure, I guess I could have ...

A. He would have probably assisted like he did on the other one.
Q. Because he's willing to falsify medical records for you, right?
A. He's willing to assist me.
Q. Okay. But you didn't do that, you didn't present a normal MRI. You said, "My insurance won't cover it."
A. I did, yep.
Q. Because you were concerned that if you came into that office with a normal MRI, Dr. Pompy would say, "I don't see anything wrong with you."
A. Yeah, I just did not want to -- didn't want to get an MRI and bring it in there or falsify one.
Q. Then that's the end of the operation, right?
A. I don't --
Q. You don't get your man?

A. I don't think so.
Q. Okay. Same thing with the referral. You don't falsify that referral to get into Dr. Pompy's office, that's the end of the operation?
A. Yeah, if you didn't come up with a pain management referral, I don't think they would accept you there.
Q. The only reason you got treated by Dr. Pompy was because you were willing to go so far as to falsify medical records to get in?

**Evidential falsification/Diversion drugs by undercover agent**
BY MR. CHAPMAN - Page 157 Line 17-25 + Page 158 Line 1-25 + Page 159 Line 1-25 + Page 160 Line 1-25 + Page 161 Line 1-7 (Howell defense cross examination) **(Exhibit 4):**

Q. Now, during that April 26th visit, you also tested positive in a point of care cup for benzodiazepines, isn't that, right?
A. I don't think that's right. I don't think there was a point of care test.
MR. CHAPMAN: Can we take a look at Government's 1, page 59? Can you blow up the box where it says
"Benzodiazepines"?
BY MR. CHAPMAN:
Q. You see a positive for benzodiazepine, sir?
A. I see that.
Q. Okay. And this is an indication that the point of care cup that you dropped a sample in showed positive for benzodiazepines?
A. If you could back that out so I can see -- I don't -- I don't recall that saying point of care above that.
Q. We can do that.
You're aware from reviewing these tests that if there's a confirmation study, usually it shows the metabolite levels in the urine?
A. I have seen that, yes.
Q. And if it's a point of care cup, it's usually filled out by hand?
A. Usually, yeah, 'cuz it's done on the spot.
Q. Somebody's trying to interpret that test?
A. Right.
Q. And you're aware from your knowledge as an investigator that these point of care cups can be very inaccurate?
A. I can't really talk about the accuracy of those. I -- I don't know the -- the total -- the accuracy of them.
Q. After you had a positive test for barbiturates and also benzodiazepines, did you think that these tests are accurate?
A. Those particular ones are not, no.
Q. Okay. So, in your experience there's inaccuracies?
A. Oh -- on -- yeah, on this case for sure there's inaccuracies.
Q. You also went over --
MR. CHAPMAN: And we can take that down. Thank you. BY MR. CHAPMAN:

Q. -- a positive barbiturate test from your urine sample, I believe it was from March 22nd, right?
A. That's correct.
Q. And you were informed of those results on April 26th?
A. That's right.
Q. Over a month later?
A. Yes.
Q. Okay. At that point you hadn't received any medications from Dr. Pompy?
A. Right. At the time they were discussing the results of the test I had not been prescribed any medication.
Q. So --
A. Is that what you're asking?
Q. Yes.
A. Okay.
Q. I don't mean to be redundant, but you dropped a sample on March 22nd, you learn of the results on April 26th?
A. That's correct, yes.
Q. You also mentioned that at that time, within 48 hours you went to Blue Cross and got your own test done?
A. I did.
Q. Had you taken a barbiturate, that would have been long gone from your system a month later, right?
A. I don't know.
Q. I imagine the positive test caused quite a stir at Blue Cross Blue Shield?
A. I -- it had me pretty upset but I don't know about causing a stir. I -- I definitely thought it was important to address it immediately.
Q. Without going over the whole thing, that same day, 4-26-26, you filled out a pre-visit questionnaire?
A. Yes.
Q. You again said your pain began ten years ago?
A. I believe so, yes.
Q. You said it was a level 5?
A. Yes.
Q. You said it stayed the same and is continuous?
A. Yeah. I kept indicating stiffness and circling 5s and continuous and --
Q. You said it was -- I'm sorry I cut you off. You said it was worse in the morning?
A. Yeah.
Q. You said you were using physical therapy to cope?
A. Yes.
Q. You did not indicate any other new symptoms?
A. Correct.
Q. And then you also indicated that you were taking Xanax at that time, right?
A. I did, yes.
Q. But that was a false statement because you weren't prescribed any Xanax?
A. That's true.

**Conspiracy to entrap and illegal concealment/non-contractual disclosure from public of health premium fund diversion to 'Blues Academy'**
BY MR. LIEVENSE – Page 8 Line 3-25 (Howell direct examination) (**Exhibit 3**):

Q. And what type of in-house training did they provide you? A. We did a training as far as we did a -- like a -- we called it a Blues Academy which -- which covered an entire range of health care investigations. We talked about undercover activities and things like that.
Q. Did you also have to learn how to become familiar with like Blue Cross Blue Shield data and information?
A. Yes.
Q. At some point did you become an accredited health care fraud investigator?
A. Yes.
Q. Is that a program -- was that a program kind of outside of Blue Cross training?
A. Yes.
Q. And what -- what -- what did that training entail?
A. That is -- to be an accredited health care fraud investigator, you had to be a member of the NHCAA, which is National Health Care Antifraud Association, and then you have to have five years' experience doing health care investigations, and then you also had to pass 150-question test to be -- to get that certification.

**Conspiracy with state to commit fraud/issue fraudulent official documents**
BY MR. LIEVENSE – Page 14 Line 11-25 (Howell direct examination) (**Exhibit 3**):

Q. Now, do you use your normal driver's license that's issued by the Secretary of State that you've had since you turned 16 years old?
A. No.
Q. All right. Do you -- are you able to get an undercover driver's license?
A. Yes.
Q. Now, how do you go about getting one of those?
A. There's a process we go through. I would -- I submit it to my manager and then it goes to the Michigan State Police, from there to the Secretary of State of Michigan.
Q. And so when you want to get an undercover driver's license, do you have to go to a special location, or do you just go to the local Secretary of State?
A. Both ...

**Conspiracy with state to commit fraud/issue fraudulent official documents**
BY MR. LIEVENSE – Page 16 Line 4-15 (Howell direct examination) (**Exhibit 3**):

Q. And would you need an insurance card that matched your undercover driver's license?
A. Yes.
Q. And so once you received an undercover driver's license from the State of Michigan, what would you need to do to get an undercover insurance card?

A. Submit -- submit a form under that same name to someone who reviews it and then they actually get a physical, actual plastic card made.
Q. And why do you use an undercover driver's license and undercover Blue Cross Blue Shield insurance card instead of your personal ones?

**Conspiracy with state in furtherance of schemes of fraud and entrapment/unaccounted for diversion of prescription drugs**
BY MR. LIEVENSE – Page 45 Line 7-23 (Howell direct examination) (**Exhibit 4**):

Q. Like to show you Government's Exhibit 1A.
After you received the prescription from Dr. Pompy on April -- the two prescriptions on April -- well, the Norco and the Lyrica prescriptions on April 26th, what did you do with them?
A. I went and filled them, and I was with the Michigan State Police and turned them over to them.
Q. So you first went to a pharmacy?
A. That's correct.
Q. And you filled the prescription?
A. Yep.
Q. And then once you got the prescription and the pills, what did you do?
A. Turned them over to them immediately, had them count them just to make sure.
Q. By them, you said it was the Michigan State Police?
A. Yes.

6. NEIL ANAND v. INDEPENDENCE BLUE CROSS: 20-cv-062456 – UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA: Dr. Neil Anand, an Indian origin Pennsylvania based Interventional pain physician, who established a highly successful interventional pain practice, was indicted by the US Government in 2019, on almost exactly the same charges as those levied against Dr. Pompy and many other ethnic minority physicians. In these cases, there is either no evidence or fraudulent 'evidence', and most charged physicians plead guilty, even though they know they are not guilty, but they are unable to fund a defense, as their assets are illegally seized. Dr. Anand attended D. Pompy's trial on every day. In late 2020, Dr. Anand, having calculated that Defendant Independence BCBS had conspired with state/federal investigative/prosecutorial/adjudicative agencies to manufacture the indictment against him, did then initiate a civil suit against BCBS. However, his efforts to prosecute the case and procure further evidence was obstructed by Defendant BCBS, and the case was eventually dismissed. Dr. Anand appealed to the Third Circuit Court of Appeals, and on June 29, 2021, the Appellate Court remanded the case to the district court (**Exhibit 5**). Consequent to the January 4, 2023, widely publicized acquittal of Dr. Pompy, the district court in Dr. Anand's case dismissed Defendant Independent BCBS's motion to dismiss, and ordered it to answer the claims (**Exhibit 6**). The lower court's decision was also based on argument/fact/law submitted by Dr. Anand in his January 4, 2023, responsive brief to Defendant motion to dismiss (**Exhibit 7**), in which he submits binding case law, in which the United States District Court has conclusively found that BCBS is a recalcitrant and chronic antitrust violator. BCBS's **"patterns"** of ongoing misconduct commenced against Kaul in 2005/2006, but were concealed from Kaul until

recently, who only came into their possession as a consequence of Dr. Anand's extensive state/federal Freedom of Information (FOI) requests in 2022 that exposed the Defendants' so called 'Health Fraud Partnership'. Dr. Anand's evidence was conclusively corroborated during Dr. Pompy's trial and acquittal. A jury of twelve (12) people believed that there does indeed exist a **"vast conspiracy"** between government agencies and private/corporate interests, that targets successful ethnic minority physicians. The referenced section of Anand's January 4, 2023, submission is:

**"Plaintiff [ANAND] Has A Valid Sherman and Clayton Act Anti-trust Claim.**
**The monopolistic and price fixing activity of the Blue Cross Blue Shield Companies is of common public awareness due to its recent antitrust settlement, arising from a class action antitrust lawsuit called In re: Blue Cross Blue Shield Antitrust Litigation MDL 2406, which was reached on behalf of individuals and companies that purchased or received health insurance provided or administered by a Blue Cross Blue Shield company. The Class Representatives reached a Settlement on October 16, 2020, with the Blue Cross Blue Shield Association and settling individual Blue Plans that knowingly violated antitrust laws by entering into an agreement not to compete with each other and to limit competition among themselves in selling health insurance and administrative services for health insurance. See https://www.bcbssettlement.com/. Pursuant to collateral estoppel, the restraint of trade by Blue Cross Blue Shield Association and its franchisees has been determined under In re Blue Cross Blue Shield Antitrust Litig., FINAL ORDER, Master File No.: 2:13-CV-20000-RDP (MDL NO.: 2406) (N.D. Ala. 2018). The FINAL ORDER provides on Pages 1-2: "This litigation began more than nine years ago and involves the consolidation of a number of actions filed by Subscriber Plaintiffs against the Blue Cross and Blue Shield Association ("BCBSA") and its Member Plans (the "Member Plans" or "Blue Plans") (collectively, "Defendants" or "Blues"). Subscriber Plaintiffs allege, among other things, that Defendants violated Sections 1, 2, and 3 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-3, by entering into an unlawful agreement that restrained competition between them in the markets for selling health insurance and the administration of Commercial Health Benefit Products in the United States and its territories. Subscriber Plaintiffs contend that the Blues: (1) allocated geographic territories; (2) limited the Member Plans from competing against each other, even when not using a Blue name, by mandating a minimum percentage of business that each Member Plan must do under that name, both inside and outside each Member Plan's territory; (3) restricted the right of any Member Plan to be sold to a company that is not a member of BCBSA; and (4) further agreed to other ancillary restraints on competition. (Doc. # 1082).**
**IBC is utilizing its monopoly market power to increase insurance premium prices and deductibles for its Members negatively. IBC and its "most favored" groups of health providers through Facilitated Health Networks (FHN), engage in anticompetitive conducts, i.e. price fixing, geographic market division, and group boycott (attack of non-white physicians prescribing controlled substances) which are causing market injury to individual physicians and small groups and are illegal per se. IBC in their own public announcements claim they are the largest and leading health insurer in Philadelphia (supported by USDOJ findings supra), and is utilizing its monopsony market power by substantially controlling physician treatment plans and reducing physician fee schedules, as IBC is the major purchaser of health services**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

DR. SHIVA AKULA,

Plaintiff,

CIVIL CASE
**CASE NO: 2:23-cv-01057**
SECTION: "R" (1)
JUDGE SUSIE MORGAN

JEFFREY LANDRY, ATTORNEY GENERAL OF THE STATE OF LOUISIANA, XAVIER BECERRA, SECRETARY OF HUMAN AND HEALTH SERVICES, KATHRYN MCHUGH, RACHEL MURPHY, MD, AGENT ROBERT CHADWICK, AGENT GREEN, CHRIS McMAHON, KELLY ANDERSON, NIKITA MURPHY, VASCHELLE HASTINGS, KIEMOND WILLIAMS, SHAYVON AUGUSTINE, BETH SEYMOUR, PALMETTO GBA, BERNARD CASSIDY, ESQ. and ROBERT TOALE, ESQ.

Defendants.

________________________________________/

**AMENDED COMPLAINT**

**NOW INTO COURT**, Plaintiff , DR. SHIVA AKULA, ("Akula" and/or "Dr. Akula" , a licensed health care practitioner and owner of Canon Hospice which has its principal place of business in the Eastern District of the State of Louisiana, alleges and avers as follows:

owner, Plaintiff owns Canon Hospice which has four (4) locations, three of which are located in Louisiana, and one is located in Mississippi. Within the three (3) hospice locations in Louisiana, approximately 75 patients are cared for on an outpatient basis daily and 15 patients on an inpatient basis. All in all Canon hospice locations provide end of life care to approximately 243,600 patients in the State of Louisiana.

**A. General Background**

Two events preceded the formation of the criminal enterprise which eventually brought about the "Racketeer Influenced and Corrupt Organizations".

**The First Event Leading to the Formation of the Criminal Enterprise**

In 2012, pursuant to a total of three separate complaints filed by Dr. Akula against the Secretary of Health and Human Services, a settlement check in the amount of **$704,881.58**, was issued to Dr. Akula in order to settle all claims raised in (a) Canon Health Care v. Secretary of Health and Human Services 2:12-cv-2120, (b) Canon Health Care v. Secretary of Health and Human Services 2:10-cv-3150, and (c) Canon Health Care v. Secretary of Health and Human Services 2:11-cv-2066.

Immediately after the check was issued and cashed, Dr. Akula received notification that audits were initiated into "99-patients" who were billed for services rendered by Canon Healthcare. These audits were in response to one of

the largest settlement checks that was issued to Dr. Akula by the Secretary of Health and Human Services. An immediate response was to find ways to initiate a criminal investigation against Dr. Akula by the Eastern District of Louisiana in order to recoup this large amount from the settlement.

In 2018, a search warrant was executed by the FBI, with Special Agent Krista Bradford at the direction of the United States Attorney from Eastern District on Canon Hospice based on the audit that was initiated immediately after the settlement.

**The Second Event Leading to Formation of the Criminal Enterprise**

When former employees like Defendants Kelly Anderson and Rachel Murphy heard of the news of federal criminal investigation against Canon Health following the 2018 raid, and especially after Defendant Anderson was interviewed by FBI agents in December of 2018, they formed their own enterprise which involved a scheme to skim, steal and unlawfully enrich themselves by initiating a payroll scheme fraud. The scheme was predicated by numerous grievances raised by Defendant Anderson who threatened Dr. Akula with professional and financial ruin if she was not given a salary promotion.

Defendant Anderson's threats against Dr. Akula included threats that if Dr. Akula does not authorize a promotion for Defendant Anderson that Defendant Anderson will guarantee that Dr. Akula will face bankruptcy.

The criminal investigation of 2018 created vulnerability for Dr. Akula which Defendants Anderson and Murphy capitalized on in order to perpetuate the criminal enterprise against Dr. Akula and Canon Healthcare. Defendant Anderson had an advanced employee status with Canon and was the Administrator for the Northshore Location of Canon Hospice. Defendant Rachel Murphy was at all times a physician contracted by Canon to see hospice patients who was paid on a per diem basis.

Starting in or about 2019, Defendants Kelly Anderson with the help and assistance of Defendant Rachel Murphy masterminded and put into operation a payroll fraud scheme that consisted of (1) issuance of double paychecks to employees within the enterprise 2022 and consists of the following elements: Under the direction of Defendant Anderson, multiple duplicate payroll checks were issued to the following employees of Canon Hospice: Defendant Vaschelle Hastings, Defendant Kiemond Williams, Defendant Shayvon Augustine and Defendant Nikita Murphy. Because payroll was processed internally under the supervision of Nikita Murphy, Defendant Anderson, who was Administrator at Northshore Canon, directed, instructed and implemented the issuance of fraudulent duplicate payroll checks for these four former employees at Canon. This scheme was put in place in order for Defendant Anderson to be able to cover her

receipt of overtime payments which are not permitted under Louisiana Statute as Defendant Anderson was a full time employee.

In late 2021, Dr. Akula uncovered the payroll scheme and immediately terminated Defendant Vaschelle Hastings who was the only one left from the enterprise members who was still employed by Canon Hospice. Realizing that she was caught red handed, Vaschelle Hastings began to make payments to Canon Health Care. These payments were mailed to Canon Health Care as cashier's checks that included amounts from $500 to 5000. One such cashier's check was the following mailed to Canon Health in December 2021:


Pelican State P.O. BOX 40088 BATON ROUGE, LA 70835 1-800-351-4877

84-7462 2652 No. 0001136974

DATE 12/16/21

*** FIVE THOUSAND DOLLARS AND 00 CENTS ***

$5,000.00

PAY EXACTLY 5,000 Dollars 00 Cents

TO THE ORDER OF DR. SHIVA AKULA

AUTHORIZED SIGNATURE

⑈0001136974⑈ ⑆265274671⑆4473000000004⑈

Cashier's checks in the amount of $5000 or less have continued to be mailed by Defendant Vaschelle Hastings to Dr. Akula with the most recent one being sent in March 2023. Each one of these cashier's checks were turned over to Agent Robert Chadwick who was the assigned agent out of the Attorney General's office

to this matter. None of these cashier's checks were cashed on the advice of Agent Chadwick who notified Dr. Akula that cashing these checks. Agent Chadwick initially showed diligence and was pursuing the investigation by issuing subpoenas to several cash payment app sites such as Cash App uncovering further conspiratorial scheme between Defendants Anderson, Hastings, Williams, Augustine and Murphy. Other evidence uncovered showed that Defendant Murphy was paid more than $1000 every month without seeing any hospice patient. The contract of Murphy required for her to see patients face to face in order to be deserving of payment by Canon Hospice. However, the evidence from the payroll fraud investigation uncovered that Defendant Murphy was not seeing any patients but still getting the payments which were controlled by Defendant Anderson. In addition, overtime payments to Defendant Anderson were uncovered which is impermissible under the statutory scheme of being hired as an Administrator for hospice.

Agent Chadwick reported his findings to Dr. Akula until January 2023. In January 2023, Agent Chadwick's investigation of this payroll fraud scheme came to a sudden halt.

The reason is because Defendant Kathryn McHugh uncovered that Agent Chadwick was going after her star witnesses in the prosecution of Dr. Akula under the baseless filed indictment of August 5, 2021 against Dr. Akula. Defendant

McHugh as agent of the United States Attorney's office in Eastern District of Louisiana ensured that Agent Chadwick stopped the progress of the investigation involving Defendants Kelly Anderson and Rachel Murphy in order so that she can have these witnesses appear with clean records and testify against Dr. Akula for the purpose of gaining a false and wrongful conviction against Dr. Akula. To date, in the matter of US v. Akula, Defendant McHugh has failed to disclose the impeaching evidence relating to her star witnesses, while she has also ensured that the Attorney General's criminal investigation was brought to a halt for the purpose of obstructing justice and for the purpose of Defendant McHugh being able to present these witnesses, Defendants Anderson and Murphy as well as the other former employees who were part of the payroll fraud, as clean and unencumbered witnesses without a credibility issue at Dr. Akula's criminal trial.

Defendant McHugh playing a central role in shutting down the criminal investigation involving payroll fraud criminal investigation initiated by state agency has also conspired with other Canon Hospice employees, to wit, Beth Seymour in an effort to embolden the criminal case filed against Dr. Akula. Specifically, Defendant McHugh did in fact cause, instructed, directed Beth Seymour who was an Administrator in the Canon Hospice facility in Mississippi to intentionally miss the deadlines for appeal on denied Medicare claims in order so

**Exhibit 2**

DENNIS L. KENNEDY
Nevada Bar No. 1462
JOSEPH A. LIEBMAN
Nevada Bar No. 10125
JOSHUA P. GILMORE
Nevada Bar No. 11576
TAYLER D. BINGHAM
Nevada Bar No. 15870
**BAILEY❖KENNEDY**
8984 Spanish Ridge Avenue
Las Vegas, Nevada 89148-1302
Telephone: 702.562.8820
Facsimile: 702.562.8821
DKennedy@BaileyKennedy.com
JLiebman@BaileyKennedy.com
JGilmore@BaileyKennedy.com
TBingham@BaileyKennedy.com

*Attorneys for Defendants and Counterclaimant*
RUSSELL J. SHAH, M.D.; DIPTI R. SHAH, M.D.; RUSSELL J. SHAH, MD, LTD.; DIPTI R. SHAH, MD, LTD.; and RADAR MEDICAL GROUP, LLP dba UNIVERSITY URGENT CARE

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, and ALLSTATE FIRE & CASUALTY INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>vs.<br><br>RUSSELL J. SHAH, M.D.; DIPTI R. SHAH, M.D.; RUSSELL J. SHAH, MD, LTD.; DIPTI R. SHAH, MD, LTD.; and RADAR MEDICAL GROUP, LLP dba UNIVERSITY URGENT CARE, Does 1-100, and ROES 101-200,<br><br>Defendants.<br><br>AND RELATED CLAIMS. | Case No. 2:15-cv-01786-APG-DJA<br><br>**RADAR MEDICAL GROUP, LLP'S RESPONSE TO COUNTERDEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**(ORAL ARGUMENT REQUESTED)**<br><br>**REDACTED** |

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

Radar Medical Group, LLP ("Radar Medical"), by and through its counsel, responds to Allstate's Motion for Summary Judgment [ECF No. 458] (the "Motion"). As shown below, if the Court permits Allstate to argue that Radar Medical's counterclaims are not supported by the evidence—the subject of Radar Medical's Motion for Summary Judgment Regarding Allstate's Failure to File an Answer to the Amended Counterclaims [ECF No. 457]—there are genuine issues of material fact underlying the counterclaims. As a result, the Motion should be denied.

This Response is made and based on the papers and pleadings on file, the following Memorandum of Points and Authorities and exhibits attached thereto, and any argument as may be heard by the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Allstate interfered with Radar Medical's relationships with personal injury attorneys and medical providers in an attempt to drive it out of business. Allstate's 30(b)(6) designee admitted that Allstate should not arbitrarily ignore a patient's bills from Radar Medical due to the filing of this lawsuit. Yet, the evidence shows that Allstate did just that—over and over again—irrespective of the economic harm that such actions inflicted upon Radar Medical.

Allstate's 30(b)(6) designee also admitted that Allstate should not use this lawsuit as a leverage point in negotiations of personal injury claims. Yet, the evidence shows that Allstate did just that—over and over again—irrespective of the reputational harm that flowed from telling members of the legal community that Radar Medical is a defendant in a RICO lawsuit.

Dating back to 2014, Allstate made it financially unattractive for personal injury attorneys to continue referring their clients to Radar Medical. Radar Medical's expert on personal injury law (Pete Wetherall, Esq.) opined that attorneys are influenced by actions taken by insurers when negotiating claims. The evidence shows that numerous attorneys and medical providers stopped referring patients to Radar Medical because of Allstate's actions. Indeed, such testimony, as exemplified in the numerous Declarations attached to this Response, is *unrefuted*—Allstate chose to not depose a single attorney or medical provider about changes in his or her referrals to Radar Medical and chose to not retain an expert to rebut Mr. Wetherall's opinion.

counterclaims. For example, he opined that in his experience, an insurer (like Allstate) "would prefer to see [an] injured person go untreated" because – all other things being equal – "claims involving less medical care or less medical expense are settled for less money than claims involving more medical care or more medical expense." (Ex. 520 at pg. 4; *see also* Ex. 519 at 102:4-108:22.)

Next, Mr. Wetherall opined that in his experience, if an insurer "does not credit the treatment which [a] physician has provided on a lien basis as reasonable and necessary, the lien may not be able to be repaid at all, or its value may be significantly impaired." (Ex. 520 at pg. 6.)

Finally, Mr. Wetherall opined that in his experience, statements by an insurance adjuster to an attorney about a physician overtreating or overbilling a patient "would likely deter referrals from the law office to that physician."[6] (*Id.*; *see also id.* at pg. 16 (opining that the statements made by Allstate claims adjustors to attorneys, if true, "appear intended and likely to deter the Las Vegas personal injury attorney community from referring injured persons to Radar Medical Group").)

Turning to Ms. Melnykovych, she is a well-respected health management professional and certified fraud examiner in the medical industry. (Ex. 522-A at pgs. 1-5.) Based on her experience, she opined that [redacted] (*Id.* at pgs. 29-30.) [redacted] (*See id.*) According to Ms. Melnykovych, "[redacted] (Ex. 521 at 224:2-228:18.)

G. **<u>Radar Medical Discloses Competent Expert Testimony Regarding Damages.</u>**

In discovery, Radar Medical disclosed various categories of damages related to its counterclaims. (*See* Ex. 588 at 2:11-4:14.) First, Radar Medical disclosed those amounts from its

---

[6] Mr. Wetherall reiterated in his deposition that there is nothing wrong with an attorney referring a large number of patients to a specific medical provider. (Ex. 519 at 163:6-165:9.) He further opined that if Radar Medical has "enjoyed longstanding referrals from a variety of different plaintiffs' personal injury law firms," it would be indicative that they have a good reputation in this community. (*Id.* at 239:3-243:10.)

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

who brought claims against Allstate after the filing of this lawsuit, were treated on a lien basis. (Ex. 501 at ¶¶ 13-14.) When asked in discovery, Allstate confirmed its knowledge of the fact that Radar Medical treats accident victims on a lien basis. (Ex. 515 at 1294:11-1296:12, 1297:11-15.)

Notwithstanding, Allstate argues that it did not necessarily receive a copy of the Lien Agreement for each and every patient. (Mot. at 11:26-12:6.) This argument fails for two main reasons: *First*, Allstate had the bills (*i.e.*, CMS1500 Health Insurance Claim Forms), which showed that money was owed for services rendered and listed the patient's attorney (*see, e.g.*, Ex. 590); and, *Second*, Allstate could request a copy of the Lien Agreement from the patient's attorney (*see, e.g.*, Ex. 587 (asking the attorney [redacted])).

For purposes of an IICR claim, it is sufficient to show facts "from which the existence of the contract can reasonably be inferred." *J.J. Indus., LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003). Radar Medical has done so here. (*See also* Ex. 510 at 114:24-25.)

***3. Allstate Took Actions That Were Intended or Designed to Disrupt Radar Medical's Doctor-Patient Relationships.***

As it relates to the third element, Allstate informed personal injury attorneys that Radar Medical allegedly overcharged for its services (Ex. 531 at pg. 11; Ex. 532 at pg. 9; Ex. 534 at pg. 12)—a false representation that was driven by inaccurate and misleading reports generated by claims adjusters through DecisionPoint. (Ex. 501 at ¶¶ 15-16.) Worse, Allstate went out of its way to inform attorneys that a RICO lawsuit had been filed against Radar Medical (*see* Ex. 581) and then – despite its 30(b)(6) designee's testimony and the directives within its claims handling manual – arbitrarily ignored treatment at Radar Medical. (*Compare* Ex. 514 at 91:7-15, 94:23-95:2, Ex. 585 at pgs. 20, 25, *with* Ex. 580.) It can hardly be said that such actions were proper; in fact, this Court previously found that such actions are improper. (*See* Order [ECF No. 220] at 4:11-21 & n.3.)

Notwithstanding, Allstate claims that because each patient was responsible for his or her bill irrespective of the outcome of his or her claim with Allstate, "Radars [sic] contractual rights [were] not affected." (Mot. at 19:20-21.) The argument is detached from reality.

The evidence shows that Allstate is keenly aware that attorneys negotiate reductions with medical providers upon resolving their clients' claims. (*See, e.g.*, Ex. 510 at 110:3-6.) The Lien

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

### 2. *Allstate's Knowledge of Radar Medical's Primary Source of Business.*

As it relates to the second element, Allstate knows Radar Medical receives referrals from attorneys and medical providers. (Ex. 515 at 1298:6-1299:3; *see also* Ex. 526 at pg. 11, Ex. 529 at pg. 4, Ex. 530 at pg. 5.) While Allstate argues to the contrary without evidentiary support (*see* Mot. at 21:22-24), a defendant's knowledge of a plaintiff's business expectancies is a question of fact. *J.SH Sec. Indus. D.C.S. v. Bartech Sys. Int'l Inc.*, 2:07-cv-00277-RCJ-GWF, 2008 WL 11388608, at *8 (D. Nev. Oct. 6, 2008). Here, there is sufficient evidence to show that Allstate knew of Radar Medical's referral relationships and resulting expectancy in ongoing referrals.

### 3. *Allstate Took Actions Intended to Harm Radar Medical By Inducing Personal Injury Attorneys to Cease Referring Patients to Radar Medical.*

As it relates to the third element, as discussed above, Allstate gratuitously informed personal injury attorneys that it had filed this RICO lawsuit against Radar Medical. (Ex. 581.) In effect, Allstate weaponized this lawsuit to make it difficult for lawyers to negotiate claims involving Radar Medical. (Ex. 595 at ¶ 10; Ex. 597 at ¶ 11; Ex. 599 at ¶ 11; Ex. 600 at ¶ 11; Ex. 605 at ¶ 17.)

Notwithstanding, Allstate claims that it was acting in a manner consistent with legitimate claims handling practices. (Mot. at 24:27-25:8.) The argument is belied by the testimony from Allstate's 30(b)(6) designee (and the Court's prior ruling). (*See* Ex. 514 at 78:5-12, 91:7-15, 125:20-24, 151:23-152:4 222:10-223:25.) Allstate was looking for a way to cause personal injury attorneys to cease referring any patients to Radar Medical; again, [redacted] In other words, Allstate was targeting a medical practice that was perceived to be adversely impacting its bottom line.[11] *See also Dodson*, 376 S.W.3d at 431 (affirming a punitive damages award in favor of a doctor who was targeted by Allstate as part of its "national claims practices and procedures to curb small, soft-tissue claims").

Allstate further claims that it did not intend to harm Radar Medical. (Mot. at 25:3-4.) An IIPEA claim only requires proof of intent to interfere with a prospective contractual relation. *See Las Vegas-Tonopah-Reno Stage Line, Inc. v. Gray Line Tours of S. Nev.*, 792 P.2d 386, 388 (Nev.

---

[11] As noted above, this Court already found that Allstate's actions would not constitute legitimate claim adjustment practices. (*See* Order [ECF No. 220] at 4:11-21 & n.3.)

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

*First*, as confirmed by Drs. Russell and Dipti Shah *and* their former Office Manager, beginning in 2014 and continuing after the filing of this lawsuit, the practice started experiencing a decline in patients involved in motor vehicle accidents—not a decline in either Medicare patients or patients presenting for issues unrelated to motor vehicle accidents. (Ex. 501 at ¶¶ 22-23; Ex. 502 at ¶¶ 9-10; Ex. 603 at ¶ 7.) To that end, the decline in revenue at Radar Medical as reported by Mr. Gordon directly corresponds with the loss of patients injured in motor vehicle accidents.

*Second*, the factual underpinnings of Mr. Gordon's report are "of evidentiary weight instead of admissibility." *Hous. Expl. Inc. v. Meredith*, 728 P.2d 437, 439 (Nev. 1986). Allstate is free to cross-examine Mr. Gordon about his approach at trial, and "it [is] for the jury to determine the weight to be assigned [his] testimony." *Id.*; *see also Leavitt v. Siems*, 330 P.3d 1, 6 (Nev. 2014).

Notably, a similar approach to calculating damages was taken in *Dodson*. There, the court found that testimony about a projected loss of earnings based on historical financial data due to the physician's loss of referrals arising from Allstate's actions was sufficient to support the jury's verdict for compensatory damages. 376 S.W.3d at 426; *see also All Care*, 914 So. 2d at 219-20, 225-26 (finding sufficient testimony from a medical practice's damage expert that was based upon changes in referral patterns and profits from before and after an insurer's improper spewing of falsities about the practice even though the expert did not consider other possible factors).

For these reasons, the Court should find that Radar Medical disclosed expert testimony sufficient for a jury to calculate damages with reasonable certainty.

***4. Radar Medical Also Seeks Damages for Harm to its Reputation.***

Allstate assumes that Radar Medical is only seeking damages in the form of lost profits. Allstate overlooked that Radar Medical also seeks damages for harm to its reputation.

"Claims for intentional interference with a prospective business advantage and contractual relations seek compensation for damage to business interests." *Stalk v. Mushkin*, 199 P.3d 838, 841 (Nev. 2009). Because business interests "include intangible assets and inchoate rights," a plaintiff pursuing an IICR claim or an IIPEA claim may seek damages for harm to its reputation. *See, e.g.*, *Drouet v. Moulton*, 54 Cal. Rptr. 278, 282 (Cal. Ct. App. 1966); *see also RFK Retail Holdings, LLC*, 2016 WL 659717, at *4. Indeed, "[o]ne who is liable to another for interference with a contract or

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

prospective contractual relation is liable for damages for .... [a]ctual harm to reputation, if they are reasonably to be expected to result from the interference." Restatement (2d) Torts § 774A(1).[12]

Here, the *unrefuted* expert testimony of Ms. Melnykovych and the testimony of Drs. Russell and Dipti Shah confirm that Allstate's actions harmed Radar Medical's reputation. (Ex. 522-A at pgs. 29-30; *see also* Ex. 501 at ¶ 25; Ex. 502 at ¶ 13.) The financial calculations from Mr. Gordon are sufficient for the jury to consider in determining the proper amount of damages to award for such harm to Radar Medical's reputation. *See, e.g., Mut. of Enumclaw Ins. v. Gregg Roofing, Inc.*, 315 P.3d 1143, 1153-54 (Wash. Ct. App. 2013) (stating that a business seeking damages for harm to its reputation should "provide evidence of some measurable loss," such as "decreased income").

Allstate did not argue that damages for harm to reputation are unavailable to Radar Medical; nor could it, as the law plainly recognizes that a plaintiff pursuing an IICR claim or an IIPEA claim is not limited to seeking economic damages. Accordingly, the Court should find that a genuine issue of material fact remains regarding the damages suffered by Radar Medical.

## IV. CONCLUSION

Allstate thinks that it has immunity in how it conducts business in Nevada. It does not. Allstate did precisely what its 30(b)(6) designee said that it should not do (and what it was held liable for in *Dodson*)—target a medical practice for no reason other than to drive it out of business.

Genuine issues of material fact remain for the jury related to Radar Medical's IICR and IIPEA claims. And, there is ample evidence for the jury to consider in calculating Radar Medical's damages (economic and non-economic). The Motion should be denied in its entirety.

DATED this 10th day of March, 2023.

BAILEY❖KENNEDY

By: /s/ Joshua P. Gilmore
DENNIS L. KENNEDY
JOSEPH A. LIEBMAN
JOSHUA P. GILMORE
TAYLER D. BINGHAM
*Attorneys for Defendants and Counterclaimant*

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

[12] The Nevada Supreme Court looks to the Restatement for guidance when analyzing IICR and IIPEA claims. *See, e.g., J.J. Indus., LLC*, 71 P.3d at 1267; *Las Vegas-Tonopah-Reno Stage Line, Inc.*, 792 P.2d at 388.

**Exhibit 3**

# Durbin invites Chief Justice John Roberts to testify on Supreme Court ethics before a Senate committee

By Lauren Fox and Tierney Sneed, CNN
Updated 4:12 PM EDT, Thu April 20, 2023




Anna Moneymaker/Getty Images

Committee chairman Sen. Dick Durbin (D-IL) arrives for a Senate Judiciary Committee business meeting on Capitol Hill on April 4, 2022 in Washington, DC.

**(CNN)** — Senate Judiciary Chairman Dick Durbin asked Chief Justice John Roberts or "another Justice whom you designate" to appear before his committee next month for a hearing on Supreme Court ethics rules - a request that is purely voluntary, with Durbin indicating he does not intend to subpoena the justice.

The call for testimony comes after Senate Democrats have raised questions about whether the ethical standards of the high court need to be reviewed or change in the wake of a ProPublica report that found Justice Clarence Thomas has gone on several luxury trips involving travel subsidized by GOP megadonor Harlan Crow.

Such a move would be extraordinary. But even if Democrats wanted to do it, they would have to wait for California Democratic Sen. Dianne Feinstein to return in order to have a chance of getting a majority vote in the committee. Feinstein has been absent as she recovers from shingles.

Republicans on the Judiciary Committee argued that Roberts should reject the request to testify, warning it would be "a circus."

"I would not recommend the chief accept the invitation because it would be a circus," Texas Republican Sen. John Cornyn told reporters. "He is a member of a coequal branch of government."

In his letter, Durbin argued that there is precedent for justices to testify before the committee, citing a hearing in 2011 when then-justices Stephen Breyer and Antonin Scalia appeared for a hearing.

"Since then, there has been a steady stream of revelations regarding Justices falling short of the ethical standards expected of other federal judges and, indeed, of public servants generally. These problems were already apparent back in 2011, and the Court's decade-long failure to address them has contributed to a crisis of public confidence," Durbin wrote. "The status quo is no longer tenable."

The Supreme Court did not immediately respond to a request for comment.

Durbin and Senate Democrats sent a letter earlier this month requesting a review of Thomas's travel and for Roberts to consider a new ethical standard for the court.

The letter noted that more than a decade ago, members of the committee had written the chief justice "urging the Court to adopt a resolution stating that the Justices of the Court abide by the Judicial Conference's Code of Conduct for United States Judges - a Code that binds every other judge in the federal judiciary," Durbin wrote.

Senate Republicans on the committee have not expressed the same level of concern as Democrats, instead defending Thomas and arguing there is no evidence that he violated reporting requirements the courts have in place.

"I probably would (decline) if I were him," Missouri Republican Sen. Josh Hawley said on Thursday reacting to the news of the request for Roberts to appear before the committee.

"They've already done what everybody is complaining about they should have done sooner. If they've already done it that's the end of it," Iowa Republican Sen. Chuck Grassley said.

Sen. Susan Collins, a Maine Republican who is not on the committee, told reporters that she would need to review the precedent for such a request before commenting.

"I think it's fine, if he wants to come," Louisiana Sen. John Kennedy said of the invitation.

"He may not want to come," Kennedy, a Republican who sits on the Judiciary Committee,

gifts from Crow – and even a real estate transaction – that went unreported in Thomas' annual financial disclosures.

Thomas has argued the gifts that were financed by Crow went unreported because he had been advised that he was not required to do so, under an exemption in the court's disclosure rules for so-called "personal hospitality."

The undisclosed hospitality – as well as the sale of property Thomas partially owned to Crow – became public not long after Judicial Conference quietly closed a loophole in those rules that appears to have covered some of the hospitality Thomas received. The Judicial Conference updated the disclosure rules under pressure from lawmakers.

Thomas said that he intended to follow that updated guidance in the future, and a source close to the justice also told CNN in recent days that he planned to amend his disclosure form to report the real estate transaction.

With Durbin now inviting Roberts to appear before the committee, Democrats are framing their interest in hearing from him around the broader issue of the Supreme Court's failure to adopt ethics rules akin to the standards applied to lower courts and other branches of government.

Asked if lawmakers planned to dig deeper into the Thomas allegations, Sen. Mazie Hirono pointed to the investigation Democrats asked Roberts to launch with their Thomas-related letter last week. She told reporters that "really the idea of the code of ethics is what I'd like to get to, in as a cooperative a way as possible."

"I would hope that [Roberts] would want to come, as a leader of a separate branch of government," Hirono, a Hawaii Democrat, said.

Thomas' relationship with Crow is not the only ethics controversy in recent year that has brought scrutiny to the high court. Critics seized on Thomas' participation in cases connected to the 2020 election after CNN revealed last year that his wife Ginni Thomas exchanged texts with the Mark Meadows – then President Donald Trump's White House chief of staff – about Trump's efforts to overturn the 2020 presidential results. The House Judiciary Committee, when it was controlled by Democrats last year, held a hearing on Supreme Court ethics that looked at allegations of a well-financed, secret campaign seeking to influence the high court's conservatives.

The absence of any reference to ethics, given those controversies, in Roberts' end-of-the-year report for 2022 was a surprise to some court observers.

In past years, Roberts has stressed the ability of the Supreme Court to police itself, writing in the 2011 report that he had "complete confidence in the capability of my colleagues to determine when recusal is warranted." His 2021 year-end-report touted the importance of the judicial branch's "institutional independence."

Connecticut Sen. Chris Murphy alluded to the court's assertions that it could manage its own affairs and told CNN, "they have an obligation to come and talk to us."